**EXHIBIT B**

# GLOWACKI, ET AL v. HOWELL PUBLIC SCHOOL DISTRICT, ET AL

## JOHNSON MCDOWELL

May 29, 2012

*Prepared for you by*



NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

JOHNSON MCDOWELL
May 29, 2012

Page 37

1  Q.  Thank you.  Do you have any opinions as to whether the
2      student population is conservative or liberal there?
3  A.  I think it's a very mixed population of students in
4      Howell.
5  Q.  In the job that you had before you were employed by
6      Howell and Midland, you taught there two years, why
7      did you leave?
8  A.  Because I had the opportunity to go overseas to teach.
9      As a young 20 something, that's something I wanted to
10     do.
11 Q.  And you had to forego your job with Midland in order
12     to be able to do that?
13 A.  Yes.
14 Q.  So did you go to China before you went to Howell,
15     immediately before?
16 A.  No, not immediately before, no.
17 Q.  Where did you go overseas after you were at Midland?
18 A.  I went to China after I was in Midland.
19 Q.  And then did you take some time off before?
20 A.  And then I came back and got my master's degree and
21     taught for Western Michigan University.
22 Q.  And why did you leave there?
23 A.  I was -- I was done with my master's degree and wanted
24     to get back to teaching high school.
25 Q.  What kind of training have you received by Howell

Page 38

1      Public Schools?
2  A.  Over an 11-year period?
3  Q.  Yes, if you can describe before you became a teacher
4      there, was there any sort of training that they made
5      you do before you were allowed to start your first
6      year?
7  A.  No, not outside of meeting the qualifications that the
8      state of Michigan sets forth.
9  Q.  So they had no sort of orientation to tell you these
10     are our policies and bylaws, you must abide by them?
11 A.  There was a bus trip around town, so I knew where the
12     Meijers was.  There -- they may have discussed
13     policies and procedures.  It was 11 years ago.  I
14     don't know.
15 Q.  And each year does Howell conduct a training prior to
16     the beginning of each school year?
17 A.  Not necessarily.
18 Q.  When you say "not necessarily," can you describe what
19     training has been?
20 A.  Well, in the -- in 2010, Marcia McEvoy was brought in
21     before the school year began to teach us
22     anti-bullying, to give us anti-bullying training.
23 Q.  And in addition to what occurred in August of 2010,
24     did you receive any other training?
25 A.  This year, we had somebody from the Marzano Institute

Page 39

1      come in to talk about lesson planning and various
2      effective methods for teaching within the classroom.
3  Q.  Prior to 2010?
4  A.  You know, I'm sure we may have, but I don't remember.
5      I don't remember what it would have been or who it
6      was.
7  Q.  Throughout this school year, are there various
8      trainings for the teachers?
9  A.  There are.  They tend to be on things like data, data
10     collation, how to analyze data, that kind of stuff.
11 Q.  How is a teacher supposed to know the different
12     policies and bylaws of the school district?
13 A.  We read the Student Code of Conduct and we read the
14     student board policy.
15 Q.  And is that mandated that you read them?
16 A.  I think it is assumed that we read them.
17 Q.  Do you have to sign anything to prove that you've read
18     them?
19 A.  No, we do not.
20 Q.  And is there any sort of training specifically on the
21     handbook?
22 A.  No, there's not.
23 Q.  Is there any training specifically on the policies or
24     bylaws?
25 A.  No, there's not.

Page 40

1  Q.  Any training specifically on guidelines?
2  A.  No.
3  Q.  Any training specifically on the procedures that you
4      should follow if there is an issue with behavior in
5      the classroom?
6  A.  Nope.
7  Q.  So other than giving you these materials, the school
8      district does not do anything to make sure that you
9      actually absorb the material?
10 A.  That would be a correct way to characterize it, yes.
11 Q.  Has the school district ever conducted a training to
12     ensure that you know the boundaries of a student's
13     First Amendment rights?
14     MR. HENLEY:  This is during the 11 years
15     that he had been there?
16     MS. MERSINO:  Yes.  And we can narrow it
17     down after that.
18     MR. HENLEY:  Okay.
19     THE WITNESS:  The only First Amendment
20     rights training I received was after the incident of
21     October 20th.
22 BY MS. MERSINO:
23 Q.  So prior to October 20th of 2010, in your 11 years
24     with Howell School District, you had never received
25     any sort of training regarding a student's First



JOHNSON MCDOWELL
May 29, 2012

Page 41

1   Amendment rights?
2   **A. Not that I remember.**
3   Q.   Had any of your supervisors ever addressed anything
4        with you regarding First Amendment rights of students?
5   **A. Not that I remember.**
6   Q.   Are there any specific policies that you know of that
7        specifically address a student's First Amendment
8        rights?
9   **A. There are policies that address dress code, that also**
10      **address -- I don't -- you know, I don't know. There's**
11      **a -- there's a school board policy that may mention**
12      **it, but I don't know that there is a specific policy,**
13      **or procedure, or guideline that talks specifically**
14      **about what a student can say and what a student can't**
15      **say. And the Student Code of Conduct and the student**
16      **policy focuses more on what a student can't wear and**
17      **what is inappropriate for a student to say in the**
18      **school.**
19  Q.   Okay. How are you supposed to know what a student can
20      say and what a student cannot say in accordance to the
21      policies that you've been given and the handbook that
22      you've been given?
23  **A. I guess I would be using my reason when reading the**
24      **policy.**
25  Q.   And no one checks up to make sure that whatever you've

Page 42

1        read from the language of the policy or handbook is
2        correct or incorrect?
3   **A. We don't take any tests on it, or anything like that,**
4        **no.**
5   Q.   Has there ever been an in-service done to go over the
6        different policies or bylaws of the school district?
7   **A. No, there has not been.**
8   Q.   And prior to October 20th of 2010, was it ever an
9        optional training to --
10  **A. Not that I remember being offered.**
11  Q.   And was there ever an optional training in regards to
12      a student's First Amendment rights?
13  **A. Not that I remember.**
14  Q.   Now, you stated that there was an in-service prior to
15      the beginning of school where Dr. Marcia McEvoy came
16      in.
17  **A. Uh-huh.**
18  Q.   Was that on the 30th of August of 2010?
19  **A. It would have been right before school, so that's**
20      **probably correct.**
21  Q.   Is there anything that would refresh your recollection
22      as to that?
23  **A. I'm sure you have something that will refresh my**
24      **recollection.**
25  Q.   If you would like to review this and then let me know

Page 43

1        if it does refresh your recollection.
2   **A. According to this, it was August 30th.**
3   Q.   And did you attend the in-service that occurred on
4        August 30th with Dr. Marcia McEvoy?
5   **A. Yes, I did.**
6   Q.   And what was the topic of this in-service?
7   **A. The topic was about anti-bullying, about creating a**
8        **better school climate and about sweating the small**
9        **stuff.**
10  Q.   And in regard to anti-bullying, what was it that you
11      gained from this in-service?
12  **A. Marcia McEvoy made a point that we should sweat the**
13      **small stuff and make sure that whenever we heard any**
14      **comments that were degrading, or harassing, or**
15      **bullying in nature, that we should say something to**
16      **stop that from occurring.**
17  Q.   And did she define what was harassing or bullying in
18      nature?
19  **A. She probably did. And I -- what I would say it was**
20      **was anything that degrades a group of students or a**
21      **specific student, anything that can be considered**
22      **threatening to a group of students or an individual**
23      **student.**
24  Q.   And who put on this training?
25  **A. The school district.**

Page 44

1   Q.   Was it mandatory for all teachers to attend?
2   **A. Yes, it was.**
3   Q.   Were any of the school policies or bylaws discussed
4        during the training?
5   **A. I don't remember.**
6   Q.   Now, you said that bullying in this training was
7        described as anything that would degrade a group of
8        students or an individual.
9   **A. Uh-huh.**
10  Q.   Was the definition that broad in this training?
11  **A. That's the way I believe it to have been presented,**
12      **yes.**
13  Q.   In the training, was religious freedom ever discussed?
14  **A. No, it wasn't religious freedom training; it was about**
15      **anti-bullying.**
16  Q.   Was it ever discussed that a student's religious
17      beliefs could come into play in situations regarding
18      bullying?
19  **A. No.**
20  Q.   Were students' First Amendment rights ever brought up
21      during this training?
22  **A. No, it was about bullying.**
23  Q.   Did the training ever go over what a student could or
24      could not say according to the Howell Public School
25      District's policies or bylaws?



JOHNSON MCDOWELL
May 29, 2012

Page 45

1  **A. Not specifically, no.**
2  Q.  According to what you gained from the training, what
3      exactly was it that you took from the training where
4      you thought a student could say this or could not say
5      that?
6  **A. I took from the --**
7              MR. HENLEY: Object to vagueness.
8              MS. BARTOS: I was about to say that, too.
9  BY MS. MERSINO:
10 Q.  Answer if you can, and let me know if you want me to
11     restate.
12 **A. Restate.**
13 Q.  Once you went to the training and received the
14     training, leaving that training and knowing what you
15     had been taught there, what was it in your head, using
16     what the school district put on with Dr. McEvoy, was
17     it that you believed after receiving the training you
18     could tell a student to say or not to say?
19             MR. HENLEY: Object to foundation.
20             MS. BARTOS: Yeah. When he walked out of
21     there, what -- what did he believe a student could or
22     could not say?
23             MS. MERSINO: Yes.
24             MS. BARTOS: We could be here until next
25     Tuesday talking about what he --

Page 46

1  BY MS. MERSINO:
2  Q.  Answer, if you can.
3  **A. You're going to need to narrow the question.**
4  Q.  Did you believe after leaving that training that there
5      were certain things that you had to stop a student
6      from saying?
7  **A. Yes.**
8  Q.  And did you believe after that training that there
9      were certain things that you could allow a student to
10     say?
11 **A. Again, that question's too broad, because I -- yes, a**
12    **student can ask to go to the bathroom.**
13 Q.  Okay. So --
14             MS. BARTOS: Yeah.
15 BY MS. MERSINO:
16 Q.  During the training, it was discussed students can say
17     some things but not others, correct?
18 **A. Correct. As you know, in society we can say some**
19    **things and not others.**
20 Q.  And were you called upon in the training to stop a
21     student from saying something that they shouldn't say,
22     according to the training?
23 **A. Yes. Yes. Sweat the small stuff. If you hear a**
24    **student calling another student the N word or the F**
25    **word, or something like that in the hallway, yes, stop**

Page 47

1      it.
2  Q.  And were you called upon to immediately stop it with
3      that student right then and there?
4  **A. Yes, right then and there, immediate intervention,**
5      **yes.**
6  Q.  According to the training, were you called upon to
7      stop the student's speech in the middle of the class?
8  **A. If the speech is inappropriate, yes.**
9  Q.  And what did they say was inappropriate speech during
10     the training?
11             MS. BARTOS: It's been asked and answered
12     like three times already.
13 BY MS. MERSINO:
14 Q.  Please answer the question.
15 **A. Speech that degrades or threatens a group or an**
16    **individual student.**
17 Q.  And was there any other definition of what exactly
18     that speech would be?
19 **A. Not that I recall at this time, no.**
20 Q.  So it was left up to the personal subjectivity of each
21     teacher?
22 **A. Yes.**
23 Q.  During the training, was there ever discussion about
24     how different students could have different religious
25     viewpoints?

