**EXHIBIT E**

```
                                                                    Page 1
 1              IN THE UNITED STATES DISTRCT COURT
                FOR THE EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION
 3    SANDRA GLOWACKI, on behalf of her
      minor children, D.K.G and D.C.G.,
 4
                  Plaintiffs,
 5                                          CASE NO. 11-cv-154891
 6    vs
 7
      HOWELL PUBLIC SCHOOL DISTRICT,
 8    JOHNSON "JAY" MCDOWELL, individually
      and in his official capacity as a teacher
 9    in the Howell Public School District,
10
                  Defendants.
11    _____/
12
13         The Deposition of DANIEL GUERNSEY, taken before me,
14    Jennifer Wall, CSR-4183, a Notary Public within and for the
15    County of Oakland, Acting in Washtenaw, State of Michigan, at
16    24 Frank Lloyd Wright Drive, Ann Arbor, Michigan on Friday,
17    October 12, 2012.
18    APPEARANCES:
19         ERIN ELIZABETH MERSINO, ESQ.
           The Thomas More Law Center
20         24 Frank Lloyd Wright Drive
           Ann Arbor, Michigan 48106
21         (734) 827-2001
22              Appearing on behalf of Plaintiff.
23
24
25
```

1      referenced?
2   A. I do.
3   Q. Could you tell me what you mean when you say the student was
4      speaking in a fumbling way?
5   A. It was endearing and touching to read his deposition, and to
6      see, here is a child who was, from what I can tell, received
7      only minimal catechetical training in Sunday school, stand
8      up to lawyers, stand up to a teacher and try to articulate
9      something that was in his heart and in his culture that he
10     was not fully trained to do.
11              And when -- I think it was -- I'm sorry. The
12     questioning that -- I forgot your name.
13              MS. BARTOS: Bartos.
14              THE WITNESS: The questioning that you did
15     was fantastic. And it's precisely what Mr. McDowell should
16     have done.
17              When you got to the crux of the
18     matter, in one question, that could have prevented this
19     whole lawsuit, and you asked -- you know, the
20     student -- this is from page 32, when you asked in line
21     four.
22              "Q. Do you have a belief on
23     homosexuality?
24              A. Yes."
25              Before this the student did a great

Page 46

1  A.  Absolutely.

2  Q.  In what ways?

3  A.  If one interprets to mean, I'm against gays, to mean that I hate gays and gays should be persecuted, then that is a terrible statement to make, and it is against human dignity and needs to be confronted accurately, okay.

       If the statement "I'm against gays" means, you know what, my faith tradition teaches me that homosexual acts are disordered, then that is a legitimate expression of Catholic teaching and of the faith tradition of millions of people.

       So that's the fumbling. It could have been easily solved, but there were other energies in the room.

15  Q.  Without the follow-up that occurred in the deposition, do you believe that the student's initial expression in the classroom could reasonably have been interpreted as having anything to do with homosexual marriage?

19  A.  Yes.

20  Q.  Why is that?

21  A.  Well, can you repeat the question. I'm sorry. I want to make sure we are talking about the same thing.

23  Q.  Just to clarify, my understanding is that the student's initial expression in the classroom was "I don't accept gays"?

Page 55

1  Q.  Dr. Guernsey, first of all, why are you here in the Detroit
2      area today?
3  A.  To serve as an expert witness.
4  Q.  Do you have other reason to come to Detroit?
5  A.  No, but I appreciate the 15 minutes of fall.  It's
6      beautiful.
7  Q.  Were you informed that the attorneys would come down to see
8      you as opposed to you coming up here?
9  A.  No.
10 Q.  All right.
11 A.  I'm glad I got the opportunity to come up though.  I'd be
12     glad to show you down in Florida as well.  If you're going
13     to come down, come down in February.
14 Q.  Do you agree with the premise that teachers in the
15     classroom, whether it be a Catholic school or a public
16     school, have an obligation to protect their students?
17 A.  Yes.
18 Q.  And they have an obligation to stop what they perceive as
19     bullying?
20 A.  They have a responsibility to accurately assess the
21     classroom environment.
22 Q.  And to put an end to bullying in the classroom?
23 A.  To put an end to accurately identify bullying, yes.
24 Q.  And what they perceive as bullying, they need to stop,
25     right?

```
 1                     MS. MERSINO:  Objection.  Asked and
 2       answered.
 3   BY MS. BARTOS:
 4   Q.  You can go ahead and answer.
 5   A.  They need to make their best professional judgment and then
 6       be held accountable to those judgments.
 7   Q.  And if that judgment is that that one student is bullying
 8       another student, they have to stop that bullying?
 9   A.  They are to use the appropriate measures and means to
10       protect all students.
11   Q.  That means stop what they perceive as bullying?
12   A.  Using the correct methodology and means, yes.
13   Q.  Thank you.  Do you have an opinion as to the appropriateness
14       of Mr. McDowell giving like a five minute discussion or talk
15       about anti-bullying and showing that video that he intended
16       to show?
17   A.  I don't know the context of the school and what the
18       expectations were for the school.  Normally, I would expect
19       that not to occur in an economics class.  And normally I
20       would expect it to occur under a teacher who was properly
21       trained and properly prepared to deal with the comprehensive
22       nature of the discussion to ensure that no one's rights were
23       harmed.
24   Q.  Do you believe that he had a plan to host a discussion of
25       homosexual -- of the homosexual experience?  You mentioned
```

Electronically signed by Jennifer Wall (201-178-308-8553)   020c9517-4eb0-4843-b0c9-d86e378966ec

1          If that's what one means by accept, but
2     clearly in Daniel's deposition that's not what I meant
3     by "I don't accept gays". He has never bullied a gay,
4     he is against gay bullying, he is against bullying in
5     general. He says it, and yet this guy got kicked out
6     of class because the teacher, in my estimation, is
7     acting like a bully.
8  Q. And your opinion to my question is based not just on the
9     statement, "I don't accept gays, blacks, Jews", whatever the
10    case, but what that person meant by that statement?
11 A. Right, because if they're saying, I don't accept homosexual
12    behavior as being moral, that is a legitimate faith claim
13    that the student needs to be able to express in public.
14         If he's saying, "I don't accept homosexuals
15    as people worthy of dignity and rights", then that
16    would be against the cultural norm of human respect and
17    the rights of the individuals and needs to be stopped,
18    and the Catholic church teachers that.
19 Q. I understand. Now I think I get where you're coming from.
20    You're looking at what the -- what Dan meant by that
21    statement as opposed to making that statement?
22         MS. MERSINO: Objection. That is a
23    mischaracterization of his testimony. You may answer.
24         MS. BARTOS: You need me to repeat?
25         THE WITNESS: I need you to repeat.