# GLOWACKI, ET AL v. HOWELL PUBLIC SCHOOL DISTRICT, ET AL

## RONALD C. WILSON

September 10, 2012

*Prepared for you by*



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw



EXHIBIT 3

RONALD C. WILSON
September 10, 2012

Page 24

```
 1   Q.   And is there any sort of requirement that a teacher
 2        has to sign that they've read all the school policies?
 3   A.   No, no.
 4   Q.   Is there ever any training specifically targeted for
 5        teachers to understanding the policies and guidelines?
 6   A.   No.
 7   Q.   Has it ever been considered to have the NEOLA
 8        representative come and give a presentation to
 9        teachers specifically?
10   A.   No.
11   Q.   And why is this?
12   A.   Well, if you review our Board policy, it's a fairly
13        broad and large document.  We do have -- the NEOLA rep
14        comes twice a year and does a review with myself, and
15        then, you know, based on the recommendations from
16        NEOLA, we take that to the Board, you know, but
17        it's -- given the number of unfunded mandates and
18        things that we are required to do, our in-service time
19        when we would normally present these kind of things to
20        teachers is usually focusing on student-achievement
21        issues or instructional issues.  The policies are
22        available.  Most organizations -- my previous two
23        districts have used NEOLA and -- and -- actually, the
24        first district I was with, Mount Pleasant, also used
25        NEOLA, too, and in 25 years I can't ever recall, as a
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

2c29ccaa-e1d0-4d83-878c-5aa0da8c2c2c

```
 1        couldn't say for sure.
 2                MR. HENLEY:  And, again, just for clarity of
 3        the record, this is the administrative guideline, not
 4        the policy.
 5   BY MS. MERSINO:
 6   Q.   But you don't recall that this administrative
 7        guideline, that there's been some sort of change that
 8        has --
 9   A.   I do not, no.
10   Q.   And are teachers trained and directed to follow the
11        administrative guidelines of Howell Public Schools?
12   A.   The administrative guidelines are included, you know,
13        within our policies, and I do expect that teachers
14        will follow those guidelines.
15   Q.   Handing you what's been marked as Exhibit 10, do you
16        recognize this?
17   A.   Yes, I do.
18   Q.   How do you recognize this?
19   A.   It's the 2240 controversial issues portion of our
20        by-laws and policies.
21   Q.   And can you describe, are teachers directed and
22        trained to follow this policy?
23                MR. HENLEY:  I think that's been asked and
24        answered.
25                THE WITNESS:  I don't know that we -- that
```

```
 1       we provide any specific training overall on all our
 2       policies and procedures.  I mean, like I said, once
 3       again, I'm dealing with people that are highly
 4       educated and they -- they are -- are aware that we
 5       have policies and procedures and guidelines and are
 6       expected to follow those.
 7  BY MS. MERSINO:
 8  Q.   In regard to the controversial issues policy, would
 9       you regard homosexuality and the discussion of
10       homosexuality in the classroom to be a controversial
11       issue?
12            MR. HENLEY:  Object to vagueness.
13            You can answer.
14            THE WITNESS:  I'm not sure if I would or
15       not.  I guess maybe -- I'm not sure.
16  BY MS. MERSINO:
17  Q.   If a teacher is planning to show a video on
18       homosexuality and, specifically, homosexual teens that
19       have committed suicide, would you believe that that
20       would be controversial?
21  A.   I think it lends itself to -- at least with my
22       familiarity with that day was an anti-bullying day,
23       and so bullying of any nature, whether it's because of
24       sexual preference or religion, color, you know,
25       gender, anything like that, is something that we find
```

1  unacceptable, and so I think that, you know,
2  necessarily showing a video about it and raising
3  awareness about that, I don't think that raises itself
4  to the level of a controversial issue.
5  Q.  So then students' parents should not be contacted
6      prior to showing a video on homosexuality and teenage
7      suicide?
8           MR. HENLEY:  Object to foundation and, also,
9      mischaracterizes testimony.  He said that bullying is
10     bad.  If we're talking about videos on homosexuality,
11     I mean, that can really cover an extremely broad
12     subject area between science and pornography.  I mean,
13     if we could be a little more specific, maybe we could
14     narrow the answer a little bit.
15 BY MS. MERSINO:
16 Q.  You can still answer the question.
17          MR. HENLEY:  If you can, go ahead.
18          THE WITNESS:  Well, here's how I feel about
19     this.  Like I said, I've been in education since, you
20     know, 1984, and I can remember when the movie, "The
21     Holocaust," came out, you know, and there was an
22     excerpt where people that were homosexuals had been
23     ostracized by the Germans and sent to concentration
24     camps.  So, I mean, that's something, as a junior
25     in high school, that I saw that movie and there was a

Page 30

