IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

SANDRA GLOWACKI, on behalf of her
minor children, D.K.G. and D.C.G.,

        Plaintiffs,

    v.

HOWELL PUBLIC SCHOOL DISTRICT, and
JOHNSON ("JAY") MCDOWELL, individually
and in his official capacity as a teacher in the
Howell Public School District,

        Defendants.

Case No. 2:11-cv-15481-PJD-DRG

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

Hon. Patrick J. Duggan

Mag. Judge David R. Grand

THOMAS MORE LAW CENTER
Richard Thompson (P21410)
Erin Mersino, Esq. (P70886)
24 Frank Lloyd Wright Dr.
P.O. Box 393
Ann Arbor, MI 48106
emersino@thomasmore.org
(734) 827-2001

THRUN LAW FIRM, P.C.
Roy Henley (P39921)
2900 West Road, Suite 400
P.O. Box 2575
East Lansing, MI 48826-2575
rhenley@thrunlaw.com
(517) 484-8000
*Counsel for Defendant Howell Public School District*

AMERICAN FREEDOM LAW CENTER
Robert J. Muise (P62849)
P.O. Box 131098
Ann Arbor, MI 48113
rmuise@americanfreedomlawcenter.org
(734) 635-3756
*Counsel for Plaintiffs*

PLUNKETT COONEY
Suzanne Bartos (P36490)
535 Griswold, Suite 2400
Detroit, MI 48226
sbartos@plunkettcooney.com
(313) 983-4741
*Counsel for Defendant Johnson ("Jay") McDowell*

---

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

NOW COME Plaintiffs, Sandra Glowacki, D.C.G. and D.K.G. (hereinafter "Plaintiffs"), by and through their counsel, the Thomas More Law Center, and move this Honorable Court, to grant Plaintiffs' motion for summary judgment.  In support of their motion, Plaintiffs attach their brief in support and also briefly state:

1.      On October 20, 2010, Defendants violated Plaintiffs' right to free speech under the First Amendment and right to the Equal Protection of the Law under the Fourteenth Amendment.

2.      Plaintiff D.K.G. was kicked out of his economics class for calmly answering a question posed by the teacher, Defendant McDowell, about the Plaintiff's religious beliefs on homosexuality.  Due to voicing those religious beliefs and explaining that his religion does not accept the homosexual lifestyle, Defendant McDowell removed Plaintiff D.K.G. from class and issued a snap suspension.

3.      Defendant McDowell issued the snap suspension and immediately interceded to stop what he erroneously perceived to be harassment upon a student group or group of students, pursuant to School District policy.

4.      Defendants' actions chilled the speech of D.C.G., who is Plaintiff D.K.G.'s brother and a student a Howell High School who shares the same religious viewpoint of homosexuality as Plaintiff D.K.G.

5.      The "unmistakable holding" of the Supreme Court for over the last half-century in regard to the First Amendment rights available to students, is that "[i]t can hardly be argued that either students . . . shed their constitutional rights to freedom of speech or expression at the school house gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).

6.     This case presents the same issues decided by Judge Rosen in 2003, where as here—the Court examined ". . . the ironic, and unfortunate, paradox of a public high school celebrating 'diversity' by refusing to permit the presentation to students of an 'unwelcomed' viewpoint on the topic of homosexuality and religion, while actively promoting the competing view." *Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 780 (2003).

7.     "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

WHEREFORE, for the reasons articulated in Plaintiffs' Brief in Support which is attached to this motion, Plaintiffs request this Court GRANT Plaintiffs' Motion to for Summary Judgment.

Respectfully submitted this 15th day of November, 2012.

*Attorneys for Plaintiffs:*

THOMAS MORE LAW CENTER

s/ Richard Thompson_____
Richard Thompson, Esq. (P21410)
24 Frank Lloyd Wright Blvd.
P.O. Box 393
Ann Arbor, MI 48106
(734) 827-2001
rthompson@thomasmore.org

s/ Erin Mersino_____
Erin Mersino, Esq. (P70886)
24 Frank Lloyd Wright Blvd.
P.O. Box 393
Ann Arbor, MI 48106
(734) 827-2001
emersino@thomasmore.org

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SANDRA GLOWACKI, on behalf of her minor children, D.K.G. and D.C.G., | Case No. 2:11-cv-15481-PJD-DRG |
| Plaintiffs, | PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| v. | |
| HOWELL PUBLIC SCHOOL DISTRICT, and JOHNSON ("JAY") MCDOWELL, individually and in his official capacity as a teacher in the Howell Public School District, | Hon. Patrick J. Duggan |
| | Mag. Judge David R. Grand |
| Defendants. | |

