# EXHIBIT 6

# GLOWACKI, ET AL v. HOWELL PUBLIC SCHOOL DISTRICT, ET AL

## JOHNSON MCDOWELL

May 29, 2012

*Prepared for you by*



NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

JOHNSON MCDOWELL
May 29, 2012

Page 45

1  A. Not specifically, no.
2  Q. According to what you gained from the training, what
3     exactly was it that you took from the training where
4     you thought a student could say this or could not say
5     that?
6  A. I took from the --
7        MR. HENLEY: Object to vagueness.
8        MS. BARTOS: I was about to say that, too.
9  BY MS. MERSINO:
10 Q. Answer if you can, and let me know if you want me to
11    restate.
12 A. Restate.
13 Q. Once you went to the training and received the
14    training, leaving that training and knowing what you
15    had been taught there, what was it in your head, using
16    what the school district put on with Dr. McEvoy, was
17    it that you believed after receiving the training you
18    could tell a student to say or not to say?
19        MR. HENLEY: Object to foundation.
20        MS. BARTOS: Yeah. When he walked out of
21    there, what -- what did he believe a student could or
22    could not say?
23        MS. MERSINO: Yes.
24        MS. BARTOS: We could be here until next
25    Tuesday talking about what he --

Page 46

1  BY MS. MERSINO:
2  Q. Answer, if you can.
3  A. You're going to need to narrow the question.
4  Q. Did you believe after leaving that training that there
5     were certain things that you had to stop a student
6     from saying?
7  A. Yes.
8  Q. And did you believe after that training that there
9     were certain things that you could allow a student to
10    say?
11 A. Again, that question's too broad, because I -- yes, a
12    student can ask to go to the bathroom.
13 Q. Okay. So --
14       MS. BARTOS: Yeah.
15 BY MS. MERSINO:
16 Q. During the training, it was discussed students can say
17    some things but not others, correct?
18 A. Correct. As you know, in society we can say some
19    things and not others.
20 Q. And were you called upon in the training to stop a
21    student from saying something that they shouldn't say,
22    according to the training?
23 A. Yes. Yes. Sweat the small stuff. If you hear a
24    student calling another student the N word or the F
25    word, or something like that in the hallway, yes, stop

Page 47

1     it.
2  Q. And were you called upon to immediately stop it with
3     that student right then and there?
4  A. Yes, right then and there, immediate intervention,
5     yes.
6  Q. According to the training, were you called upon to
7     stop the student's speech in the middle of the class?
8  A. If the speech is inappropriate, yes.
9  Q. And what did they say was inappropriate speech during
10    the training?
11       MS. BARTOS: It's been asked and answered
12    like three times already.
13 BY MS. MERSINO:
14 Q. Please answer the question.
15 A. Speech that degrades or threatens a group or an
16    individual student.
17 Q. And was there any other definition of what exactly
18    that speech would be?
19 A. Not that I recall at this time, no.
20 Q. So it was left up to the personal subjectivity of each
21    teacher?
22 A. Yes.
23 Q. During the training, was there ever discussion about
24    how different students could have different religious
25    viewpoints?

Page 48

1  A. No.
2  Q. Was it ever discussed that a discussion could occur in
3     the class if people disagreed upon something?
4  A. Not in the way you're phrasing the question. I mean,
5     I teach classes that call for students to disagree;
6     that's the concept behind social issues. Or a
7     philosophy class, you want students to disagree, to
8     argue. So in the broad sense that you're asking that
9     question, no, the training didn't touch on that.
10 Q. So the training did not discuss that different
11    students could have an argument in class that would
12    further academic goals?
13 A. It was anti-bullying training.
14       MARKED FOR IDENTIFICATION:
15       DEPOSITION EXHIBIT 4
16       2:47 p.m.
17 BY MS. MERSINO:
18 Q. I'm handing you what has been marked as Plaintiff's
19    Exhibit 4. Do you recognize this document?
20 A. I do.
21 Q. And how do you recognize it?
22 A. It's Howell Public Schools Bylaws and Policies
23    regarding bullying and other aggressive behavior
24    towards students. Is this the policies and bylaws
25    that were in effect on October 20th, 2010?