Page 48

1  **A. No.**
2  Q.  Was it ever discussed that a discussion could occur in
3      the class if people disagreed upon something?
4  **A. Not in the way you're phrasing the question. I mean,**
5      **I teach classes that call for students to disagree;**
6      **that's the concept behind social issues. Or a**
7      **philosophy class, you want students to disagree, to**
8      **argue. So in the broad sense that you're asking that**
9      **question, no, the training didn't touch on that.**
10 Q.  So the training did not discuss that different
11     students could have an argument in class that would
12     further academic goals?
13 **A. It was anti-bullying training.**
14             MARKED FOR IDENTIFICATION:
15             DEPOSITION EXHIBIT 4
16             2:47 p.m.
17 BY MS. MERSINO:
18 Q.  I'm handing you what has been marked as Plaintiff's
19     Exhibit 4. Do you recognize this document?
20 **A. I do.**
21 Q.  And how do you recognize it?
22 **A. It's Howell Public Schools Bylaws and Policies**
23    **regarding bullying and other aggressive behavior**
24    **towards students. Is this the policies and bylaws**
25    **that were in effect on October 20th, 2010?**



JOHNSON MCDOWELL
May 29, 2012

Page 49

1  Q.  These are the policies and bylaws that were provided
2      by your counsel in response to our request.
3  A.  **As you can see at the bottom of page 3, it was revised**
4      **on 3/26/12.**
5  Q.  So you would agree this was not the policy that was
6      actually in place?
7  A.  **I agree it may not be the policy.**
8  Q.  Okay.  Do you have the policy that was actually in
9      place on the 20th of October of 2010?
10 A.  **No, I don't.  The only policies I have are what are on**
11     **the school district website.**
12 Q.  Okay.  So if you would look then at Exhibit 1, then it
13     would be in response to paragraph 1, the policies that
14     you relied upon on October 20th of 2010.  And then if
15     you want to go to tab one of your production of
16     documents, you can see the first policy, the Howell
17     Public Schools Policy 5517.01.
18 A.  **Uh-huh.**
19 Q.  So you can see that this is identical to what you have
20     as Exhibit 4, correct?
21 A.  **Correct.**
22         MS. BARTOS:  Obviously, it's the revised
23     policy; it's not the one that was in effect in October
24     of 2010.
25 BY MS. MERSINO:

Page 50

1  Q.  Okay.  So you do not have the actual policy that you
2      relied upon?
3  A.  **If they have changed it on the website, I do not have**
4      **it, no.**
5  Q.  Okay.  And you provided this policy that has been
6      revised, correct?
7  A.  **Counsel has --**
8          MS. BARTOS:  No, it was -- it was our
9      document response.  It came from our office.  I
10     provided that to you.  It's the revised policy.  That
11     is what is on their website.
12 BY MS. MERSINO:
13 Q.  Will you please answer the question?
14 A.  **Counsel provided you with what was requested.  The**
15     **only place the policy is kept is on the website.**
16 Q.  Okay.  So when I asked for different policies that
17     supported your actions on October 20th of 2010, this
18     would not be a correct policy to rely upon, correct?
19 A.  **I cannot answer that question, because I don't know**
20     **how it differs from the October 20th policy.**
21 Q.  Okay.  But you do agree that it was revised on the
22     26th of March of 2012?
23 A.  **That is what it states in the document.**
24 Q.  Okay.  Thank you.
25         MARKED FOR IDENTIFICATION:

Page 51

1          DEPOSITION EXHIBIT 5
2          2:50 p.m.
3  BY MS. MERSINO:
4  Q.  Do you recognize this document?
5  A.  **I do.**
6  Q.  And can you please describe what it is?
7  A.  **It is the revised policies of Howell Public Schools**
8      **Bylaws and Policies for Emergency Removal and**
9      **Suspension, Expulsion, of Non-Disabled Students.**
10 Q.  And if you can go to again tab one.
11         MS. BARTOS:  All right.  We can cut this
12     short.  This is attached to our request for production
13     of documents, obviously, the revised policy.  It is
14     not what was relied upon in October of 2010.  Let's
15     cut to the chase.  It's just like this is ridiculous.
16 BY MS. MERSINO:
17 Q.  If you can go to tab one.
18         MS. BARTOS:  Okay.  Go to tab one.  Answer
19     the questions.
20         THE WITNESS:  Okay.
21 BY MS. MERSINO:
22 Q.  Okay.  Did you find policy 5610?
23 A.  **I did.**
24 Q.  And what I handed you as Exhibit 5?
25 A.  **5610.**

Page 52

1  Q.  And this is what you provided as your basis and your
2      support for your actions on October 20th of 2010,
3      correct?
4          MS. BARTOS:  Objection.  That was through
5      counsel; it wasn't from the witness.  It came from my
6      office, in response to your request for production.
7      It's clearly revised 6/6/11.
8  BY MS. MERSINO:
9  Q.  You now can answer the question.
10 A.  **It was provided to you by counsel.**
11 Q.  Okay.  And when you say "counsel," you mean your
12     counsel, correct?
13 A.  **Correct.**
14 Q.  And this was revised on the 6th of June of 2011?
15 A.  **That is what the document states.**
16 Q.  So this was not the policy in place?
17 A.  **It may not be the exact policy in place.**
18 Q.  It was revised after the date of October 20th, 2010?
19 A.  **But I do not know what was revised.**
20         MARKED FOR IDENTIFICATION:
21         DEPOSITION EXHIBIT 6
22         2:53 p.m.
23 BY MS. MERSINO:
24 Q.  I'm handing you Exhibit 6.  Do you recognize what this
25     exhibit is?



JOHNSON MCDOWELL
May 29, 2012

Page 53

1  A. It's 5610, Emergency Removal, Suspension, Expulsion of
2     Non-Disabled Students.
3  Q. And is this the policy that was in place on the 20th
4     of October of 2010?
5  A. I assume so, since it looks like it was printed out on
6     October 21st.
7  Q. Is this the policy that you relied upon to issue the
8     snap suspension against Daniel Glowacki?
9  A. That would be correct.
10 Q. And if I could mark this as Plaintiff's Exhibit 7.
11         MARKED FOR IDENTIFICATION:
12         DEPOSITION EXHIBIT 7
13         2:54 p.m.
14 BY MS. MERSINO:
15 Q. Do you recognize what's in Exhibit 7?
16 A. I do not recognize this document.
17 Q. Have you ever been given the guidelines from the
18    Office of Superintendent of Howell Public Schools in
19    regard to the different policies that they have?
20 A. I have not been given this, no.
21 Q. So it's not customary for teachers to be given the
22    guidelines of Howell to interpret the policies?
23         MR. HENLEY: Objection; asked and answered.
24         MS. BARTOS: It's also lack of foundation as
25    to whether the teachers are given it.

Page 54

1  BY MS. MERSINO:
2  Q. You may answer.
3  A. I was not given this document.
4  Q. It's 2:55. I think it's a good time to take a
5     10-minute break.
6         (Off the record at 2:55 p.m.)
7         (Back on the record at 3:04 p.m.)
8  BY MS. MERSINO:
9  Q. Directing your attention to Exhibit 6, the snap
10    suspension policy, 5610, is this the policy that you
11    relied upon on the 20th of October of 2010?
12 A. Yes.
13 Q. And can you tell me how you relied upon this policy?
14 A. In terms of a snap suspension, if a student is being
15    disruptive to the class and disruptive to the
16    educational purpose of the class, then the student may
17    be removed for up to 24 hours in what's known as a
18    snap suspension. And that has to be reported to the
19    assistant principals, which I did immediately
20    following school.
21         This happened in 6th hour, which was the
22    last hour of the day. I walked down to their office
23    and informed them of that. And then the parent must
24    be informed. And I was going to call Mrs. Glowacki,
25    but she called me first.

Page 55

1  Q. Was it ever defined for you what disruptive behavior
2     of a student was that would merit a snap suspension?
3  A. No. If you're saying by the school district, no.
4  Q. Was there ever any training on what disruptive
5     behavior was of a student?
6  A. No.
7  Q. So how were you supposed to figure out what disruptive
8     behavior of a student was where you could issue a snap
9     suspension?
10 A. We use our reason as the teacher.
11 Q. And you said that you immediately informed the vice
12    principals at the school?
13 A. That's correct.
14 Q. And how did you do that?
15 A. I walked down to their office and told them about what
16    I had done, and then we filled out the proper
17    documents.
18 Q. Who did you speak with first?
19 A. I spoke with Jen Goodwin and then Mark Sharp.
20 Q. Did you ever call either vice principal from your
21    school, from your classroom?
22 A. From the classroom, yes, to have the students removed
23    from the hallway.
24 Q. And did this occur immediately after you had requested
25    the removal of the students?

Page 56

1  A. I removed the students from class to the hallway, and
2     then called -- Jen Goodwin called the student
3     management office and asked the security guard be sent
4     out to remove them from the hallway.
5  Q. And why did you believe the security guard was
6     necessary?
7  A. The students continued to argue with me in the
8     hallway.
9  Q. Was the security guard there in the hallway?
10 A. He showed up.
11 Q. And what is his name?
12 A. Dave. I forget Dave's last name.
13 Q. Would it be Devries or Devies?
14 A. Possibly.
15 Q. Were there many security guards named Dave at the
16    school at the time?
17 A. No, no, there was just one at the time.
18 Q. This would be the only one?
19 A. So that possibly could be his last name. I don't
20    remember if I ever knew it.
21 Q. But for sure it was Dave?
22 A. It was Dave, yes.
23 Q. Was it according to policy that you would make this
24    phone call from your classroom to the vice principals?
25 A. According to my understanding of the policy.



JOHNSON MCDOWELL
May 29, 2012

Page 73

1    not a lawyer.
2    BY MS. MERSINO:
3    Q.   You can still answer.
4    A.   I'm not a lawyer.
5    Q.   Okay. So in interpreting the school board policy --
6         which is all I'm asking you to do, I'm not asking for
7         a legal conclusion -- in interpreting the school board
8         policy, is it your understanding that a student who is
9         issued a snap suspension is not allowed due process
10        rights, as they are defined under the school board
11        policies?
12   A.   I would have to see the due process rights, as defined
13        in 5611, in order to answer that question.
14   Q.   I'm handing you 5611, if you would review that
15        document.
16             MS. BARTOS:  This doesn't refer to snap
17        suspension. It refers to short-term, long-term
18        suspension and expulsion. It's not relevant.
19             THE WITNESS:  Okay.
20   BY MS. MERSINO:
21   Q.   After reviewing the document, do you believe then that
22        a student who is issued a snap suspension is then
23        allowed due process rights?
24   A.   No, because that does not refer to snap suspensions.
25   Q.   Okay. So even though Daniel Glowacki had no due

Page 74

1         process rights, you still called the vice principal
2         immediately?
3    A.   I followed the guidelines and the procedure.
4    Q.   So you did follow up in some manner after the snap
5         suspension?
6    A.   As required by the rules, yes, to report it to the
7         assistant principals, yes. That's my job to do.
8    Q.   And did you call Daniel Glowacki's family?
9    A.   Mrs. Glowacki called me before I had the opportunity
10        to call her.
11   Q.   And when did she call you?
12   A.   That afternoon, approximately 3:00 or 3:30.
13   Q.   And do you remember what you told her?
14   A.   It was a long-ranging conversation, but we talked
15        about his reaction to class. I told her about the
16        fact that he was allowed back in class the next day;
17        that he was being disruptive. She said something to
18        the effect of, you know, it seems like he stuck his
19        nose in someplace where it doesn't belong, and I
20        thought we had the situation settled. He was going to
21        talk to me briefly before class the next day, and that
22        was going to be that.
23   Q.   Did you issue a referral to Daniel Glowacki?
24   A.   A discipline referral, yes; that's required in the
25        process.