```
 1        discussion about that and a discussion about how not
 2        only did they target Jews, they targeted Catholics and
 3        lots of other different groups, so I think that there
 4        are things that we talk about and, you know, what's
 5        happening in our society is really a reflection or
 6        just a microcosm of what's happening in our schools.
 7        So there are issues out there that we talk about.  We
 8        are not necessarily asserting a position, you know, or
 9        opinion on it, but what we are saying is that we don't
10        believe that anybody should be bullied because of
11        their preferences or beliefs.  It's not that we're
12        looking to promote those necessarily, but we don't
13        think anybody should be bullied or harassed as a
14        result of that.
15   BY MS. MERSINO:
16   Q.   Okay.  So you said that the 20th of October of 2010
17        was an anti-bullying day?
18   A.   Correct.  It was a spirit or -- a spirit day which
19        was -- my understanding was to promote, you know,
20        anti-bullying, raise awareness of bullying and the
21        harmful effects of bullying.
22   Q.   Were you aware that teachers were wearing purple
23        shirts?
24   A.   Not until after the fact, I was not, no.
25   Q.   When were you first aware of the anti-bullying day?
```



RONALD C. WILSON
September 10, 2012

Page 58

1  A.  Yes.
2  Q.  And has it taken place?
3  A.  Yes, it did.
4  Q.  And can you describe it for me?
5  A.  We had a school attorney come in and he did some
6      research on public or First Amendment rights, and
7      provided I believe two separate training sessions for
8      Mr. McDowell, and we also provided it for all our
9      teachers, too, at a later day.
10 Q.  And who put on the training?
11 A.  Dave Revore, an attorney from the Thrun Law Firm.
12 Q.  Could you spell the last name?
13          MR. HENLEY:  I could.  R-E-V-O-R-E.
14 BY MS. MERSINO:
15 Q.  And when did this occur?
16 A.  I believe it was February of 2011, I believe.
17 Q.  Is there any written documentation of this?
18 A.  Yes.  There would have been a handout and it was -- I
19     believe it was done on a professional development day
20     so it would have been memorialized in our professional
21     development for that day.
22 Q.  You said that Mr. McDowell had an individualized
23     training?
24 A.  Correct.
25 Q.  And how many people were present at the training?



RONALD C. WILSON
September 10, 2012

Page 59

```
 1   A.   I'm not sure.
 2   Q.   Can you describe the training with the teachers for
 3        me?
 4   A.   I did attend that and, essentially, it just went
 5        through the current case law and -- regarding, you
 6        know, First Amendment rights and free speech and --
 7        which is presenting, you know, this is the
 8        information, this is what we -- you know, in these
 9        situations, this is what we recommend.
10   Q.   And prior to February 2011, was there any First
11        Amendment training conducted at the school?
12   A.   Not that I'm aware of, no.
13   Q.   And why was it decided that First Amendment training
14        should take place at the school in February of 2011?
15   A.   Well, given the incident that occurred on the 20th and
16        then subsequent questions about, you know, how we
17        should handle those types of situations, it seemed
18        somewhat self-evident that we needed to go ahead and
19        review this with our staff and make sure that we set
20        some clear guidelines to ensure that we don't have a
21        repeat.
22   Q.   Are there clear guidelines in place now?
23   A.   I think in referencing -- I think the guidelines that
24        are in place are clear, but I believe that
25        in referencing Mr. Revore's presentation, he
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

2c29ccaa-e1d0-4d83-878c-5aa0da8c2c2c