THOMAS MORE LAW CENTER
Richard Thompson (P21410)
Erin Mersino, Esq. (P70886)
24 Frank Lloyd Wright Dr.
P.O. Box 393
Ann Arbor, MI 48106
emersino@thomasmore.org
(734) 827-2001

THRUN LAW FIRM, P.C.
Roy Henley (P39921)
2900 West Road, Suite 400
P.O. Box 2575
East Lansing, MI 48826-2575
rhenley@thrunlaw.com
(517) 484-8000
*Counsel for Defendant Howell Public School District*

AMERICAN FREEDOM LAW CENTER
Robert J. Muise (P62849)
P.O. Box 131098
Ann Arbor, MI 48113
rmuise@americanfreedomlawcenter.org
(734) 635-3756
*Counsel for Plaintiffs*

PLUNKETT COONEY
Suzanne Bartos (P36490)
535 Griswold, Suite 2400
Detroit, MI 48226
sbartos@plunkettcooney.com
(313) 983-4741
*Counsel for Defendant Johnson ("Jay") McDowell*

---

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

**STATEMENT OF THE ISSUES PRESENTED**

I.      Whether Defendants' free speech restriction violated the first amendment by restricting the Plaintiffs' free speech based upon the view-point.


II.     Whether the Defendants' free speech restriction Violated the Equal Protection Clause by granting the use of a forum to people whose views it finds acceptable, but denying use to those wishing to express less favored or more controversial views.


III.    Whether Defendants' free speech restriction, which calls for school officials to intercede to stop student speech, both facially and as applied to Plaintiffs' expressive conduct violates Plaintiffs' right to freedom of speech protected by the First Amendment and Equal Protection Clauses of the Fourteenth Amendment.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 780 (2003).

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).

## INTRODUCTION

The "unmistakable holding" of the Supreme Court for over the last half-century in regard to the First Amendment rights available to students, is that "[i]t can hardly be argued that either students . . . shed their constitutional rights to freedom of speech or expression at the school house gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).  This case presents the same issues decided by Judge Rosen in 2003, where as here—the Court examined ". . . the ironic, and unfortunate, paradox of a public high school celebrating 'diversity' by refusing to permit the presentation to students of an 'unwelcomed' viewpoint on the topic of homosexuality and religion, while actively promoting the competing view."  *Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 780 (2003).  In this case, Plaintiff D.K.G., a 16-year-old child, was kicked out of his economics class for calmly answering a question posed by the teacher, Defendant McDowell, about the Plaintiff's religious beliefs on homosexuality.  Due to voicing those religious beliefs and explaining that his religion does not accept the homosexual lifestyle, Defendant McDowell removed Plaintiff D.K.G. from class and issued a snap suspension.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Rule 56 "standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly support motion for summary judgment; the requirement is that there be no *genuine* issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Moreover, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive

1

determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 317 (1986) (internal quotations omitted). In the present case, there is no genuine issue of material fact and Plaintiffs are entitled to judgment in their favor as to all claims as a matter of law.

## STATEMENT OF MATERIAL FACTS

This case is about 16-year-old boy, Plaintiff D.K.G., and the unconstitutional acts of Defendant McDowell, the boy's Economics Teacher and the President of the Teacher's Union, who brashly threw the boy out of class after prying into the child's religious views, and ridiculing the child for being Catholic and following the Church's teachings in regard to homosexuality. *See* (Dep. of Daniel Glowacki at Page 32 at Ex. 1) ("Q. Do you have a belief on homosexuality? A. Yes. Q. What is your belief – A. It's against my religion. It's against my beliefs. Q. When you say it's against your religion, what do you mean it's against your religion? A. As I was raised, homosexuality is against my religion. I was raised that it is right for a male and a female to be married, not another male and another male. That's how I was raised. Q. Okay. So you're saying it's not right for -- A. Two men to be married, yes. Q. That's what I'm asking. When you're saying against your religion, that's what I want to know what do you mean? A. Yes."); (Dep. of Daniel Glowacki at Page 76-77 at Ex. 1) ("Q. Did you ever discuss homosexual lifestyle with any employee of the Howell Public Schools? A. Not that I recall. Besides the incident. Q. Besides the incident, okay. With respect to the incident, do you remember using the phrase, 'I don't accept gays'? A. Yes. Q. When did that come up? A. Well, not those words exactly, but- Q. Do you remember what words you actually used? A. 'My religion does not accept gays.'"); (Affidavit of Brandon Szuch at Ex. 2) (D.K.G. "said it was against his religion to be gay."); (Affidavit of Danielle Kollath at Ex. 3) (D.K.G. "said it was against his religion to accept gays. Mr. McDowell said 'Your religion cannot say whether you

2

like or dislike gays.'  I felt that Mr. McDowell was bashing religion."); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of Defendant McDowell Ex. 17 at Ex. 5).