JOHNSON MCDOWELL
May 29, 2012

Page 89

1  administration and/or other documents, such as the
2  Student Code of Conduct that contains other
3  information. For example, this does not talk about
4  the length of skirts; however, we have a very strict
5  policy on the length of skirts that girls wear. That
6  is in the Student Code of Conduct.
7  Q. So you previously stated you had not read this policy,
8     Exhibit 9, prior to October 20th, 2010.
9  A. That's correct.
10 Q. And there were other policies, as well, that you had
11    not read prior to that date?
12 A. Sure.
13 Q. And the school did not mandate that you read every
14    last policy?
15 A. That's correct.
16 Q. The school did not mandate that you were familiar with
17    every policy?
18 A. I think the school assumes that we're familiar with
19    policies.
20 Q. They assume, but they don't check up on it?
21 A. That's correct.
22 Q. They don't make you sign anything to confirm that
23    you've read all the policies?
24 A. That's correct.
25 Q. And they don't do any training to make sure that

Page 90

1  you're familiar and know how to interpret the
2  policies?
3  A. That's correct.
4          MARKED FOR IDENTIFICATION:
5          DEPOSITION EXHIBIT 10
6          3:48 p.m.
7  BY MS. MERSINO:
8  Q. I'm handing you Exhibit 10, Controversial Issues
9     Policy 2240. Do you recognize this policy?
10 A. I do.
11 Q. How do you recognize it?
12 A. It is Controversial Issues Policy 2240.
13 Q. And had you read this policy prior to October 20th of
14    2010?
15 A. Yes.
16 Q. And in reading this policy, did you believe that it
17    was appropriate to discuss bullying in class?
18 A. Yes.
19 Q. Did you believe it was appropriate to discuss
20    homosexuality in class?
21 A. Counsel, are you saying that bullying and -- bullying
22    and homosexual issues are controversial issues?
23 Q. I'm asking you. In your interpretation of the policy,
24    do you believe that homosexualality is a controversial
25    issue?

Page 91

1  A. No, it's not a controversial issue. Do you believe
2     it's a controversial issue?
3  Q. I'm not the person answering questions here.
4  A. But ultimately, you are. When you go to sleep at
5     night, you must answer those questions for yourself.
6  Q. Okay. Back to the policy here in discussing
7     controversial issues, does the school give any sort of
8     definition for what controversial issues are?
9  A. You have the policy in front of you.
10 Q. But in your understanding, did they say homosexuality
11    is not a controversial issue?
12 A. They did not say homosexuality is a controversial
13    issue.
14 Q. So is it up to each individual teacher to determine
15    what is or is not a controversial issue?
16 A. There are no specific issues listed in this bylaw that
17    are stated as being controversial.
18 Q. So how would a teacher know how to interpret the
19    controversial issues policy?
20 A. That's a very good question.
21 Q. As a teacher of the Howell Public School District, how
22    do you believe a teacher would know how to interpret
23    this policy and know which issues are controversial?
24 A. I don't know how teachers would know which issues are
25    controversial when they're not listed in the policy.

Page 92

1  Q. Do you think had you known which issues were
2     controversial and not controversial, you would have
3     been more able to conduct your class in accordance
4     with the First Amendment?
5        MR. HENLEY: Objection, calls for a legal
6  conclusion.
7        MS. BARTOS: Yeah, you're making really
8  broad assumptions there that he didn't conduct his
9  class in conformance with the First Amendment.
10 BY MS. MERSINO:
11 Q. Do you understand the question?
12 A. I do. It's very broad. I mean, I conducted my class
13    in accordance with the First Amendment, and I don't
14    know that the controversial issues bylaw would change
15    any of that.
16 Q. Okay. So if the school were to list which issues were
17    controversial and which issues were not listed as
18    controversial, would that help you, as a teacher,
19    interpreting this policy?
20 A. Yes.
21 Q. If it were listed that homosexuality was a topic that
22    was a controversial issue, would you have discussed it
23    in your sixth hour classroom on the 20th of October of
24    2010?
25        MS. BARTOS: Objection, calls for