Page 75

1    Q.   That's required for a snap suspension?
2    A.   Uh-huh.
3    Q.   And why did you issue the discipline referral?
4    A.   Because it's required in the process.
5    Q.   And you believed by interpreting the school board
6         policies and bylaws that it was merited that he
7         receive a disciplinary referral?
8    A.   Uh-huh.
9    Q.   What is the effect of a disciplinary referral?
10   A.   In this case, it would actually be no effect, except
11        for the fact that it documented a snap suspension,
12        because he was being allowed in class the next day.
13        So he missed all of 30 minutes of school time.
14   Q.   And is there something then placed in a student's
15        file, as part of their student records, that this
16        occurred?
17   A.   I believe so, yes. I'm not privy to student
18        discipline records, so I don't -- I assume that it
19        would be put in there. It's school policy that we not
20        see student's disciplinary records; and what's in
21        there, I don't know.
22   Q.   And are colleges then privy to student records?
23   A.   No, colleges are not privy to high school student
24        records.
25   Q.   Would this be considered a reprimand or referral that

Page 76

1         would be needed to be disclosed on a college
2         application?
3    A.   No.
4    Q.   You don't believe that it is?
5    A.   No, not at all.
6    Q.   So a disciplinary referral does not need to be
7         known -- made known to colleges where a person is
8         applying?
9    A.   No. No.
10             MS. BARTOS:  You're referencing this
11        situation? You're not talking about some other type
12        of discipline, Counsel; you're talking about a snap
13        suspension referral?
14   BY MS. MERSINO:
15   Q.   In your 11 years at Howell High School, how many times
16        have you issued a snap suspension?
17   A.   Probably two or three times.
18   Q.   Can you recall what happened in those circumstances?
19   A.   The only one -- the only major one I recall was I was
20        teaching U.S. history at the time, and we were talking
21        about Indian reservations. And a student said, "Well,
22        all Indians are drunks." And then when I asked him to
23        not say that again, and that that was inappropriate
24        speech in the classroom, he reiterated that, and,
25        "Well, but they are all drunks." And so I snap

JOHNSON MCDOWELL
May 29, 2012

Page 77

1   suspended him.
2   Q.   Any other times that you can remember, besides that
3        one time?
4   A.   No, not off the top of my head.  That one stands out
5        to me just because of the nature of the offense.
6   Q.   The two to three times then, would it be what occurred
7        when the student made the comment about the Indian
8        reservations, in addition to Daniel Glowacki?
9   A.   **Probably two or three times besides Daniel Glowacki.**
10       **It's not -- snap suspensions are not uncommon in a**
11       **high school.  Students being disruptive in a class is**
12       **not uncommon in a high school.**
13  Q.   But no other details, except for the one other time
14       this occurred?
15  A.   **That's the only one.  It's not a big deal.  We**
16       **normally don't get sued over it.**
17                MARKED FOR IDENTIFICATION:
18                DEPOSITION EXHIBIT 8
19                3:33 p.m.
20  BY MS. MERSINO:
21  Q.   And do you recognize what I handed you as Exhibit 8?
22  A.   **Yes, I do.**
23  Q.   And how do you recognize it?
24  A.   **It's the Howell Public Schools Student-Parent**
25       **Handbook.**

Page 78

1   Q.   *Can you tell me which year this was the handbook for?*
2   A.   **2011-2012.**
3   Q.   And if you could look under tab one to your responses
4        to Plaintiff's Request for Documents.
5   A.   **I got all my tabs confused now.  Okay.  There it is.**
6   Q.   *And is this what was provided as support for your*
7        decisions on the 20th of October of 2010?
8                MS. BARTOS:  Again, Counsel, for the record,
9        I -- it came from my office; it was not supplied by
10       the witness.
11               THE WITNESS:  It was supplied by counsel.
12  BY MS. MERSINO:
13  Q.   Do you have the actual handbook for the year 2010 to
14       2011?
15  A.   **I don't think so.  It may be in a box somewhere.  I**
16       **don't know.**
17  Q.   Is there anything then that you could point me to, in
18       *terms of a student handbook, that you relied upon?*
19  A.   **Again, the student handbooks -- everything the**
20       **district does is online now; they don't print stuff**
21       **out.  You would have to go to the district's website**
22       **and look at that.**
23  Q.   Okay.  So you can't provide any support according to
24       the student handbook, for the current academic year
25       when this occurred?

Page 79

1   A.   **I do not have the exact student handbook from the year**
2        **2010, but I would state that handbooks do not change**
3        **significantly from year to year.**
4   Q.   Okay.  Then can you tell me what is -- what you
5        believe is the same, from what you have provided?
6   A.   **Well, I would assume that -- from what you have here,**
7        **that the bullying procedure, the stuff that's written**
8        **on bullying is similar to the 2012, although I cannot**
9        **say whether it was exact or not.  And also, the**
10       **complaints, general complaints.**
11  Q.   And is that all?
12  A.   **And the student's rights and responsibilities, those**
13       **are the three things that are in here.**
14  Q.   Okay.  Did you mention the student rights of
15       expression, as well?
16  A.   **I did.**
17  Q.   And did you rely upon student rights of expression
18       from your handbook for the 2010-2011 academic year?
19  A.   **I relied from the dress code section of the 2010**
20       **student handbook.**
21  Q.   For Mr. Glowacki?
22  A.   **No.  Is that what you're talking about?**
23  Q.   Yes.
24  A.   **Oh, for Mr. Glowacki -- for Mr. Glowacki I do not have**
25       **it in here, but I relied upon the information that**

Page 80

1        deals with disruption of a classroom, and also on --
2        if we look at the bullying language, "The Board will
3        not tolerate any gestures, comments, threats or
4        actions to a student which cause or threaten to cause
5        bodily harm, reasonable fear for personal safety or
6        personal degradation."
7   Q.   Okay.  So in your opinion, did Daniel Glowacki make
8        gestures, comments, threats or actions to a student?
9   A.   **In my opinion, Daniel Glowacki saying "I do not accept**
10       **gays" would cause students to possibly fear for their**
11       **personal safety and definitely falls under personal**
12       **degradation to not accept a group of people.**
13  Q.   Okay.  Did he make any sort of gestures, comments,
14       threats or actions to a student, a specific student?
15  A.   **No, he did not, to a specific student.**
16  Q.   Did he cause or threaten bodily harm to a student?
17  A.   **He did not.**
18  Q.   Did he put anyone in reasonable fear for personal
19       safety?
20  A.   **Yes, he did.  I believe he did.**
21  Q.   How did he do that?
22  A.   **He did that by telling a group within our school, and**
23       **possibly students that were in that classroom at that**
24       **time, that he did not accept them as human beings.**
25  Q.   Did he say that he would harm anyone?



JOHNSON MCDOWELL
May 29, 2012

Page 81

1  A. He said that "I do not accept gays."
2  Q. Did he say that he would harm anyone?
3  A. My interpretation of that, or the students'
4     interpretation of that, would be relevant in terms of
5     whether they felt they could be harmed by someone who
6     does not accept them.
7  Q. In the language that Daniel Glowacki used, did he say
8     that he was going to harm someone?
9  A. He said, "I do not accept gays."
10         MS. BARTOS: It's been asked and answered.
11 BY MS. MERSINO:
12 Q. Did he say that he was going to physically hurt
13    someone?
14         MS. BARTOS: It's been asked and answered
15    about five times. He said --
16         THE WITNESS: He said, "I do not accept
17    gays."
18 BY MS. MERSINO:
19 Q. Did he say in his language that he would physically
20    hurt someone?
21         MS. BARTOS: Asked and answered.
22         THE WITNESS: He said, "I do not accept
23    gays."
24 BY MS. MERSINO:
25 Q. Did he say that he was going to beat someone up?

Page 82

1  A. No.
2  Q. Did he say he was going to punch someone?
3  A. No.
4  Q. Did he say he was going to slap someone?
5  A. No.
6  Q. Did he say he was going to trip someone?
7  A. No.
8  Q. Did he say that he wanted to meet somebody outside and
9     beat them up outside of the school?
10 A. No.
11 Q. Did he say -- did he challenge anyone to get in his
12    face and he would beat them up because they were gay?
13 A. No.
14 Q. Did he say that he was going to wait to act on this,
15    and then one day hurt someone so they could live in
16    fear?
17 A. No. I threw him out of class before then.
18 Q. The definition of the handbook, and this is the
19    2011-2012 handbook, do you believe that, in your
20    memory, this was -- what's listed under A through G,
21    would those be relatively similar to what you relied
22    upon back in 2010?
23 A. Yes, approximately the same.
24 Q. Okay. So did Daniel cause actual physical harm?
25 A. No.