On October 20, 2010, teachers and students of Howell High School celebrated what the Gay & Lesbian Alliance Against Defamation ("GLAAD") nationally advertised as "Spirit Day" and Howell High School's Gay Straight Alliance deemed "Anti-Bullying Day."   (Dep. of Defendant McDowell at 117-28 at Ex. 6).  The purpose of "Anti-Bullying/Spirit Day" was to support the gay, lesbian, bisexual, and transgender lifestyle ("LGBT") and to honor homosexual teenagers who recently committed suicide.  (Dep. of Defendant McDowell at 117-28 at Ex. 6). The Principal of Howell High School had approved a flyer advertising the day, calling for teachers and students to wear purple in support of the LGBT lifestyle.   (Dep. of Defendant McDowell at 117-28 at Ex. 1); (Dep. of Aaron Moran at 49-56 at Ex. 7).

A Howell High School teacher, Wendy Hiller, made a purple t-shirt with the silkscreened words "Tyler's Army." "Tyler's Army" referenced support for an 18-year-old homosexual named Tyler Clementi.  While a freshman at Rutgers University, Tyler Clementi engaged in homosexual sex with another male student in his dorm room. The homosexual sex acts performed by Mr. Clementi were thought to have been captured on video by his roommate, which prompted Mr. Clementi to jump off the George Washington Bridge and end his own life. Hiller created the title "Tyler's Army" to reference "Dumbledore's Army," referring to a character in the Harry Potter books rumored to be homosexual.  (Dep. of Wendy Hiller at 13 at Ex. 8); (Dep. of Defedant McDowell at 119 at Ex. 7).  Staff members of Howell High School, including Defendant McDowell, decided to wear the purple Tyler's Army t-shirts and discuss the "Anti-Bullying/Spirit Day" in class. (Dep. of Defendant McDowell at 117-28 at Ex. 7). On October 20, 2010, McDowell wore the purple "Tyler's Army" t-shirt and began each of his

classes by showing a video about homosexual teens committing suicide. (http://www.gaypolitics.com/2010/10/13/out-fort-worth-city-councilman-tells-personal-bullying-story, last visited November 15, 2012).

On the previous day, the Superintendent of Howell Public Schools Ronald Wilson had received a parent complaint inquiring whether Howell High School was supporting a Gay Pride Rally. (Dep. of Ronald Wilson at 35 at Ex. 9). Wilson contacted the Principal of Howell High School, Aaron Moran, who informed him that the Gay Straight Alliance called for students and teachers to wear purple on October 20th to stop homophobia. (Dep. of Ronald Wilson at 36 at Ex. 9). Then, on October 20, 2010 in Defendant McDowell's 6th Hour Economics course, Plaintiff D.K.G. was kicked out of class for failing to support gay rights and voicing his religious beliefs. (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of Defendant McDowell Ex. 17 at Ex. 5).

I.     **Defendants Restricted Plaintiffs' Free Speech and Equal Protection of the Law.**

On October 20, 2010, Defendant McDowell began his 6th hour economic class wearing his purple "Tyler's Army" t-shirt. (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of Defendant McDowell Ex. 17 at Ex. 5). Defendant McDowell first reprimanded a female student for wearing a confederate flag belt buckle in his class and had the student remove the belt buckle. (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of Defendant McDowell Ex. 17 at Ex. 5). Defendant McDowell then explained that October 20th was "Anti-Bullying/Spirit" Day and the students were going to watch a movie about Homosexual Teen Suicide and how homosexuals face discrimination. (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3);

(Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of Defendant McDowell Ex. 17 at Ex. 5). Confused after Defendant McDowell asked the female student to remove her belt buckle, Plaintiff D.K.G. asked Defendant McDowell about the difference between Confederate Flags and symbols promoting gay rights, and why wearing a message promoting gay rights was acceptable in the school but not wearing a Confederate Flags belt buckle. (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of Defendant McDowell Ex. 17 at Ex. 5). Defendant McDowell responded by discussing that a symbol, such as the rainbow flag, symbolizes the gay community, but the confederate flag represents something to the effect of "killing people and hanging and skinning people alive." (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of Defendant McDowell Ex. 17 at Ex. 5). Defendant McDowell then asked Plaintiff D.K.G. if he "supported gays." (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of Defendant McDowell Ex. 17 at Ex. 5). Plaintiff D.K.G. responded by saying that *his religion* did not accept gays. (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of Defendant McDowell Ex. 17 at Ex. 5); (Dep. of Daniel Glowacki at Page 32, 76-77 at Ex. 1). Plaintiff D.K.G. is a Catholic who had been taught to strictly follow the Magisterium of the Catholic Church and its sexual teachings. (Compl. at ¶¶ 41-46). Plaintiff's faith teaches that homosexual acts are amoral, sinful, and contrary to natural law. (Compl. at ¶¶ 41-46).