JOHNSON MCDOWELL
May 29, 2012

Page 105

1  Q. Okay. And are either offensive to you?
2  A. "I don't accept gays" is offensive.
3  Q. Even when the T-shirt says "because I'm a Catholic"?
4  A. Did a student wear a T-shirt that said such a thing?
5  Q. No. I'm asking in your professional judgment, would
6     that cause you alarm?
7        MS. BARTOS: Calls for speculation, but you
8     can answer.
9        THE WITNESS: I would refer to -- I would
10    send the student to the office to have the school
11    district make a judgment on that.
12 BY MS. MERSINO:
13 Q. So to you, it would cause some alarm at least enough
14    to notify --
15 A. Yeah. "I do not accept gays part," yes.
16 Q. Would you make the student take off the T-shirt in
17    your classroom?
18 A. Which T-shirt?
19 Q. If it said "I do not accept gays because I'm
20    Catholic."
21 A. I just said I would send them to the office.
22 Q. So you would ask for them to be removed from your
23    class?
24 A. No, I would ask for -- just like when a girl comes in
25    with a skirt that may be too short, send them to the

Page 106

1     office for the office to make a decision on that skirt
2     is not disciplinary in nature; it's asking the
3     district to make a decision as to whether the student
4     is violating the dress code. If the district says
5     they're not, then they're not.
6  Q. But the student would not be allowed to stay in class;
7     they would have to get a second opinion?
8  A. It's a common procedure that if we believe a dress
9     code is being violated, for example, if a student wore
10    a Hooters' shirt in the past, not since this
11    lawsuit -- now they can wear whatever they want -- but
12    in the past, if someone had a Hooters' shirt on, there
13    were instances where that was deemed as being
14    offensive to women.
15       And so we would just send them down to the
16    office, and the district would make a decision and we
17    would abide by that decision. If a student wears a
18    shirt that says "I want you to rub my Johnson," we
19    send them to the office and ask them to make a
20    determination on whether that's offensive or vulgar or
21    not.
22 Q. Okay. And when the student is going down to the
23    office, the student is not participating in the class?
24 A. That is standard procedure, yes.
25 Q. What about if a student wore a shirt that said "I

Page 107

1     support homosexuality"?
2        MS. BARTOS: What's your question?
3  BY MS. MERSINO:
4  Q. Would that person be allowed to stay? Would they be
5     sent down to the office?
6  A. And how is support for a group of people offensive?
7  Q. That's what I'm asking you. Would that --
8  A. Support for a group of people is not offensive. If a
9     student wore "I support Catholics," that's not
10    offensive.
11 Q. Okay. So if the student wears "I support
12    homosexuality," that person will not be sent down to
13    the office?
14 A. That's not offensive. Support for a group is not
15    offensive.
16 Q. So the answer is no?
17 A. No.
18       MARKED FOR IDENTIFICATION:
19       DEPOSITION EXHIBIT 12
20       4:09 p.m.
21 BY MS. MERSINO:
22 Q. You've just been handed Exhibit 12. It's 8800(B),
23    Religious Expression in the District. Would you
24    please review this administrative guideline?
25 A. Okay.