Page 83

1  Q. Did he make unwelcomed physical contact?
2  A. No.
3  Q. Did he say something threatening or taunting?
4  A. Yes.
5  Q. How did he say something threatening or taunting?
6  A. He said, "I do not accept gays."
7  Q. And you take that to be threatening or taunting?
8  A. Yes.
9  Q. Did he take or extort money or property?
10 A. No.
11 Q. Did he block or --
12 A. Except for a lawsuit.
13 Q. Did he block or impede student movement?
14 A. No.
15 Q. Did he do anything through electronically-transmitted
16    acts?
17 A. I have no idea.
18 Q. Like texting anyone?
19 A. That, I have no knowledge of.
20 Q. Instant messaging?
21 A. No knowledge.
22 Q. Blog, websites, or online bullying through social
23    networking sites?
24 A. That, I have no knowledge of.
25 Q. So that was not anything you based your decision on on

Page 84

1     the 20th of October of 2010?
2  A. That's correct.
3  Q. Now, you said that you relied upon student rights of
4     expression, as well.
5  A. I said I relied upon the dress code -- well, not the
6     dress code. Well, yes, rights of expression.
7  Q. And in the 2011 and 2012 handbook, it says, "The
8     district recognizes the rights of students to exercise
9     freedom of speech." Was that true in the 2010-2011
10    handbook, to your knowledge?
11 A. I do not know. You're asking me to surmise how a
12    possible lawsuit may have changed how they worded a
13    handbook before and after the incident.
14 Q. I'm just asking you what your memory is.
15 A. I said I don't know.
16 Q. Now, it also says, "With the right of expression comes
17    the responsibility to do it appropriately." Is that
18    something that you remember from the 2010-2011
19    handbook?
20 A. Again, I don't know. I would assume, but I don't
21    know.
22 Q. And this includes right to distribute -- that should
23    be, "This includes the right to distribute or display
24    at reasonable times and places non-sponsored,
25    non-commercial written material, petitions, buttons,



Page 85

1 badges and other insignia, except expression which,"
2 and then it lists different letters. Do these letters
3 look familiar to what you relied upon back in 2010?
4 **A. I -- I don't remember the letters.**
5 Q. Okay. Was Daniel Glowacki's speech obscene?
6 **A. No.**
7 Q. Was it rebellious?
8 **A. No, not in the way I understand that word.**
9 Q. Was it pervasively indecent or vulgar?
10 **A. I would say it was indecent.**
11 Q. Did it advertise any product or service not permitted
12 by minors?
13 **A. No.**
14 Q. Did it constitute insulting or fighting words, the
15 very expression of which injures or harasses other
16 people? For example, threats of violation, defamation
17 of character or of a person's race, religion or ethnic
18 origin?
19 **A. Yes, I believe it did infringe. It did defame the**
20 **character of those gay students that might be in the**
21 **classroom.**
22 Q. Did it present a clear and present likelihood that
23 either because of its content, or the manner of
24 distribution or display, it would cause a material or
25 substantial disruption of school or school activities,

Page 86

1 a violation of school regulations, or commission of
2 unlawful act?
3 **A. Yes, it did.**
4 Q. And how did it do that?
5 **A. Because his statement "I don't accept gays" may have**
6 **caused a student in the classroom who is gay to shut**
7 **down or fear for their safety. It caused a material**
8 **and substantial disruption to the school activities of**
9 **that student and the educational -- the ability of**
10 **that student to get an education in my classroom.**
11 Q. Did you see any students in your classroom shut down?
12 **A. Yes, I did, actually.**
13 Q. You saw a student shut down immediately upon Daniel
14 Glowacki making a comment?
15 **A. Yes.**
16 Q. And which student was that?
17 **A. I do not remember the name.**
18 Q. And how exactly did you observe this student shut
19 down?
20 **A. As a professional teacher, scanning the classroom and**
21 **seeing which students get a look on their face, like**
22 **oh, my God, I can't believe he said that.**
23 Q. So a student was surprised by his comments?
24 **A. Surprised, hurt, dismayed.**
25 Q. Were the students crying?

Page 87

1 **A. I think one might have been on the verge, yes.**
2 Q. When Mr. Glowacki made a comment?
3 **A. Yes.**
4 Q. The student immediately started crying?
5 **A. No. I said he might have been on the verge.**
6 Q. And I'm asking about before you removed Daniel
7 Glowacki from class.
8 **A. Oh, yes. I mean, that's -- it was such a disruption**
9 **to say "I do not accept gays."**
10 **MARKED FOR IDENTIFICATION:**
11 **DEPOSITION EXHIBIT 9**
12 **3:45 p.m.**
13 BY MS. MERSINO:
14 Q. Can you please review what's been marked as Exhibit 9.
15 **A. Okay.**
16 Q. How do you recognize this exhibit?
17 **A. Howell Public Schools Bylaws and Policies 5511, Dress**
18 **and Grooming.**
19 Q. Did you rely upon this policy for asking the student
20 in your classroom to remove the Confederate belt
21 buckle?
22 **A. I relied upon the Student Code of Conduct Handbook.**
23 Q. So you did not rely upon this policy?
24 **A. I assume that a -- what is in the Student Code of**
25 **Conduct issued by the district is in compliance with**

Page 88

1 **their policy.**
2 Q. Had you reviewed this policy prior to the 20th of
3 October of 2010?
4 **A. I did not. I reviewed the Student Code of Conduct,**
5 **what is now known as the Student-Parent Handbook.**
6 Q. And you -- had you read this policy prior to October
7 20th of 2010?
8 **A. I had not. I read the Student Code of Conduct as**
9 **refers to dress code.**
10 Q. Did you read any of the policies before October 20th,
11 2010?
12 **A. Oh, sure, I read some of them.**
13 Q. But not all of them?
14 **A. There are -- it's probably a 200-page document.**
15 Q. Were you asked by the school to read all of the
16 policies?
17 **A. No.**
18 Q. It was not your responsibility that you know the
19 policies?
20 **A. That's a different question.**
21 Q. Okay. If you could answer the question.
22 **A. It is our responsibility to know the policies? Yes.**
23 Q. How can you know the policy if you have not previously
24 read it?
25 **A. We rely upon any guidelines that are issued by**



JOHNSON MCDOWELL
May 29, 2012

Page 113

1   Q.  And going on to looking at the first paragraph, it
2       says that you received the written reprimand after an
3       investigation into an incident that occurred in your
4       classroom, substantiated that you displayed a serious
5       lack of professionalism when you slammed your door,
6       raised your voice, and attempted to discipline
7       students for their beliefs.  Is that correct?
8   A.  That is what it states.
9   Q.  And is that correct?
10  A.  I did not discipline students for their beliefs.
11  Q.  Did you slam the door?
12  A.  I do not remember.
13  Q.  Did you raise your voice?
14  A.  About this level, yes.
15  Q.  Did you attempt to discipline the students for their
16      beliefs?
17  A.  I did not attempt to discipline students for their
18      beliefs.
19  Q.  Did you discipline students for comments that were
20      made in the class?
21  A.  I disciplined students for comments that were made in
22      the class that were disruptive to the educational
23      environment.
24  Q.  How was this agreement negotiated?
25  A.  It's negotiated through our grievance process.

Page 114

1   Q.  So were you instrumental in the terms of the
2       agreement?
3   A.  It was negotiated on my behalf by the HEA and the MEA.
4   Q.  Was it negotiated until finally it was in a form that
5       was acceptable to you?
6   A.  It was negotiated until it was in a form that was
7       acceptable to all parties concerned.
8   Q.  And one of those parties being you?
9   A.  One of the parties being me.
10              MARKED FOR IDENTIFICATION:
11              DEPOSITION EXHIBIT 15
12              4:21 p.m.
13  BY MS. MERSINO:
14  Q.  I'm handing you what has been marked as Exhibit 15.
15      Do you recognize Exhibit 15?
16  A.  Yes, I do.
17  Q.  And is this your syllabus for economics?
18  A.  That is correct.
19  Q.  And was that the 6th hour class that you were teaching
20      on the 20th of October of 2010?
21  A.  That is correct.
22  Q.  And I see that this syllabus is dated 2009.  Has it
23      been updated since 2009?
24  A.  I guess not since you just printed it off a couple
25      days ago, or somebody did.

Page 115

1   Q.  And fair to say that this, which is currently up on
2       your website, is the actual syllabus for the 2010
3       class that Daniel Glowacki was in?
4   A.  Yes, that would be accurate.
5   Q.  Looking at the class rules, looking at class rule No.
6       2, it states, "No cursing, swearing, bullying, racism,
7       sexism, homophobia."
8   A.  That is correct.
9   Q.  Correct?
10  A.  Uh-huh.
11  Q.  Is there any reason why it doesn't state anything
12      about any comments made to a religion?
13  A.  State your question again.
14  Q.  Is there any reason why class rule No. 2 doesn't
15      include any sort of bullying or any sort of insult to
16      a religion?
17  A.  There's no reason why it's not in there.  I mean,
18      it -- if somebody said I -- I hate Catholics, they
19      would be disciplined the same as anybody else.
20  Q.  And has this been -- this syllabus been up on the
21      website since 2009?
22  A.  I would assume so, since it's the date of that, yes.
23  Q.  And has this syllabus been approved by the school
24      district?
25  A.  Yes, also by turning it in to the principal.

Page 116

1   Q.  Can you describe for me the policy of having a
2       syllabus approved by the school district?
3   A.  All I know is that we turn in all our syllabuses to
4       the principal, and I assume he looks over them and
5       would return them to me if they were in violation.
6   Q.  You turned this syllabus Exhibit 15 in to Aaron Moran?
7   A.  That's correct.
8   Q.  And he, we assume, reviewed it, correct?
9   A.  We assume that, yes.
10  Q.  And does he come back then with an approval?
11  A.  He does not come back with an approval.  And I would
12      assume if he had issue with it, he would come back and
13      let me know.
14  Q.  And is this syllabus handed out to your students each
15      year?
16  A.  It is not.  That's why we have it up on the website.
17      One of the things we're trying to do is to cut down on
18      costs, and so students are directed to the website.
19  Q.  But it's up for students to see?
20  A.  Obviously, you got it, yes.
21  Q.  But students have access to it and students -- parents
22      have access to it?
23  A.  Yes. Yes.
24  Q.  Had there ever been a comment about class rule two
25      having the word "homophobia" in it?

JOHNSON G. McDOWELL, IV
June 5, 2012

Page 141

1  Bloomfield Hills, Michigan
2  Tuesday, June 5, 2012
3  9:10 a.m.
4           JOHNSON G. McDOWELL, IV,
5  was thereupon called as a witness herein, and
6  after having first been duly sworn to testify to
7  the truth, the whole truth and nothing but the
8  truth, was examined and testified as follows:
9           CONTINUED EXAMINATION
10 BY MS. MERSINO:
11 Q.  Good morning, Jay.
12 **A.  Good morning.**
13 Q.  Do you remember the ground rules that we went
14 through at the last deposition?
15 **A.  I believe so.  I'm not to interrupt you.**
16 Q.  That would be one of them.
17 **A.  Okay.**
18 Q.  There were several.  Would you like me to go over
19 them again?
20 **A.  Sure.**
21 Q.  Okay.  So I'm going to ask you a series of
22 questions about what happened on the 20th of
23 October of 2010.  You understand that?
24 **A.  Yes.**
25 Q.  And at any time if you don't understand any of my

Page 142

1  questions, please let me know and I will do my
2  best to rephrase and clarify.
3  **A.  Okay.**
4  Q.  Okay?  If you don't hear one of my questions, let
5  me know and I will speak up.
6  **A.  Because you are a soft talker.**
7  Q.  I'm a soft talker, yes.  Let's see.  All of your
8  answers have to be verbal, no uh-huhs or head
9  nodding.
10 **A.  Correct.**
11 Q.  If you don't know the answer to any of the
12 questions that I state, then simply let me know.
13 And I don't want you to speculate.
14 **A.  You got it.**
15 Q.  I want your answers to be clear for the record.
16 So if you say something and you don't think that
17 it accurately reflects what you meant to say, let
18 me know.
19 **A.  Okay.**
20 Q.  Wait until I finish asking the question before
21 you state your answer.
22 **A.  Will do.**
23 Q.  We'll take a break about every hour and a half or
24 so.  If you need a break before then, just let me
25 know.