Defendant McDowell admitted that "I did get emotional at this time." (Dep. of Defendant McDowell Ex. 17 at Ex. 5). Defendant McDowell told Plaintiff D.K.G. that he could not express his religious belief on homosexuality in class. (Dep. of Defendant McDowell Ex. 17 at Ex. 5);

(Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4).   Defendant McDowell stated that "It doesn't matter if it is your religion, you can't say it in class."   (Dep. of Defendant McDowell Ex. 17 at Ex. 5). Defendant McDowell equated Plaintiff D.K.G.'s religious belief to racism, and not accepting blacks.   (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of Defendant McDowell Ex. 17 at Ex. 5); (Dep. of D.K.G. at 58-59 at Ex. 1).   Defendant McDowell told Plaintiff D.K.G. that if he really were Catholic, then he should attend a Catholic school.   (Affidavit of Danielle Kollath at Ex. 3); (Dep. of Dr. Mark Sharp Ex. 35 and 36 at Ex. 4); (Dep. of D.K.G. at 59 at Ex. 1).   Defendant McDowell then asked Plaintiff D.K.G. if he accepted gays, and Plaintiff D.K.G. answered that he did not based upon his religious beliefs.   (Dep. of Defendant McDowell Ex. 17 at Ex. 5); (Affidavit of Brandon Szuch at Ex. 2).   Defendant McDowell, immediately and in a state of anger, threw Plaintiff D.K.G. "out of class and wrote up a referral for unacceptable behavior"— voicing religious beliefs that did not support or promote the rights of homosexuals.   (Dep. of Defendant McDowell Ex. 17 at Ex. 5); (Affidavit of Brandon Szuch at Ex. 2).   A security guard heard McDowell slam the classroom door and yell at Plaintiff D.K.G. in the hall.   (Affidavit of David DeVries at Ex. 10).   Plaintiff D.K.G., calmly and cooperatively, told the security guard that he had not done anything to merit being thrown out of class, while the security guard witnessed McDowell yelling and in a state of anger.   (Affidavit of David DeVries at Ex. 10).

When Defendant McDowell returned to his classroom, he engaged the class in a conversation about gay rights.   (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3).   Defendant McDowell showed his video discussing suicide amongst homosexual teenagers. (http://www.gaypolitics.com/2010/10/13/out-fort-worth-city-councilman-

tells-personal-bullying-story, last visited November 15, 2012).   According to students in the class, Defendant McDowell made comments during the class that made his students "feel small" and were "attacking my religion and family."  (Affidavit of Danielle Kollath at Ex. 3).  Many students "felt uncomfortable in the classroom" and that Plaintiff D.K.G. "did nothing wrong" and only told Defendant McDowell that "it was against his religion to be gay."  (Affidavit of Brandon Szuch at Ex. 2); (Affidavit of Danielle Kollath at Ex. 3).

After an investigation into Defendant McDowell's 6th hour Economic class, Howell Public Schools initially reprimanded Defendant McDowell finding:

> Students' First Amendment Right were violated when you directed a student to remove a belt buckle you found offensive. . . .You went on to discipline two students [one of the students being Plaintiff D.K.G.] who told you they do not accept gays due to their religion.  After failure of getting one student to recant, you engaged in an unsupported snap suspension, rather than allow the student his beliefs.  You not only missed an opportunity to model a mature and professional response, you modeled oppression and intolerance of student opinion.  You did this based on your own discomfort with their belief and how it related to a personal experience.  This could be construed as teacher-to-student bullying; ironic of the Anti-Bullying Day intent.  Your demonstration of intolerance stands in contra-distinction of the anti-bullying message of the day. . . . As a result of your behaviors, you will receive a one day suspension without pay, a written reprimand will be placed in your personnel file, and you are mandated to engage in training on First Amendment Rights.

(Dep. of Defendant McDowell at Ex. 13 at Ex. 11).   However after initially reprimanding Defendant McDowell, Defendant McDowell, the President of Howell's teacher's union, filed a grievance against the school and the school reversed its decision.  The school paid Defendant McDowell and took away his one day suspension, the school made training on First Amendment Rights mandatory for all Howell High School Teachers, and replaced the reprimand in Defendant McDowell's personnel file.  *See* (Dep. of Ronald Wilson at 59 at Ex. 9) ("Q. And prior to February 2011, was there any First Amendment training conducted at the school?  A. Not that I'm aware of, no.  Q. And why was it decided that First Amendment training should take place at

the school in February of 2011?   A. Well, given the incident that occurred on the 20th [of October, 2010] and then subsequent questions about, you know, how we should handle those types of situations, it seemed somewhat self-evident that we needed to go ahead and review this with our staff and make sure that we set some clear guidelines to ensure we don't have a repeat."). The new reprimand placed in McDowell's file was innocuous to his misdeeds when compared to the original reprimand; however, the replacement reprimand did state the following:

> You are receiving a written reprimand after an investigation into an incident when you slammed your door, raised your voice, and attempted to discipline students for their beliefs. . . . Further, you disregarded a student's constitutionally protected rights to self-expression to wear a belt buckle which you found 'personally objectionable,' notwithstanding the fact that there was no disruption to the class as a result of this student's apparel. . . . In addition, you loudly and angrily dismissed another student from the class for expressing an opinion which you deemed intolerant and unacceptable, an action which may have violated the student's right to free speech.

(Dep. of Defendant McDowell at Ex. 14 at Ex. 12); *see* (Dep. of Dr. Guernsey at 49 at Ex. 13) (Describing replacement reprimand ("A. It's inadequate, especially when compared with the reprimand of October 25th by Moran and Moore, that, in my estimation, is a more appropriate articulation of the severity of what happened in that classroom towards the denial of [D.K.G.'s] rights. . . . Mr. McDowell was guilty of unprofessional, unethical conduct which deprived the student of his rights.  His behavior in the classroom, as I articulated in my report, was grossly inadequate, and unfair and created a hostile environment, not just for [D.K.G.], but for the other student[s] are they articulated in their response to the incidents.")); *see also* (Expert Report of Dr. Guernsey, Defense Ex. 38 at Ex. 14).   On October 27, 2011, Plaintiff Sandra Glowacki requested that her son, D.K.G. be removed from McDowell's class, and the school honored the Plaintiff's request and placed D.K.G. in a different 6th hour Economics course.  (Dep. of Aaron Moran at 63).   Indeed, even the Principal of Howell High School disagreed with Defendant McDowell's actions.  (Dep. of Aaron Moran at 45 at Ex. 7) ("Q. In what manner wasn't it

handled appropriately, in the way that the student [D.K.G.] was thrown out of class?  A. Well, the manner it was handled from the beginning to the end.  Asking the student – I think in Mr. McDowell's statement, he asked the student his opinion.  He asked it again.  He didn't like the answer.  Well, that doesn't make it okay to kick him out of class because he doesn't agree with you. . . .Q. But in your experience and what you learned in your two master's degrees and what you know about administrating in a high school, that was inappropriate behavior to punish a student for stating his opinion in class?  A. It was inappropriate to do that.").  Defendant McDowell admitted himself that he wished Plaintiff D.K.G. simply would not express his religious viewpoint again.  (Dep. of Defendant McDowell at Ex. 18 at Ex. 18).  Any other explanation for silencing Plaintiff D.K.G.'s speech that voicing religious views contrary to Defendant McDowell's position on homosexuality should be recognized for what they are— nothing more than subterfuge.

Howell administrators allowed for the disparate treatment of the Plaintiffs religious views.  The principal of Howell High School approved the syllabus, which barred statements deemed to be "homophobic" in Defendant McDowell's class, but offer no protection for religious viewpoints.  (Dep. of Defendant McDowell Ex. 15 at Ex. 15).  This syllabus was approved by the school principal with the knowledge that certain religions, such as Plaintiff's Catholic religions did not support the homosexual lifestyle.  *See* (Dep of Aaron Moran at 70 at Ex. 7) ("Q. And you are aware that some religions have views that the correct orientation, I guess, of sex would be for a man to be with a female?  A. Yes.  Q. And that some religions disapprove of the act of homosexual relations?  A. Yes.  Q. Are you familiar with the Catholic religion holding this view?  A.  Yes.").  Furthermore, the School District established training and set forth policies and guidelines enabling Defendant McDowell's actions which were used to

silence Plaintiffs speech and created a school environment where religious viewpoints were treated unequally to favor views supporting the homosexual lifestyle.

Plaintiff D.K.G. sincerely holds the Catholic views he was punished for voicing on October 20, 2010. *See* (Dep. of Daniel Glowacki at 45-47 at Ex. 1). Plaintiff's brother, D.C.G. is currently a student at Howell High School and holds the same views as Plaintiff D.K.G. Quite pointedly, Plaintiff D.C.G. asserts his claim so "That other students or me would not be punished for speaking my beliefs in class." (Dep. of Drake Glowacki at Ex. 19 at 9).