Page 108

1  Q. Now, looking at really the second full paragraph,
2     beginning in -- with the word "generally," going to
3     the last sentence. It states, "School officials,
4     however, should intercede to stop student speech that
5     constitutes harassment aimed at a student group or a
6     group of students."
7  A. Uh-huh.
8  Q. Is that what you relied upon when you acted on the
9     20th of October of 2010?
10 A. I did not rely upon 8800(B), I relied upon the school
11    district policy that talks about disruption in class
12    and being a behavioral issue in class.
13 Q. Okay. Had you reviewed this administrative guideline
14    at all prior to the 20th of October of 2010?
15 A. I have seen this, yes, because I teach religion.
16 Q. So you were familiar with this policy?
17 A. Uh-huh.
18 Q. As a religion teacher, did you receive any specific
19    training in regard to the religious rights of students
20    in the classroom?
21 A. Not as a religion teacher. I teach the academic
22    subject of religion. That's what I have the master's
23    degree in. So in terms of religious expression, did I
24    receive training, no.
25 Q. Do you agree with this sentence here that, "School

JOHNSON MCDOWELL
May 29, 2012

Page 109

1    officials, however, should intercede to stop student
2    speech that constitutes harassment aimed at a student
3    group or a group of students"?
4  A. I do agree with that.
5  Q. And do you believe that your actions on the 20th of
6    October of 2010 were in compliance with this policy?
7  A. I don't believe my -- I believe my actions were not in
8    violation of this policy, but I did not rely upon this
9    policy. I relied upon other policies dealing with
10   disruptive students.
11 Q. Specifically snap suspension?
12 A. Uh-huh.
13        MARKED FOR IDENTIFICATION:
14        DEPOSITION EXHIBIT 13
15        4:14 p.m.
16 BY MS. MERSINO:
17 Q. You've been handed Exhibit 13, which is dated October
18   25th, 2010. And in the memorandum labeled as a
19   "written reprimand," are you familiar with this
20   document?
21 A. I am.
22 Q. And how are you familiar with it?
23 A. It was presented to me October 25th; I signed it,
24   dated it.
25 Q. And in this memorandum, you see that the school

Page 110

1    district decided that you had violated certain board
2    policies, correct?
3  A. Yes.
4  Q. And they stated that you had violated School Board
5    Policy 5610, Emergency Removal, Suspension and
6    Expulsion of Non-Disabled Students, correct?
7  A. I see that in this written reprimand they say that I
8    violated that, yes.
9  Q. And the school board or school district further stated
10   that you violated the controversial issues, School
11   Board Policy 2240, correct?
12 A. I see that it says that, yes.
13 Q. Were you surprised when the school board came back
14   with these?
15 A. Yes, absolutely.
16 Q. Why were you surprised?
17 A. Because I hadn't violated any of them, and the
18   subsequent grievance process proved that.
19 Q. And how did it prove that you had not violated these
20   board policies?
21 A. Because this is no longer in my disciplinary file.
22 Q. And what is now in your disciplinary file?
23 A. A written reprimand, but it contains none of these
24   violations of school board policy.
25 Q. Do you have a copy of the written reprimand?

Page 111

1  A. Not on me, no. I didn't bring it.
2  Q. Do you possess it?
3  A. It would be in my personnel file.
4  Q. The school board also stated that you had violated the
5    student's First Amendment rights, according to this
6    memorandum, correct?
7  A. According to this memorandum, yes.
8  Q. And were you surprised in accordance with the training
9    that you received and with your belief of what the
10   policies were at the school district, that they
11   determined that you violated the --
12 A. Yes. I was surprised, yes.
13 Q. And why were you surprised?
14 A. I felt that I had followed school board policy and
15   procedures.
16 Q. And why is that?
17 A. Because I felt that I had followed school board policy
18   and procedures.
19 Q. According to what the -- they taught you and trained
20   you to do?
21 A. Yes, that's correct.
22        MARKED FOR IDENTIFICATION:
23        DEPOSITION EXHIBIT 14
24        4:17 p.m.
25 BY MS. MERSINO:

Page 112

1  Q. Looking at Exhibit 14, do you recognize this?
2  A. Yes, it is the settlement agreement on my grievance.
3  Q. And looking at the last page, this is also dated
4    October 25th, 2010, and is titled Written Reprimand.
5    Is this now what is in your personnel file?
6  A. Yes, that's correct.
7  Q. Okay. Now, this states that you disregarded a
8    student's constitutionally-protected rights to self
9    expression to wear a belt buckle, which you found
10   personally objectionable, correct?
11 A. Yes, that is what it states.
12 Q. And it also states that in addition, you loudly and
13   angrily dismissed another student from the class for
14   expressing an opinion which you deemed intolerant and
15   unacceptable, an action which may have violated the
16   student's right to free speech; is that correct?
17 A. That is what it says, yes.
18 Q. And did you sign this document?
19 A. Yes.
20 Q. The one that's in your personnel file?
21 A. Yes.
22 Q. And by signing, you acknowledged the issues with what
23   occurred on the 20th of October of 2010?
24 A. By signing it, I acknowledged this written reprimand,
25   yes.

JOHNSON MCDOWELL
May 29, 2012

Page 117

1  A. No comment ever.
2  Q. And after the 20th of October of 2010, has there ever
3     been any comment?
4  A. Still no comment.
5  Q. Has the school district ever come back and said, you
6     know, we looked at class rule No. 2 and we have any
7     concerns about it?
8  A. They have never done that.
9  Q. Has anyone ever asked you to define what you deem to
10    be homophobia?
11 A. No one has ever done that.
12 Q. What do you deem to be homophobia?
13 A. Homophobia is the degradation and threatening of
14    homosexual students.
15 Q. And again, no one from the school district has ever
16    talked to you about this?
17 A. No.
18 Q. And fair to say you have the same syllabus or same
19    class rules for all the classes you teach?
20 A. Yes, that's correct.
21 Q. And when did you implement these class rules?
22 A. For certain I can say from 2009 on, but my guess is it
23    goes back as far as 2004, 2005, something to that
24    effect.
25 Q. For all of your classes in 2010, did you have these

Page 118

1     same class rules, including class rule No. 2?
2  A. Uh-huh.
3  Q. And currently you have the same class rules?
4  A. Uh-huh.
5  Q. Can you tell me how anti-bullying day originated, when
6     you first found out about it?
7  A. I can't tell you how --
8        MS. BARTOS: That's two questions. Why
9     don't you break it down. How did he find out about
10    it, or how was it originated?
11 BY MS. MERSINO:
12 Q. Are you able to answer the question?
13 A. It would be better if you separated them, because they
14    are two very different questions.
15 Q. Okay. If you want to handle how it originated first.
16 A. I don't know how it originated. It's a -- it was a
17    national anti-bullying day, so I don't know how a
18    national thing originates.
19 Q. Do you know any organizations that supported or were
20    behind the anti-bullying day?
21 A. I would assume many organizations were behind it.
22 Q. Could you name any personally?
23 A. No, not really.
24 Q. When did you first find out about it?
25 A. I found out about it when I was asked if I wanted to

Page 119

1     buy a Tyler's Army T-shirt.
2  Q. Who asked you that?
3  A. Wendy Hiller.
4  Q. Who is Wendy Hiller?
5  A. She's an English teacher at the freshman campus.
6  Q. The freshman campus, is that part of Howell High
7     School?
8  A. Yes, that's part of the high school.
9  Q. Are there two separate campuses?
10 A. Two separate campuses.
11 Q. And she asked you if you would want to purchase the
12    T-shirt?
13 A. Uh-huh.
14 Q. Did she describe the T-shirt to you?
15 A. Yeah, she did.
16 Q. How did she describe it?
17 A. She described it as it says "Tyler's Army" on the
18    front, referring to Tyler Clementi, the young man who
19    killed himself. And then "Army" refers to
20    Dumbledore's Army, a reference to Harry Potter. And
21    on the back it says something like "killing evil with
22    kindness," or something to that effect.
23 Q. Did you know about Tyler Clementi prior?
24 A. Yes, I watched the shows, yes.
25 Q. And you found out about him through just the