Page 143

1  **A.  Before we start, if I could grab something to**
2  **drink.**
3           **(Off the record at 9:12 a.m.)**
4           **(Back on the record at 9:13 a.m.)**
5  BY MS. MERSINO:
6  Q.  You understand that everything today will be
7  transcribed by the court reporter who's here?
8  **A.  That's correct.**
9  Q.  Okay.  And everything today could be used in a
10 court of law --
11 **A.  Um-hmm, yes.**
12 Q.  -- and is under oath --
13 **A.  Yes.**
14 Q.  -- subject to penalties of perjury?
15 **A.  Yes.**
16 Q.  And are there any rules that I just stated that
17 you don't understand or require further
18 clarification?
19 **A.  No, I understand all that.**
20 Q.  Okay.  So let's go to the 20th of October of
21 2010.  Can you describe -- you said that you
22 showed the video in six of your classes that day?
23 **A.  That's correct.**
24 Q.  And can you go through those classes.
25 **A.  It would be five classes.  There are six classes**

Page 144

1  **now this year.  There were five classes at that**
2  **time.**
3  Q.  Starting with your first class, can you describe
4  which class it was and how it came about that you
5  showed the video.
6  **A.  I don't remember my exact schedule.  I teach**
7  **semester classes, so it changes from semester to**
8  **semester, so I don't know whether I taught**
9  **government first and then philosophy and then**
10 **world religions and then econ.  So I don't**
11 **remember the exact order of the classes is what**
12 **I'm saying.  In each class, the class began with**
13 **me talking about the fact that it was**
14 **anti-bullying day and that the school district was**
15 **doing an anti-bullying program as brought forward**
16 **by Marcia McEvoy.  And I spoke briefly about the**
17 **problems with bullying and the recent deaths that**
18 **had occurred that semester -- the fall semester**
19 **around the country, and then I showed about three**
20 **minutes of the video, and then we went on to**
21 **class.**
22           **And each class went that way up until**
23 **Daniel Glowacki's class, at which point I didn't**
24 **get five minutes into the class before he**
25 **interrupted me and interrupted the class.**

JOHNSON G. McDOWELL, IV
June 5, 2012

Page 149

1   A.   I don't know exactly what I said.
2        MS. BARTOS:  He said he doesn't know.
3   BY MS. MERSINO:
4   Q.   Not saying exactly what you said, can you
5        paraphrase what you said?
6   A.   I talked about -- or I would have begun to talk
7        about anti-bullying, but Daniel interrupted me and
8        said, what is that T-shirt, or something to that
9        effect, and I said it was an anti-bullying
10       T-shirt.  And he said, well, why do you get to
11       wear those T-shirts if gays get -- why -- no,
12       actually, if we go back, I guess, before that,
13       that's when the other young lady came in and sat
14       down and had the Confederate belt buckle on her --
15       on her hand.  I asked her to remove it, as I had
16       many times, and she took it off and put it in her
17       bag.
18  Q.   Can you describe which student this was who had
19       the Confederate flag belt.
20  A.   It was a female student.
21  Q.   Do you remember her name?
22  A.   I do not.
23  Q.   And did she come into your class prior to class
24       beginning?
25  A.   Um-hmm.

Page 150

1   Q.   Were there people in your class already seated
2        when this female was entering?
3   A.   Yes, of course.
4   Q.   And at what time did you decide to ask her to
5        remove the Confederate flag belt buckle?
6   A.   As soon as she sat down like I normally did.
7   Q.   So the student sat down and then you asked her
8        to --
9   A.   Um-hmm.
10  Q.   Did you ask her in front of the whole class or
11       did you take her aside?
12  A.   Well, I just approached her and said can you
13       remove your Confederate flag belt buckle.  It's a
14       class of 35 students.  You're standing, you know,
15       a foot from the student, two feet from the student
16       and you ask her.  I don't know if that qualifies
17       as taking her aside or not.
18  Q.   And where was she seated in the class?
19  A.   Front row.
20  Q.   Now, you said the student had previously worn the
21       Confederate flag belt buckle to class?
22  A.   That's correct.
23  Q.   Why was it on this day that you asked her to
24       remove it?
25  A.   I asked her to remove it every day that she wore

Page 151

1        it.
2   Q.   Every day?
3   A.   Um-hmm.
4   Q.   How many times had you asked her to remove it?
5   A.   I don't remember, because I don't remember how
6        many days she wore it.  She didn't wear it every
7        day.
8   Q.   Had you ever placed a complaint with the
9        administration regarding the Confederate flag
10       belt buckle?
11  A.   No.
12  Q.   Did you ever discuss the matter with her parents?
13  A.   No.
14  Q.   Was she ever reprimanded for wearing the
15       Confederate flag belt buckle?
16  A.   No.
17  Q.   Had you previously asked her to remove the
18       Confederate flag belt buckle in your class?
19  A.   Yes.
20  Q.   And can you describe what happens when you ask
21       her to remove it.
22  A.   On that day?
23  Q.   Yes.
24  A.   On that day when I asked her to remove it, she
25       removed it and put it in her bag as she normally

Page 152

1        did without incident.  She didn't say anything,
2        never complained or anything like that.  And
3        that's when Daniel spoke up and said, you know,
4        why can't she wear the Confederate flag if gays
5        get to fly, you know, their rainbow flag.
6   Q.   When Daniel spoke up, was this after the class
7        bell had rung?  Had class begun?
8   A.   I would assume so.
9   Q.   And did you say something first prior to Daniel
10       raising his hand?
11  A.   No, I don't think so.
12  Q.   So you didn't say anything to address the class?
13  A.   I don't think so.  I don't remember.
14  Q.   And in what manner did Daniel initiate the
15       conversation?
16  A.   In a belligerent manner.
17  Q.   Did he raise his hand to speak?
18  A.   No.  Daniel rarely raises his hand to speak.
19  Q.   Do you have your students raise their hands
20       before they speak in class?
21  A.   Not necessarily.  I mean, it's not something I'm
22       going to reprimand them for.
23  Q.   How do you run your class discussions typically?
24  A.   They're pretty free-wheeling as class discussion
25       in a philosophy class should be.



JOHNSON G. McDOWELL, IV
June 5, 2012

Page 153

1   Q.   And are they free-wheeling in your economics
2        classes as well?
3   A.   Um-hmm.
4   Q.   And what does that mean exactly?  Are students
5        expected to speak their mind when --
6   A.   Not speak their mind, but students are expected to
7        speak out in class and answer questions and to ask
8        questions.  They're not expected to sit silent at
9        their desk with their hands on top of their desks
10       waiting for the master to give them instruction.
11       They're supposed to ask questions and participate
12       in the class.
13  Q.   And you're saying on the 20th of October you
14       asked the student to remove her Confederate flag
15       belt buckle?
16  A.   Um-hmm.
17  Q.   And then immediately after Daniel Glowacki made a
18       comment?
19  A.   Yeah, pretty much.
20  Q.   And did you not say anything first?
21  A.   Not that I remember, no.
22  Q.   Okay.  And what did Daniel say?
23  A.   He said why can't she wear that Confederate flag
24       if the gays get to the fly their rainbow flag.
25  Q.   And what did you say in response?

Page 154

1   A.   I then explained the difference in symbolism
2        between the Confederate flag and the rainbow flag.
3   Q.   And can you explain that to us.
4   A.   I explained the Confederate flag is seen by many
5        people to be a symbol of racism, a symbol of a
6        racist Jim Crow south.  It's associated with
7        lynchings, with cross burnings, with the KKK, and
8        that the rainbow flag was originally used by Jesse
9        Jackson's Rainbow Coalition in the early 1970s and
10       was taken over by the gay movement in the late
11       70s, early 1980s.
12  Q.   Was this all that you said --
13  A.   Um-hmm.
14  Q.   -- at that time?
15            And then was there any response?
16  A.   He said, well, I don't accept gays.
17  Q.   Had you asked him about his feelings on
18       homosexuality prior to this?
19  A.   No.  No.  That wouldn't make any sense.
20  Q.   So you're saying Daniel then says I don't accept
21       gays?
22  A.   That's correct.
23  Q.   And then what do you say in response?
24  A.   I said that you can't say that in class.
25  Q.   And then what is the response?

Page 155

1   A.   He said, well, I don't accept gays because I'm
2        Catholic.
3   Q.   Did you ask him what he meant by this?
4   A.   No.  I said that's fine that you're Catholic, but
5        you still can't say I don't accept gays in class.
6   Q.   Did you ask him to clarify what he was saying
7        or --
8   A.   No.  There didn't need to be a discussion.
9        Because usually when a student says something that
10       they're not allowed to say in class, you say you
11       can't say that in class and they don't say it.  If
12       a kid swears in class and you correct them and say
13       you can't say that in class, that's the end of the
14       discussion.
15  Q.   Did Daniel swear in class?
16  A.   No.  He said I don't accept gays.
17  Q.   And then he says I don't accept gays because it's
18       against my religion?
19  A.   No, he said I don't accept gays because I'm
20       Catholic.
21  Q.   Because I'm Catholic?
22  A.   Um-hmm?
23  Q.   What happens next?
24  A.   Then classroom, you know, discussion occurred,
25       that, you know, where I became upset over the fact

Page 156

1        that he insisted on saying I don't accept gays.  I
2        mean, you can imagine if somebody said I don't
3        accept blacks, I don't accept Asians, I don't
4        accept Jews, and kept saying it, and giving
5        reasons for why it's okay for them to say that,
6        that that would upset a teacher who's trying to
7        continue on in class and knowing there might be
8        Asians or Jews or blacks or gays in the classroom,
9        that that could be upsetting.
10            So then I became upset and told him he
11       can't say that in class, and I said, just like you
12       can't say I don't accept blacks, you can't say I
13       don't accept gays in class, and just like you
14       can't say I don't accept blacks because blacks are
15       against my religion, you can't say I don't accept
16       gays because it's against my religion.
17  Q.   Did he ever say that he didn't accept blacks?
18  A.   No.
19  Q.   Did he ever say that he didn't accept Jews?
20  A.   No.
21  Q.   Did he ever say that he didn't accept Asians?
22  A.   No.
23  Q.   Do you know of any religion that would have those
24       beliefs?
25  A.   Sure.  Southern Baptists didn't denounce slavery

JOHNSON MCDOWELL
May 29, 2012

Page 21

1   in any way any Howell Public School District policy,
2   practice and/or procedure that the Plaintiff DKG
3   violated or may have violated at Howell High School on
4   or about October 20th of 2010. What you reviewed
5   under tab two, the 41 pages, is that completely
6   responsive to paragraph 3?
7          MS. BARTOS: It says No. 1 -- No. 2 and No.
8   1.
9   BY MS. MERSINO:
10  Q.  And I'm asking him directly about tab two.
11  A.  Tab two, as far as I know, doesn't contain information
12      in there about the Howell Public School District
13      policy or practice that's under tab one.
14  Q.  What I'm asking about are emails, digital information,
15      computer-based information and correspondences,
16      including Facebook posts, emails and/or
17      correspondence.
18  A.  So what you're asking me is there anything else,
19      besides what's in two that deals with Howell Public
20      School District policy, practice or procedure?
21  Q.  Specifically concerning communications, emails,
22      digital information and correspondences.
23  A.  Right. Are you asking me, or are you asking does it
24      exist?
25  Q.  I'm asking do you have anything else in your

Page 22

1   possession, any other emails or correspondences?
2   A.  To your verbal question do I have any other emails or
3       correspondence, no. Does it exist on my hard drive at
4       school under the publications tab? Yes.
5   Q.  Okay. And can you tell me more about that?
6   A.  Well, that's where the school district policies,
7       practices and procedures are contained.
8   Q.  Okay. So not asking you about the school district's
9       own policies, practices and procedures, but about
10      communications that you have had concerning the
11      policies and practices and procedures. Is there
12      anything else not contained in tab two, that you
13      possess?
14  A.  Not that I'm aware of, no.
15  Q.  Looking at paragraph 6, the plaintiffs requested a
16      copy of any and all documents and correspondence,
17      including emails and other digital information,
18      computer-based information and/or correspondence,
19      including Facebook posts, emails and/or correspondence
20      relating to and/or referencing in any way the
21      suspension of your employment with the school district
22      or any reprimand. Now, reviewing what you did under
23      tab two, which was the response to paragraph 6 of our
24      request, does that encompass everything that you have
25      in your possession?