## II.  School District Policy and Guidelines Authorized the Speech Restriction and the Violation of Equal Protection.

The School District has a written policy regarding "religious expression in the district," which states that "School officials . . . should intercede to stop student speech that constitutes harassment aimed at a student group or a group of students." (Dep. of Defendant McDowell at Ex.12); (Dep. of Aaron Moran at 58 at Ex. 7); (Dep. of Ron Wilson at 72 at Ex. 9). Defendant McDowell was acting in compliance with this policy when he threw Plaintiff D.K.G. from his classroom. Indeed, Defendant McDowell was familiar with this policy of the School District. (Dep. of Defendant McDowell at 108-09 at Ex. 6) (although stating that relied on the School District's snap suspension policy). Defendant McDowell asserted numerous times that "I believe I acted within school board policies" when throwing Plaintiff D.K.G. from class. (Dep. of Defendant McDowell at 134 at Ex. 6).

The School District held trainings and brought in Dr. Marcia McEvoy to present an "in service" to the high school teachers immediately prior to the beginning of the 2010-11 school year. In cohesion with the policy "to stop student speech that constitutes harassment aimed at a student group or a group of students," the training called for teachers to act immediately if they perceived any sort of harassment. (Dep. of Aaron Moran at 12-14 at Ex. 7) ("Q. And that was

10

what the training was teaching?  A.  Going about how to address it.  Q. And address it directly?

A.  Directly.  Q. And immediately upon seeing the bullying activity? . . . To address the bullying

immediately upon seeing it occur?  A.  Correct."); (Dep. of Defendant McDowell at 47 at Ex. 6)

("Q. And were you called upon to immediately stop it with that student right then and there?  A.

Yes, right then and there, immediate intervention, yes. Q. According to the training, were you

called upon to stop the student's speech in the middle of the class?  A. If the speech is

inappropriate, yes. Q. And what did they say was inappropriate speech during the training? . . .

A. Speech that degrades or threatens a group or an individual student.").  However, no definition

or clarity was given regarding what harassment or bullying might be.  (Dep. of Defendant

McDowell at 47 at Ex. 6) ("Q. And was there any other definition of what exactly that speech

would be? A. Not that I recall at this time, no.  Q. So it was left up to the personal subjectivity of

each teacher? A. Yes.  Q. During the training, was there ever discussion about how different

students could have different religious viewpoints?  A. No.").  The training included role-playing

which discussed bullying toward homosexuals.  (Dep. of Aaron Moran at 76 at Ex. 7) ("Q. Have

you gone through the different literature by Dr. McEvoy?  A.  Uh-huh.  Q. Are you aware that

she says –she brings up different examples of things to bring up with students?  A.  Uh-huh.  Q.

Like calling another person gay?  A.  Uh-huh.").  However, the training never addressed what

was appropriate to say under the First Amendment and how teachers were to treat the religious

viewpoints of its students.  (Dep. of Defendant McDowell at 44 at Ex. 6).

Most disturbing is that the School District never required any training prior to October

20, 2010 regarding its policies or the protections of the First Amendment.  *See* (Dep. of Ron

Wilson at 24 at Ex.  9) ("Is there ever any training specifically targeted for teachers to

understand[] the policies and guidelines?  A.  No.").  Defendant McDowell admitted that he did

not read all of the school's policies, nor was there a mandate or system to ensure that teachers at minimum read the school policies.  (Dep. of Defendant McDowell at 89-90 at Ex. 6).  Such lack of training explains the great divergence in interpretation between employees of the School District.  *See* (Dep. of Defendant McDowell at 91 at Ex. 6) (discussing that homosexual, teen suicide was not a controversial topic- an answer completely retrograde to the response of principal Aaron Moran, who stated it was a controversial subject that should not be taught unless permission was gained from the student's parents).

## ARGUMENT

I.   **Defendants' Free Speech Restriction Violated the First Amendment.**

   a.   **Plaintiffs' Answer to the Teacher's Questions Pertaining to His Religious Beliefs Is Protected Speech.**

There can be no dispute that the message conveyed by Plaintiffs' statement made in class as a response to a direct question by his teacher is protected speech. Student speech that "happens to occur on the school premises" is governed by *Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503 (1969); *Hazelwood Sch. Dist. v. Kuhlmerier*, 484 U.S. 260, 271 (1988). Pure student speech, such as a tee-shirt worn by a student or a student's personal statement, must be tolerated by the school unless evidenced that school authorities have reason to believe that such expression will substantially interfere with the work of the school of impinge the rights of others. *Barber v. Dearborn Pub. Sch.*, 286 F. Supp. 2d 847 (E.D. Mich. 2003); *Hazelwood*, 484 U.S. at 266 (quoting *Tinker*, 393 U.S. at 509). Here, Plaintiff D.K.G's statement, "My religion does not accept gays," is pure student speech.  Therefore, any restriction on speech even when related to legitimate pedagogical concerns must still be viewpoint-neutral.  *See Searcey v. Harris*, 888 F.2d 1314, 1319, 1325 (11th Cir.); Kincaid v. Gibson, 191 F.3d 719, 727 (6th Cir. 1999); *Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 780, 797-98 (2003).