Page 120

1     national --
2  A. CNN, yes, NPR.
3  Q. Was it described what color the T-shirt would be?
4  A. I believe the day called for purple shirts, so I guess
5     I probably assumed it was a purple shirt.
6  Q. Does that have any sort of significance?
7  A. It's a color often associated with LGBT groups; but
8     besides that, I don't know if it has any significance.
9  Q. Is the purpose of the shirt being purple to associate
10    it with an LGBT group or --
11 A. I don't know why Miss Hiller chose purple. Maybe she
12    likes Barney.
13 Q. Was Tyler Clementi an individual who, to your
14    knowledge, associated with an LGBT group?
15 A. Yeah.
16 Q. Now, when you received this invitation to purchase the
17    T-shirt from Miss Hiller, what did you do?
18 A. I said sure, I would take one.
19 Q. And what was the arrangement to get the T-shirt?
20 A. We were going to meet in a dark parking lot at
21    midnight.
22       MS. BARTOS: For the record, you're joking.
23       THE WITNESS: I'm joking. I'm sorry, I'm
24    joking. She just brought it to me the next day.
25 BY MS. MERSINO:

JOHNSON MCDOWELL
May 29, 2012

Page 121

1  Q. Was there an exchange of money for the T-shirt?
2  A. I think there was supposed to be, but I don't think I
3     ever paid her.
4       MS. BARTOS: Nice.
5       THE WITNESS: Well, you know.
6  BY MS. MERSINO:
7  Q. Did she --
8  A. Other things intervened.
9  Q. Did she ask for money?
10 A. Yeah. I think she wanted to cover the cost of, you
11    know, creating the shirt.
12 Q. And how much was the shirt?
13 A. $5 or $10.
14 Q. And it was Miss Hiller who came up with the design for
15    the T-shirt?
16 A. I believe so. It was her that brought the concept of
17    the T-shirt to me, so I don't know whether her -- who
18    designed it for her. Whether she designed it herself,
19    I don't know.
20 Q. Do you know if she had them made?
21 A. I assume she had them made. I would assume she had
22    them made at a T-shirt shop.
23 Q. Was this in accordance with a group at school?
24 A. That, I don't know. I don't know why she made it. I
25    do know that the Gay-Straight Alliance was promoting

Page 122

1     the national anti-bullying day, and that was approved
2     by the school.
3  Q. And what is the Gay-Straight Alliance?
4  A. It's a school organization.
5  Q. Is it an organization at Howell High School?
6  A. Uh-huh, many high schools across the nation.
7  Q. And you said that this activity was approved by the
8     school.
9  A. The Gay-Straight Alliance had put up posters about the
10    anti-bullying day around the school, and that was
11    approved by the school. You can't put posters up
12    without approval.
13 Q. What is the procedure for getting school approval to
14    put up a poster?
15 A. You take it to the principal, and the principal
16    approves or disapproves it.
17 Q. Do the principals have like a stamp they have on the
18    poster?
19 A. Yes.
20 Q. Were you ever able to see a stamp on the poster for
21    the anti-bullying day?
22 A. Yes, it had Aaron Moran's name stamped on it.
23 Q. For the anti-bullying day, which was on behalf of the
24    Gay-Straight Alliance?
25 A. Uh-huh.

Page 123

1  Q. What did the poster say on it?
2  A. That, I don't remember.
3  Q. But you remember that it specifically said something
4     about anti-bullying day?
5  A. Right. Uh-huh.
6  Q. Was the poster approved by the school, or the entire
7     activity of the anti-bullying day?
8  A. I don't know the answer to that question. I do know
9     the poster was approved. I believe that the
10    administration knew about the T-shirts.
11 Q. Who on the administration would have known about the
12    T-shirts, to your knowledge?
13 A. The principal and the assistant principals.
14 Q. So Aaron Moran?
15 A. Uh-huh.
16 Q. Jen Goodwin and Dr. Mark Sharp?
17 A. Yes.
18 Q. Anyone else?
19 A. Morrison Borders.
20 Q. Who is a vice principal, as well?
21 A. Uh-huh.
22 Q. Does each student group have a designated teacher
23    sponsor?
24 A. Yes, they do.
25 Q. And who is the designated teacher sponsor for the