Page 23

1          MS. BARTOS: Well, also the response says,
2   "Please refer to the records provided by the school
3   district referencing the grievance chain."
4          MS. MERSINO: Everything that --
5          MS. BARTOS: So obviously, No. 2 is not all
6   that's there.
7   BY MS. MERSINO:
8   Q.  You may answer.
9   A.  I also have the grievance chain within -- I assume
10      within the emails from the district.
11  Q.  And what exactly is the grievance chain?
12  A.  That would be the -- when you file a grievance,
13      there's a grievance hearing, and then there's an
14      appeal, and then there's a grievance hearing, and then
15      there's an appeal.
16  Q.  Okay. So as far as your own communications, your own
17      emails, your own Facebook posts, is everything that
18      you possess contained in tab two, which was the
19      response to paragraph 6?
20  A.  As far as what I generated or what I received?
21  Q.  What you generated.
22  A.  Yes.
23          MARKED FOR IDENTIFICATION:
24          DEPOSITION EXHIBIT 2
25          2:12 p.m.

Page 24

1   BY MS. MERSINO:
2   Q.  You've been just handed Plaintiff's Exhibit 2. Do you
3       recognize what that is?
4   A.  Plaintiff's Exhibit 2?
5   Q.  Yes.
6   A.  Yes, it's Plaintiff's Exhibit 2.
7   Q.  And how do you recognize this?
8   A.  It is an email from myself to my counsel.
9          MS. BARTOS: Just for the record, it's only
10      page 1 of 10. It's only the first page.
11          MS. MERSINO: And pages 2 through 10 contain
12      nothing but hearsay statements and comments that --
13          MS. BARTOS: I'm just saying for the record
14      it's only the first page of 10 pages. That's all I'm
15      saying, for the record. You can use page 5, if you
16      want; I don't care.
17  BY MS. MERSINO:
18  Q.  In reference to Exhibit 2, did you write this
19      correspondence?
20  A.  Not to be, you know, nitpicky about it, did I write --
21      did I write the email to my counsel? Yes.
22  Q.  Did you write the stated paragraph?
23  A.  That stated paragraph, yes.
24  Q.  "I have been suspended a day without pay from teaching
25      for telling a student that he cannot say in class, 'I



JOHNSON MCDOWELL
May 29, 2012

Page 25

1   don't accept gays.' I've also been suspended for
2   telling a student to remove the Confederate flag from
3   her clothing. Last year we had a hate group formed on
4   Facebook that used the Confederate flag as their
5   symbol. Therefore, I considered it a controversial
6   symbol."
7   **A.   Yes, I wrote that.**
8   Q.   And when did you write it?
9   **A.   October 25th, 2010.**
10  Q.   And who did you write it to?
11  **A.   It is a Facebook post.**
12  Q.   And can you describe for me exactly who the Facebook
13  *post would have gone out to?*
14  **A.   It's a Facebook status.**
15  Q.   So this was your status after --
16  **A.   This was my status on October 25th.**
17  Q.   And who are your friends on Facebook?  Are you open to
18  *the public or do you restrict --*
19  **A.   No, I restrict it to friends.**
20  Q.   And can you describe for me in general who your
21  *friends are on your Facebook?*
22  **A.   Friends and family.**
23  Q.   And approximately how many people do you have as
24  *friends and family?*
25  **A.   I don't know.  200, maybe. I don't know.  I would**

Page 26

1   **have to check.  I would have to go back to October**
2   **25th and find out how many I had then.**
3   Q.   Did you remove this after you posted it as your status
4   *update?*
5   **A.   I do not remember, but I was able to find it on my**
6   **Facebook, when requested.**
7   Q.   And is this the only post that you made to your
8   *Facebook account regarding what occurred in your*
9   *classroom on October 20th, 2010?*
10  **A.   Yes, I believe it is.**
11  Q.   And is it the only Facebook post that you made to your
12  *account regarding any actions by Daniel Glowacki?*
13  **A.   This does not reference Daniel Glowacki.**
14  Q.   It is stemming from --
15  **A.   It does not concern Daniel Glowacki; it concerns my**
16  **suspension.**
17  Q.   Okay.  So when you wrote, "I don't accept gays," who
18  *would be the speaker saying that?*
19  **A.   That would be Daniel Glowacki.**
20  Q.   Okay.  So you are quoting Daniel Glowacki in this
21  *Facebook post, correct?*
22  **A.   Yes, I am.**
23  Q.   And is this the only Facebook post that you made
24  *concerning what occurred in your classroom or the*
25  *school's actions subsequent to?*

Page 27

1   **A.   Yes, as far as I -- yes, because I went for a search**
2   **for it and that's what I found.**
3   Q.   If I could have this marked as Exhibit 3.
4   *MARKED FOR IDENTIFICATION:*
5   *DEPOSITION EXHIBIT 3*
6   *2:16 p.m.*
7   BY MS. MERSINO:
8   Q.   I'm handing you what's been marked as Exhibit 3.
9   *Could you please review it for me.*
10  **A.   Uh-huh.**
11  Q.   And do you recognize Exhibit 3?
12  **A.   I do.**
13  Q.   How do you recognize it?
14  **A.   I recognize it as actually the document that I**
15  **reviewed on my computer last night before I came here,**
16  **that I had under the statement of HEA press release.**
17  Q.   Okay.  You would agree on October 3 it says, "Jay
18  *McDowell statement concerning his reprimand"?*
19  **A.   Yes, it does.**
20  Q.   And it says -- the title of it is, "My response to my
21  *reprimand."*
22  **A.   Correct.**
23  Q.   "Please read for an account of the events that day,"
24  *by Jay McDowell, on Monday, November 1st, 2010 at 2:56*
25  *p.m., correct?*

Page 28

1   **A.   Correct.**
2   Q.   And did you, indeed, write this statement?
3   **A.   I did.**
4   Q.   Now, when you say that this is a statement that you
5   *reviewed, what do you mean by that?*
6   **A.   When I looked -- I looked on my computer last night to**
7   **see if I had -- see if I had a statement about the**
8   **incident.  I found a document on there called HEA**
9   **press release, but this was a document that was under**
10  **that title.  So when I told you earlier I looked at**
11  **the HEA press release, this was the document that had**
12  **that title.**
13  Q.   So this is not -- Exhibit 3 is not the HEA press
14  *release?*
15  **A.   No.  No, it's not.  That is the title it had in my**
16  **computer.**
17  Q.   Can you please describe for me what Exhibit 3 is?
18  **A.   Exhibit 3 is a statement concerning my reprimand.**
19  Q.   And you wrote everything in Exhibit 3?
20  **A.   Yes, I did.**
21  Q.   And you posted this on Facebook?
22  **A.   I think I posted it in a notes section of it.  I**
23  **don't --**
24  Q.   Notes section of what?
25  **A.   Of Facebook.  I don't remember exactly where, but I**



JOHNSON G. McDOWELL, IV
June 5, 2012

Page 165

1  where Daniel was sticking his nose where it didn't
2  belong.
3  Q.  Is it typical for students to see someone have to
4     remove an item of clothing in the classroom?
5  A.  It is typical for students to see students be
6     asked to dress according to dress code, yes.
7  Q.  Would it be reasonable to ask why it was
8     unacceptable so that student would know what to
9     wear or what not to wear?
10 A.  No, I don't see that as reasonable. They have a
11    student code of conduct and they have a student
12    handbook that it is assumed they've read and
13    understand the dress code.
14 Q.  Now, somewhere in between, then, the conversation
15    regarding the Confederate flag and the rainbow
16    flag you say Daniel asked about your T-shirt that
17    you were wearing that day?
18 A.  Right. I believe so, yes.
19 Q.  And that was the T-shirt that you had on that
20    addressed anti-bullying?
21 A.  Correct.
22         MS. BARTOS: I'm sorry, can you repeat
23    the question? Did you say it was sometime during
24    or was it after? Because I thought the testimony
25    was after the discussion regarding the rainbow

Page 166

1     flag is when he asked about the T-shirt.
2  BY MS. MERSINO:
3  Q.  We can read it back, but it was sometime between
4     --
5         MS. BARTOS: Was it between?
6         THE WITNESS: No, I think -- I think we
7     had the -- he asked about the Confederate flag --
8     or, yeah, the Confederate flag. I explained the
9     difference between the Confederate flag and
10    rainbow flag, and then he talked about the
11    T-shirt. So in my view as teacher, instead of
12    just -- instead of Daniel saying, oh, okay and
13    stopping, he continued the discussion.
14 BY MS. MERSINO:
15 Q.  Was he supposed to say, oh, okay, and not say
16    anything else at that point?
17 A.  It would be typical in a classroom, sure. I mean,
18    I don't know what high school you went to, but
19    typical high school behavior, yes.
20 Q.  It's what you would have wanted him to do?
21 A.  Yes.
22 Q.  Was to stop the discussion at that point?
23 A.  Right. I answered his question, I explained it to
24    him, and now would be the time to move on.
25 Q.  Okay. So then what exactly does Daniel say in

Page 167

1     reference to your anti-bullying T-shirt?
2  A.  That, I don't remember very clearly. I'm sure he
3     just asked why are you wearing that T-shirt or
4     what is that T-shirt about, something to that
5     effect, but I don't remember that very clearly.
6  Q.  And the T-shirt is an anti-bullying T-shirt, and
7     that's what you wanted to devote the first part
8     of your class to, correct?
9  A.  The first five minutes, yes.
10 Q.  And so Daniel asked the question about the
11    T-shirt?
12 A.  Um-hmm.
13 Q.  And how do you respond?
14 A.  You know, I don't remember. I don't remember. I
15    probably said it's an anti-bullying T-shirt and it
16    refers to anti-bullying, but that part I don't
17    remember very well.
18 Q.  What does the T-shirt have on it?
19 A.  It has Tyler's Army in the front, and then on the
20    back it says something to the effect of killing
21    evil with kindness, I believe.
22 Q.  And Tyler's Army, did any student ask to explain
23    what that meant?
24 A.  Throughout the course of the day, I think, one or
25    two might have, yes.