**b.  Defendants Restricted Plaintiffs' Speech Based on Its Message.**

To determine whether a restriction is content-based, the courts look at whether it "restrict[s] expression because of its message, its ideas, its subject matter, or its content." *Consol. Edison Co. of N.Y. v. Public Serv. Comm. of N.Y.*, 447 U.S. 530, 537 (1980).  Here, there is no dispute that Defendants restricted Plaintiffs' speech because it conveyed a religious message that failed to promote the homosexual lifestyle.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995).  "The First Amendment does not permit [state actors] to impose special prohibitions on those speakers who express views on disfavored subjects."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992).  And the Supreme Court has held time and again that the mere fact that someone might take offense at the content of the speech or the viewpoint of the speaker foes not provide a basis for prohibiting the speech.  *Johnson*, 491 U.S. at 414 ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975) ("[T]he Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer."); *Street v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that . . . the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."); *see also Cohen v. California*, 403 U.S. 15, 26 (1971); *Snyder v. Phelps*, 131 S. Ct. 1207, 1219 (2011).

Indeed, a listener's reaction is not a legally sufficient basis for restricting speech.  *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) (noting that speech cannot

13

be "punished or banned, simply because it might offend a hostile mob"); *Boos v. Barry*, 485 U.S.
312, 321 (1988) (stating that "[t]he emotive impact of speech on its audience is not a 'secondary
effect'" that would permit regulation (opinion of O'Connor, J.); *Lewis v. Wilson*, 253 F3d 1077,
1082 (8th Cir. 2001) ("The [F]irst [A]mendment knows no heckler's veto.").   Consequently, the
fact that certain "hecklers" may object to Plaintiffs' speech does not license school officials to
deny Plaintiffs the right to speak.   Case law confirms that in a case involving speech in a school
context, "There is . . . no precedent for a 'minors' exception to the prohibition on banning speech
because of listeners' reaction to it content.   It would therefore be an unprecedented departure
from bedrock First Amendment principles to allow the government to restrict speech based on
listener reaction simply because the listeners are children."   *Ctr. For Cio-Ethical Reform, Inc. v.
L.A. Cnty. Sheriff's Dep't*, 533 F3d 780, 790 (9th Cir. 2008).   *See also Holloman ex rel.
Holloman v. Harland*, 370 F.3d 1252, 1275-76 (11th Cir. 2004) (teacher's chastising student and
referring him for discipline for silent act of protest during Pledge of Allegiance was not justified
by concern that act upset other students; "we cannot afford students less constitutional protection
simply because their peers might illegally express disagreement through violence instead of
reason.").   If these precedents have any practical meaning, then school officials—anticipating
any form of discomfort from competing political views—should be prepared to inculcate in their
student populations the spirit and magnificence of the First Amendment's place in the shaping of
democratic values. *Cf. Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1055 (9th
Cir. 2003) (stating that "it is far better to teach students about the First Amendment . . . about
why we tolerate divergent views" than to suppress speech and noting that "[t]he school's proper
response is to educate the audience rather than squelch the speaker") (internal quotations and
citation omitted); *Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 780 (2003) (holding that

Defendants violated Plaintiff's free speech rights by suppressing Plaintiff's speech that she could not accept sexual orientation or religious teachings Plaintiff believed were wrong).

In sum, Defendant's undifferentiated claim that some students might take offense to the Plaintiff's religious beliefs provides no basis for restricting his speech. Indeed, Defendants' restriction of Plaintiffs' speech based on the perceived reaction of some students to the speech's religious message is a violation of the Plaintiffs' clearly established First Amendment rights.

### c. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.* **Compels Granting the Motion.**

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), compels this Court to grant this motion.  In *Tinker*, similar to here, the Court described the "problem posed by the present case" as follows: "[t]he school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioner."  Id. at 508.  The school authorities in *Tinker* sought to defend their actions "based upon their fear of a disturbance from the wearing of the armbands."  *Id.*  In finding the speech restriction unconstitutional, the Court rejected the school districts' argument, stating that:

> [I]n our system, undifferentiated fear or apprehension of disturbance is *not enough to overcome the right to freedom of expression*.  Any departure from absolute regimentation *may cause trouble*.  Any variation from the majority's opinion may inspire fear.  *Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance.  But our Constitution say we must take this risk*, and our history says that it is this sort of hazardous freedom— this kind of openess—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, and oftern disputatious society.