Page 124

1     Gay-Straight Alliance?
2  A. At that time, I believe it was Laura Stark.
3  Q. How do you spell her name?
4  A. S-t-a-r-k.
5  Q. Do you know if the Gay-Straight Alliance had anything
6     to do with the T-shirts?
7  A. I do not.
8  Q. Do you know individuals who are members of the
9     Gay-Straight Alliance?
10 A. I do not.
11 Q. How many people on the 20th of October were wearing
12    these T-shirts?
13 A. Many. That's all I -- I couldn't give you a specific
14    number.
15 Q. How many people in your class were wearing the Tyler's
16    Army T-shirts?
17    MS. BARTOS: In this class? In 6th hour?
18 BY MS. MERSINO:
19 Q. In 6th hour economics class.
20 A. I believe in a statement somewhere I say how many, but
21    I don't remember how many that was, but there -- there
22    were several.
23 Q. What does several mean to you?
24 A. Seven to 10.
25 Q. And throughout the day, adding together all of your

JOHNSON MCDOWELL
May 29, 2012

Page 125

1  classes that day, how many students were wearing
2  Tyler's Army T-shirts?
3  A. 40, 50 in my classes.
4  Q. Were there any announcements made about this day?
5  A. I do not remember.
6  Q. In addition to the note that you received from Wendy
7     Hiller, what other information did you receive about
8     the anti-bullying day?
9  A. I don't -- I don't recall.
10 Q. Did you talk about it at all during HEA meetings?
11 A. No. It wouldn't be appropriate during HEA meetings.
12 Q. Did teachers make any sort of effort to discuss
13    anti-bullying day during the class?
14 A. Did other teachers?
15 Q. Yes.
16 A. I'm sure they did. I believe they did, yes.
17 Q. Had you talked with other teachers about anti-bullying
18    day?
19 A. Outside of the discussion regarding the T-shirt, I
20    don't think so, no. I'm a very busy man.
21 Q. And did Wendy Hiller have any sort of discussion about
22    anti-bullying day?
23 A. Probably while we were talking about the T-shirt.
24 Q. So you found out through her, and then you saw a
25    poster from the Gay-Straight Alliance?

Page 126

1  A. That would be a rough chronology, sure.
2  Q. Did you see any sort of other information outside of
3     the school, like on the news or on different websites?
4  A. I may have, but I don't remember. It doesn't stand
5     out of note.
6  Q. I'm just wondering how you knew it was anti-bullying
7     day, beyond the email and the poster.
8  A. That would have been sufficient for me, for one
9     teacher to come to me. A teacher could come to me and
10    say it's -- it's leukemia awareness day, will you wear
11    a leukemia awareness T-shirt? Sure, I'll do that.
12 Q. Was there any discussion that this was specifically
13    about teen suicide of homosexual students?
14 A. I think teen suicide, in general, from bullying.
15 Q. How did --
16 A. It was shortly after the Irish girl killed herself,
17    the freshman.
18 Q. How did you come about the video that we referred to
19    earlier, that was referred to in your answer to
20    paragraph 8 of Exhibit 1, the video where you gave the
21    website address of the gay politics website?
22 A. I don't remember. I don't want to speculate. I don't
23    remember.
24 Q. How did you form the decision to play the video in
25    class?

Page 127

1  A. I related to teen suicide due to bullying.
2  Q. And did you have a hard copy of the video at that
3     time, or was it something that you played from the
4     website?
5  A. Played from a website. Can we take a break?
6        MS. MERSINO: Sure.
7        (Off the record at 4:37 p.m.)
8        (Back on the record at 4:40 p.m.)
9        MARKED FOR IDENTIFICATION:
10       DEPOSITION EXHIBIT 16
11       4:40 p.m.
12 BY MS. MERSINO:
13 Q. I'm going to show you what has been marked as Exhibit
14    16. It's the last exhibit for this round.
15       (At about 4:54 p.m., CD played.)
16 Q. Do you recognize Exhibit 16?
17 A. I do.
18 Q. And how do you recognize it?
19 A. It is the full video, of which I showed part in class.
20 Q. Which part did you show in class?
21 A. The first three minutes and 30 seconds.
22 Q. And are you positive that's the first three minutes
23    and --
24 A. I just checked it.
25 Q. You showed this in your 6th hour economics class on