Page 168

1  Q.  And how did you respond to their questions?
2  A.  I responded that it referred to Tyler Clementi,
3     the young man at Rutgers that committed suicide
4     and also referred to Dumbledore's Army from Harry
5     Potter.
6  Q.  Anything else about Tyler besides the fact that
7     he did commit suicide?
8  A.  He committed suicide because he was bullied.
9  Q.  And did you explain how he was bullied?
10 A.  I don't think so, no.
11 Q.  But did you show the video in class, Exhibit 16?
12 A.  The first three minutes, yes.
13 Q.  And what is the topic of that video?
14 A.  The topic of that video is about student --
15    teenage students who committed suicide due to
16    bullying.
17 Q.  And is there a specific common thread with these
18    teenagers who committed suicide in the video?
19 A.  They were bullied and they committed suicide.
20 Q.  Don't all of the teenagers also happen to be
21    homosexual?
22 A.  I believe so, yes.
23 Q.  And Tyler Clementi was homosexual, correct?
24 A.  I believe so, yes.
25 Q.  And he committed suicide after the widely

JOHNSON G. McDOWELL, IV
June 5, 2012

Page 169

1   publicized video of him in his dorm room with
2   another male, correct?
3   A.  That's correct.
4   Q.  So when Daniel asked his question about the
5       purple T-shirt, the Tyler's Army T-shirt, you say
6       that you can't quite remember what your
7       explanation is?
8   A.  Um-hmm.
9   Q.  Do you believe that at that point homosexuality
10      was discussed?
11  A.  No, no. I believe I probably referred to the fact
12      that it referred to anti-bullying, and it was an
13      Anti-Bullying Day.
14  Q.  And which was -- which club was it again that put
15      on the Anti-Bullying Day?
16  A.  I don't know that any club necessarily put on the
17      anti-bullying day, but it was the Gay-Straight
18      Alliance that had posters up about it.
19  Q.  What does that club do typically? What are their
20      activities? What's their mission?
21  A.  Like any other high school club, they gather
22      together like-minded students to discuss topics
23      and hang out.
24  Q.  What kind of topics would the Gay-Straight
25      Alliance discuss specifically?

Page 170

1   A.  I don't know. It would be very similar to, you
2       know, bible club or, you know, fellowship of
3       christian athletes. It's a group of like-minded
4       students who get together and discuss what it is
5       they're going to discuss.
6   Q.  Like-minded in the fact they want to be in a
7       group, the Gay-Straight Alliance, correct?
8   A.  Right. I believe so.
9           MS. BARTOS: If you don't know, you
10      don't know. I don't want you guessing.
11  BY MS. MERSINO:
12  Q.  Did the students at Howell from what you heard
13      that day, did they know that Anti-Bullying Day
14      was associated with the Gay-Straight Alliance?
15  A.  I'm not going to speculate as to what students
16      know.
17  Q.  Were you familiar with the poster that the
18      Gay-Straight Alliance put up about anti-bullying?
19  A.  The Gay-Straight Alliance put up posters, yes.
20  Q.  Are you familiar with any activities that they
21      were putting on that day?
22  A.  I'm not.
23  Q.  Now, Daniel asked you a question about the
24      Tyler's Army T-shirt, and then you state that you
25      responded by discussing anti-bullying?

Page 171

1   A.  I believe so, yes. I don't clearly remember.
2   Q.  And then what is the next thing that happens? Do
3       you say something? Does he say something?
4   A.  The next thing I assume, you know, because certain
5       points stand out. Others don't. But the next
6       thing I assume is the I-don't-accept-gays comment.
7   Q.  And what is the very next thing after that?
8   A.  I said you can't say that in class.
9   Q.  And this is during the class while all the
10      students were there?
11  A.  Um-hmm.
12  Q.  Did you explain why he couldn't say that in
13      class?
14  A.  It's an inappropriate comment to say in class.
15  Q.  Did you say that to Daniel Glowacki that day?
16  A.  I don't remember.
17  Q.  So you stated -- he says I don't accept gays.
18      You say you can't say that in class?
19  A.  Um-hmm.
20  Q.  Is there any other discussion at that point?
21  A.  And he says I don't accept gays because I'm
22      Catholic, or I don't accept gays, I'm Catholic.
23          MS. BARTOS: We just went through this
24      about four minutes ago, counsel. I suggest you
25      read over your notes before you waste any more

Page 172

1       time.
2   BY MS. MERSINO:
3   Q.  Okay. So then you're stating -- you say you
4       can't say that in class. Daniel Glowacki says I
5       don't accept gays, I'm Catholic?
6           MS. BARTOS: And he said you can't say
7       that in class, just like you can't say I don't
8       accept blacks.
9   BY MS. MERSINO:
10  Q.  Can you answer the question?
11  A.  I said you can't say that in class just like you
12      can't say I don't accept blacks in class.
13  Q.  Just like you can't say that you don't accept
14      blacks in class?
15  A.  Um-hmm.
16  Q.  At that point what does Daniel say next, or do
17      you say something more?
18  A.  I don't remember what happened next.
19  Q.  At that point does it get foggier?
20  A.  It gets foggier, yes.
21  Q.  Why is that?
22  A.  Because other students join in and Daniel
23      continues to argue and I continue to try and say,
24      you know, you can't say that in class, it's
25      inappropriate to say in class.



JOHNSON G. McDOWELL, IV
June 5, 2012

Page 173

1   Q.  Other students join in.  Who joins in?
2   A.  **I don't remember exactly who.**
3   Q.  How many students join in?
4   A.  **I don't know.  I do not remember.**
5   Q.  And how do these other students join in?  Do they
6       raise their hand?  Do they start talking?
7   A.  **No, they just start talking.**
8   Q.  And what are the other students saying?
9   A.  **I don't remember.  What I do know is I've lost**
10      **control of the class at this point.**
11  Q.  Now, what do you say in response to the other
12      students, in response to their comments?
13  A.  **I don't remember, because I don't remember the**
14      **specific comments that were said to me.**
15  Q.  What where the comments regarding?
16  A.  **I assume the topic that was being discussed, the I**
17      **don't accept gays and whether or not you can say**
18      **that in class, but I don't remember.**
19  Q.  Did any of the students comment on what you
20      stated about not accepting blacks?
21  A.  **I don't remember.**
22  Q.  Okay.  So other students are joining in on the
23      conversation, correct?
24  A.  **Um-hmm.  That's correct.**
25  Q.  And you can't remember exactly what's said

Page 174

1       between you and the other students?
2   A.  **That's correct.**
3   Q.  And the other students don't raise their hands
4       either?
5   A.  **No, no, they don't.**
6   Q.  Do you remember how the other students were
7       behaving?
8   A.  **No, not -- I mean, not exactly, no.**
9   Q.  Was it a calm discussion --
10  A.  **No.**
11  Q.  -- between the other students?
12  A.  **No, it was not a calm discussion at that point,**
13      **no.**
14  Q.  So the other students were not acting calmly?
15  A.  **No, I wouldn't characterize it as that, no.**
16  Q.  Why not?
17  A.  **Because I don't believe they were.**
18  Q.  Did anyone stand up in class?
19  A.  **I don't remember.**
20  Q.  Did anyone raise their voice?
21  A.  **I'm sure students raised their voice.  They do all**
22      **the time.**
23  Q.  And which students would those be?
24  A.  **I don't remember.**
25  Q.  And how many students raised their voice?

Page 175

1   A.  **I don't remember.**
2   Q.  Okay.  Safe to say you said something in response
3       to the other students?
4   A.  **Safe to say that, yes.**
5   Q.  And how did you say something to the other
6       students?  Were you getting upset at that point?
7   A.  **I was probably getting frustrated, yes.**
8   Q.  And why were you getting frustrated?
9   A.  **Because my class was now not doing what it should**
10      **have done, not doing what I planned on it doing,**
11      **and that would be talking about anti-bullying for**
12      **five minutes and then going to economics.**
13  Q.  Okay.  What should your class have done?
14  A.  **In a typical situation, after I answered Daniel's**
15      **question, that would have been the end of that**
16      **discussion.  I would have talked about**
17      **anti-bullying a little bit and we would have gone**
18      **on into economics.**
19  Q.  What was it that you planned to do during that
20      time, though, on the 20th of October?
21  A.  **What do you mean?**
22  Q.  What was your plan for the beginning of your
23      class?
24          MS. BARTOS:  He asked and answered that
25      about six times, counsel, and I'm getting a little

Page 176

1       tired of this.  You can write this down.  Mark it
2       however you need to, but he's not answering that
3       question for the sixth or seventh time.  You can
4       take it up with Judge Duggan.  I don't care.
5   BY MS. MERSINO:
6   Q.  Do you understand the question?
7           MS. BARTOS:  He's not answering that
8       question.  He's not answering it.  He's answered
9       it already.
10  BY MS. MERSINO:
11  Q.  You still have to answer the question.
12          MS. BARTOS:  No, he doesn't if I
13      instructed him not to, he doesn't.
14          MS. MERSINO:  You're refusing to have
15      him answer the question?
16          MS. BARTOS:  Yes.  Move on to something
17      else.  Mark this one down.  You can take it up
18      with Judge Duggan at the end of the day, but let's
19      move on.
20          MS. MERSINO:  I think at this point we
21      should take a break.
22          MS. BARTOS:  Okay.
23          (Off the record at 9:52 a.m.)
24          (Back on the record at 10:09 a.m.)
25  BY MS. MERSINO:

JOHNSON G. McDOWELL, IV
June 5, 2012

Page 177

1  Q.  So to clarify, I was asking at the point when the
2      other students were getting involved in this
3      discussion, what were your lesson plans at that
4      point?
5  A.  **The lesson plan I had for that day was to talk for**
6      **five minutes about anti-bullying and then to get**
7      **into whatever it was we were studying in econ that**
8      **day, which I don't remember.**
9  Q.  And in your other classes, approximately how long
10     did you speak about anti-bullying?
11 A.  **About five minutes.**
12 Q.  And did you speak for five minutes and then play
13     the video?
14 A.  **Yeah. That would be correct.**
15 Q.  So approximately the first eight minutes of class
16     were devoted to anti-bullying?
17 A.  **Approximately, yes, more or less.**
18 Q.  And you said that the other students were raising
19     their voices?
20 A.  **I believe so, yes.**
21 Q.  And at this point, you were getting frustrated?
22 A.  **That's correct.**
23 Q.  And you also said that Daniel was arguing at this
24     point?
25 A.  **That's correct.**

Page 178

1  Q.  Was he speaking with the other students in class?
2  A.  **Yes, he was.**
3  Q.  And what was he saying?
4  A.  **I don't remember.**
5  Q.  Do you remember how many comments he made to
6      other students?
7  A.  **I don't remember.**
8  Q.  Do you remember the tone of voice he used?
9  A.  **I don't remember, no.**
10 Q.  Do you remember which students he spoke to?
11 A.  **No.**
12 Q.  Do you remember what the other students said back
13     to Daniel?
14 A.  **No, I do not.**
15 Q.  Did you tell the class at that point to stop?
16 A.  **I don't remember if I did or not.**
17 Q.  Did you make any sort of request of the class in
18     its entirety for the way they were behaving?
19 A.  **I don't remember.**
20 Q.  Okay. So what's the next thing that you do?
21 A.  **The next thing that I do is I then -- because**
22     **Daniel was still pursuing his point of I don't**
23     **accept gays, it's against my religion, I then put**
24     **him in the hallway.**
25 Q.  How do you put Daniel in the hallway?