> In order for the State *in the person of school officials* to justify prohibition of a particular expression of opinion, *it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint*.  Certainly where there is no finding and no showing that engaging in the forbidden conduct would "*materially and substantially interfere with the requirements of appropriate discipline in the operation of the school*," *the prohibition cannot be sustained*.

*Id.* at 508-09 (emphasis added).  Here, the Defendants prohibited the expression of a particular viewpoint and religious belief without any evidence that the belief materially and substantially interfered with the operation of the school.  Rather, they restricted Plaintiffs' speech because they believed that some students who partake in or support the homosexual lifestyle would object to the Plaintiffs' sincerely held religious beliefs.

As a result of being singled out and suspended because of his speech, D.K.G. suffered a constitutional injury and is entitled to declaratory relief from this court.  Plaintiff D.C.G. is entitled to relief for the chilling effect Defendants' actions and policies pose to his free speech rights.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) ( "even minor punishments can chill protected speech"); *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994) ( "a chilling effect on one's constitutional rights constitutes a present injury in fact"); *N.H. Right to Life Polical Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) ("[A]n actual injury can exist when the plaintiff is chilled from exercising her right to free expression . . ..").

## II.     Defendants' Free Speech Restriction Violated the Equal Protection Clause

"Under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."  *Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92 (1972); *Carey v. Brown*, 447 U.S. 455, 461-62 (1980).  The relevant principle of law was articulated in *Mosley*, where the Court struck down a city ordinance that prohibited all picketing within 150 feet of a school, except peaceful picketing of any school involved in a labor dispute.  Similarly here, the Defendants' restriction on Plaintiffs'

religious speech not only violated the Free Speech Clause of the First Amendment, as discussed above, but it violated the equal protection guarantee of the Fourteenth Amendment.

When, as here, similarly situated persons receive disparate treatment, and that disparate treatment invades a "fundamental right" such as free speech or religious freedom, the rigorous "strict scrutiny" standard governs, and Defendants' actions will be sustained only when they are narrowly tailored to serve a compelling government interest. *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F. 3d 614, 621 (6th Cir. 1997) (*quoting City of Cleburne v. Cleburn Living Center*, 473 U.S. 432, 439 (1985); *Hansen v. Ann Arbor Pub. Schs*, 293 F. Supp. 780, 806 (2003).

## III.   Declaratory and Injunctive Relief Against the School District Are Justified.

Plaintiffs challenge the School District's free speech restriction both facially and as applied to Plaintiff D.K.G.'s expressive conduct on October 20, 2010, as a violation of his right to freedom of speech protected by the First Amendment and Equal Protection Clauses of the Fourteenth Amendment.  Furthermore, the School District's free speech restriction has a chilling effect on Plaintiff D.C.G.'s free speech rights.  Liability for a constitutional violation attaches when the execution of the policy or custom inflicts the alleged injury.  *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) (*citing Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978)). The Sixth Circuit explained that "[t]he official policy or custom 'must be the moving force of the constitutional violation' to establish the liability of a government body." *Ibid.* (*quoting Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)). The absence of a written policy endorsing the constitutional violation is also not fatal to a claim. "Section 1983 'authorizes suit 'for constitutional deprivations visited pursuant to [a] 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Cash v. Hamilton Cnty. Dep't of Adult Probation*, 388 F.3d 539, 542-43 (6th Cir. 2004) (*quoting City of*

*St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). To sustain liability under this theory, a plaintiff must "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so well settled as to constitute a custom or usage with the force of law." *Id.* at 543 (citation and quotation marks omitted).

The Supreme Court recognized in *City of Canton v. Harris*, 489 U.S. 378 (1989), liability can be found under section 1983 for failure to train its employees.  To prevail, the plaintiff must show that the training program is inadequate to the tasks that must be perform; that the inadequacy is the result of a deliberate indifference; and that the inadequacy is "closely related to" or "actually caused" the plaintiff's injury. *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989). Here, the Defendants' free speech restriction, training under Dr. Marcia McEvoy, and failure to properly train its employees all caused the Plaintiffs injury.

## CONCLUSION

Public schools represent "a most vital civic institution for the preservation of a democratic system of government," *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 230 (1963), and are the primary vehicle for transmitting "the values on which our society rests," *Ambach v. Norwick*, 441 U.S. 68, 76 (1979).  Therefore, it is essential that First and Fourteenth Amendment protection is respected by the rule of law.  For the reasons stated in this brief, Plaintiffs request this Court GRANT their motion for summary judgment.

Respectfully submitted,

THOMAS MORE LAW CENTER

s/ Richard Thompson
Richard Thompson, Esq.

s/ Erin Mersino
Erin Mersino, Esq.

18

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2012, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing has been served by ordinary U.S. Mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

THOMAS MORE LAW CENTER
<u>s/ Erin Mersino</u>
Erin Mersino, Esq. (P70886)