Page 128

1  the 20th of October?
2  A. I did.
3  Q. And which other classes did you show it to?
4  A. Every other class.
5  Q. When you say "every other class," can you list those
6     classes for me?
7  A. The classes I taught that day, which would have been
8     world religions. I don't remember whether I had two
9     world religions and one economics, or one economics
10    and two world religions that semester, as well as
11    social issues. Social issues, I would have taught
12    five classes that day; what the exact combination of,
13    I don't remember.
14 Q. Did you show the video to each of the five classes?
15 A. Uh-huh.
16 Q. So five times that day?
17 A. Yes.
18 Q. Each time was it only the first --
19 A. Three minutes.
20 Q. Three minutes and 30 seconds?
21 A. Yes.
22 Q. Just a couple more questions before we wrap up. Was
23    it the school district's training, supervision,
24    policies, customs and procedures that were your
25    justification or the reason why you issued a snap

Page 133

1  Q. And so half the class were talking with Daniel?
2  A. I would say at least a third, yeah.
3  Q. So now it's a third of the class were talking with
4     Daniel?
5  A. Not talking; arguing.
6  Q. Arguing?
7  A. This was a substantial disruption that Daniel created
8     in the classroom, hence the snap suspension.
9  Q. And how long did this argument take place?
10 A. Probably for 10 minutes before I decided that that was
11    enough and we needed to get back to work.
12 Q. Given the fact that the school district reprimanded
13    you on the 25th of October, 2010, and now there is
14    some sort of written reprimand of some sort currently
15    in your file, do you believe that the school district
16    failed to adequately train or supervise you with what
17    occurred in the classroom on the 20th of October of
18    2010?
19         MS. BARTOS: Wait. You're -- wait a minute.
20    You're making the assumption that Mr. McDowell did
21    something wrong, and he's not accepting that
22    assumption. You're saying okay, you weren't trained
23    correctly, were you; that's why you messed up. That's
24    what your question was.
25 BY MS. MERSINO:

Page 134

1  Q. Do you understand the question?
2  A. I do understand the question, and I do not believe
3     that I messed up in class. I followed school board
4     policies and removed a disruptive student.
5  Q. Okay. So the fact that the school district now says
6     that you did not follow policies, does that make you
7     believe that they inadequately trained you?
8  A. I believe that I acted within the school board
9     policies and removed a disruptive student.
10 Q. Do you believe that the school district did everything
11    they could so you understood the policies as you
12    should have, in order not to be reprimanded?
13 A. I believe the school board has policies that I
14    followed in snap suspending Daniel Glowacki.
15 Q. And the school district has since reprimanded you for
16    what you did on the 20th of October 2010; is that
17    correct?
18 A. That is correct.
19         MS. MERSINO: Does counsel have questions
20    for today?
21         MR. HENLEY: None for today.
22         MS. MERSINO: I think we're done. We'll see
23    on you the 5th.
24         (The deposition was concluded at 5:05 p.m.
25    Signature of the witness was not requested by

Page 135

1  counsel for the respective parties hereto.)

Page 136

         CERTIFICATE OF NOTARY
STATE OF MICHIGAN )
                  ) SS
COUNTY OF BAY     )

         I, MARIE M. PUCHEL, certify that this
deposition was taken before me on the date
hereinbefore set forth; that the foregoing questions
and answers were recorded by me stenographically and
reduced to computer transcription; that this is a
true, full and correct transcript of my stenographic
notes so taken; and that I am not related to, nor of
counsel to, either party nor interested in the event
of this cause.




                    MARIE M. PUCHEL, CSR-0212
                    Notary Public,
                    Bay County, Michigan
                    My Commission expires: August 27, 2013