Page 179

1  A.  **I told him to get out into the hallway.**
2  Q.  Did you tell him anything else other than get out
3      in the hallway?
4  A.  **I probably said get out in the hallway.**
5  Q.  And probably, or you remember saying that?
6  A.  **I probably -- that's typically what I say, so**
7      **that --**
8  Q.  Did you ever tell Daniel after you had the
9      discussion with the entire class to stop talking
10     prior to saying get out in the hallway?
11 A.  **Yes, I did.**
12 Q.  So after the class was speaking up and making
13     comments, you made a request of Daniel?
14 A.  **Yes.**
15 Q.  And what was that request?
16 A.  **I asked -- I believe I asked him to stop talking**
17     **or stop commenting -- stop saying I don't accept**
18     **gays.**
19 Q.  And what was his reaction after the entire class
20     was involved?
21 A.  **I don't understand your question.**
22 Q.  Okay. So the order of things is at this point
23     we're talking about when the other students were
24     discussing matters and you said they were
25     getting frustrated at this point.

Page 180

1  A.  **Um-hmm.**
2  Q.  And at this point do you yet again ask Daniel to
3      stop?
4  A.  **I believe I did, yes.**
5  Q.  And what is his reaction?
6  A.  **He didn't stop.**
7  Q.  And then what do you do next?
8  A.  **I told him to get in the hallway.**
9  Q.  What does Daniel do?
10 A.  **He gets up and gets in the hallway.**
11 Q.  Do you tell him why?
12 A.  **I would assume that I did after he was in the**
13     **hallway, yes.**
14 Q.  Okay. Can you walk me through the steps that
15     occur after you tell Daniel to get into the
16     hallway.
17 A.  **Then I -- at that point when he went out into the**
18     **hallway, another student came in who was coming in**
19     **to class late, and he said, well, I don't accept**
20     **gays either, can I get in the hallway. And I**
21     **said, sure.**
22 Q.  How did that student know what the conversation
23     was in class?
24 A.  **He had just walked into class.**
25 Q.  How long was the other student in class for?



JOHNSON G. McDOWELL, IV
June 5, 2012

Page 189

1   that you do?  Do you address the class?
2   **A.   When I go back into class, we -- the students had**
3   **some questions of me about what just happened and**
4   **about the whole issue of rainbow flag and gays and**
5   **bullying, suicide, and so, you know, I had a**
6   **choice of one of two things, to not discuss it at**
7   **all with my students and stop the discussion right**
8   **there, or to do what we often do as teachers, to**
9   **diffuse the situation and get it back down to a**
10  **normal level, and then move on with class, which**
11  **is what I did.  I talked to them about it for a**
12  **little while, diffused the situation, and then got**
13  **on with class.**
14  Q.   Okay.  So what were the questions that the
15      students asked?
16  **A.   I don't remember exactly.**
17  Q.   You said that there were some questions about the
18      rainbow flag and the Confederate flag?
19  **A.   Yes, there were, but I don't remember what exactly**
20  **the questions were.**
21  Q.   Do you remember which students participated in
22      the discussion?
23  **A.   I do not.**
24  Q.   Did some students support Daniel's position?
25  **A.   I'm sure some did, yes.**

Page 190

1   Q.   And others opposed it?
2   **A.   That's correct.**
3   Q.   And were these students allowed to have a
4       discussion with each other?
5   **A.   That would have been part of that diffusing of the**
6   **situation.**
7   Q.   Did any of the students in the classroom ask
8       about free speech?
9   **A.   I don't remember.**
10  Q.   Approximately how long did you discuss the
11      situation for?
12  **A.   It probably took another 10 to 15 minutes to**
13  **diffuse the situation, calm everybody down.**
14  Q.   At that point did you also discuss anti-bullying?
15  **A.   At that point then I showed the three minutes of**
16  **the video.  I was determined to go through my**
17  **lesson plan the way I wanted to before Daniel**
18  **interrupted the class.**
19  Q.   When you were having the conversation with the
20      class, did you also incorporate discussions of
21      anti-bullying?
22  **A.   I don't remember.**
23  Q.   Did you consider Daniel's comment to be bullying?
24  **A.   I did, yes, at that time.**
25  Q.   Did you tell this to the class?

Page 191

1   **A.   I don't remember whether I told it to the class**
2   **after he left, no.**
3   Q.   What was your lesson plan in regard to economics
4       that day?
5   **A.   I don't remember.**
6   Q.   You don't remember what it was?
7   **A.   No.  No.  It's a semester-long class.  I don't**
8   **remember exactly what I teach on any given day.**
9   Q.   What's your typical way that you organize your
10      lesson plans?  Do you plan it out like the Sunday
11      before so you have everything planned for the
12      week?
13  **A.   No, no.  I'm a 20-year teacher.  I've taught**
14  **economics for 20 years.  I can walk into the**
15  **classroom and teach any given subject.  Students**
16  **could just toss up a subject in economics and I**
17  **can do a 50-minute lesson on that subject.**
18  Q.   You do follow certain chapters, though, correct,
19      in your class?
20  **A.   There is a textbook, and I do follow that**
21  **textbook, although we jump around because the**
22  **textbook is not very well organized.**
23  Q.   Do you give students then reading assignments or
24      homework prior to the day's work?
25  **A.   Sometimes, sometimes not.**

Page 192

1   Q.   What's your typical class like?
2   **A.   It varies.  I mean, it all varies from day to day.**
3   **That's why I've been nominated for teacher of the**
4   **year.  On any given day, it could be -- it could**
5   **be some lecture, there could be some discussion,**
6   **there could be an economics video, there could be**
7   **project-based learning, there could be group work,**
8   **there could be jigsawing, there could be students**
9   **developing games.**
10  Q.   And all of these activities and methods of
11      teaching, they all relate to economics, correct?
12  **A.   Correct.  They're just processes.**
13  Q.   And do you typically try to teach just economics
14      during your economics courses?
15  **A.   Yeah, typically.**
16  Q.   And on this day did you plan on teaching about
17      anti-bullying and then teaching about economics?
18  **A.   That's correct.**
19  Q.   And you don't recall what you were going to teach
20      in economics?
21  **A.   No, which would be -- you could ask me what I**
22  **taught last week in economics and I wouldn't**
23  **recall on a given day.  You know, I've taught --**
24  **since October 20th, 2010, there have been over 200**
25  **days of school -- maybe 250 days of school in**



JOHNSON G. McDOWELL, IV
June 5, 2012

Page 197

1  Q.  No other students in the classroom were suspended
2      from the class?
3  A.  No, only Daniel and Adam.
4  Q.  How long did that discussion take place?
5  A.  Which discussion?
6  Q.  Over how much time, the discussion with the
7      students?
8          MS. BARTOS:  Asked and answered.  Look
9      back at your notes.  He said ten minutes.
10  BY MS. MERSINO:
11  Q.  Is it fair that your discussion with the students
12      occurred over a ten-minute long period of time?
13  A.  That's fair.
14  Q.  And then after you discussed the matter with the
15      students for approximately 10 minutes, then you
16      entered into a discussion about Anti-Bullying
17      Day?
18  A.  No. All I did at that point was show the video --
19      the three minutes of the video.
20  Q.  How did you intro into the video?
21  A.  I said I have a video I want to show you.
22  Q.  Did you give any other explanation?
23  A.  I don't believe so at that time, no.
24  Q.  The discussion that you had with the students in
25      the classroom that you say occurred over

Page 198

1      approximately 10 minutes, was it related to the
2      video?
3  A.  No.  No.  It was related to Daniel Glowacki and
4      the situation beforehand.
5  Q.  And then the next thing you do is without
6      explanation, pop in the video?
7  A.  That's correct.  It was an anti-bullying video.
8      So we started the class with anti-bullying.
9      Daniel interrupted the class.  Once that situation
10     was taken care of, we went to the anti-bullying
11     video.  It would make logical progression within
12     the 16-, 17-year-old students' minds.
13  Q.  What did you explain then about anti-bullying at
14      the beginning of the class?
15  A.  I said -- remember, I had to explain the shirt,
16      because the question was asked, and then from that
17      point on.
18  Q.  And you explained that the shirt was
19      anti-bullying.  Anything else?
20  A.  No.  That's as far as I got, I believe.
21  Q.  And you showed the video for approximately how
22      long?
23  A.  Three minutes.
24  Q.  And after the video is done, then is there any
25      discussion about the video and its contents?

Page 199

1  A.  I don't believe so, no.
2  Q.  And at that point you begin teaching economics?
3  A.  That's correct.
4  Q.  And you stated that that's for approximately 15
5      to 20 minutes?
6  A.  Ten to 15 to 20 minutes, yeah.
7  Q.  Which one do you believe, 10 --
8  A.  10 to 15 to 20 minutes.  I don't remember exactly
9      how long.
10  Q.  After --
11  A.  I don't.  We don't time stamp our classes.
12  Q.  After class what occurs?
13  A.  Pardon me?
14  Q.  What occurs after class?
15  A.  After class I go down to Jen Goodwin and talk to
16      her and Dr. Sharp about what occurred in class,
17      and I write up a referral for Daniel Glowacki and
18      I believe Adam, and we have a discussion about
19      contacting Mrs. Glowacki, and I believe that's it.
20      And I explained to Dr. Sharp that, you know,
21      Daniel can come back to class the next day, once
22      he talks to me before class, and that was it.
23  Q.  And the referral, do you remember your basis for
24      writing up the referral?
25  A.  I do not.  You can look at the referral, but I

Page 200

1      don't remember what I wrote on a referral from a
2      year and a half ago.
3  Q.  Do you remember what you told Jennifer Goodwin
4      about what happened?
5  A.  I do not.
6  Q.  Do you remember what you told Dr. Sharp?
7  A.  No, I don't.
8  Q.  Do you remember stating that you felt upset when
9      you initiated the snap suspension about Daniel?
10  A.  I'm sure I probably did.
11  Q.  And why didn't you tell Dr. Sharp or Jennifer
12      Goodwin that you were upset when you issued the
13      snap suspension?
14  A.  Because I felt bad for the students that were in
15      the classroom.  I mean, if they were gay students
16      that were in the class and we've got one, two
17      students saying I don't accept gays, I mean, you
18      know -- I mean, right when we're talking on a
19      situation about bullying and suicide, and the
20      suicide of gay students has been occurring, you
21      know, that's upsetting.  It would be the same if
22      somebody came in and said I hate Asians and there
23      were Asians in the class.  That would be upsetting
24      to me as a teacher to think that those students
25      who were of Asian descent would be sitting there

