# EXHIBIT 7

# GLOWACKI v. HOWELL PUBLIC SCHOOL DISTRICT, ET AL

## AARON MORAN

September 5, 2012

*Prepared for you by*



NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

AARON MORAN
September 5, 2012

Page 9

1  or a student came to the office and I was there
2  to deal with it, then I would deal with it.
3  But it wasn't the main focus.
4      Q.  Was there ever a situation where
5  you would have the final say after speaking
6  with the assistant principals in a disciplinary
7  matter with a student?
8      A.  Sometimes things would get
9  appealed to me. Then that would be my final
10 decision, too, in that process.
11     Q.  And did that ever happen with
12 teachers as well?
13     A.  Yes. Well, I'm trying to remember
14 if there was discipline. With evaluations,
15 that was part of the grievance process is that
16 I would be part of the grievance process. The
17 building principal was part of that grievance
18 process, so that could be discipline or others.
19     Q.  I'm going to ask you about
20 evaluations, just generally.
21     A.  Okay.
22     Q.  Can you describe for me what you
23 mean by evaluation? Is it a one-time
24 evaluation after something occurs or is it,
25 like, a yearly or a monthly evaluation?

Page 10

1      A.  According to contracts, you have
2  to do evaluations, formal observations of
3  teachers. So that would be part of the
4  evaluation.
5      Q.  What exactly is involved in an
6  evaluation?
7      A.  Formal observation of the
8  teacher's classroom for a minimum amount of
9  time, dialogue, possible dialogue in regards to
10 the observations.
11     Q.  So you would go into the teacher's
12 classroom. Was this known to the teacher or
13 not?
14     A.  Yes.
15     Q.  And for how long would you stay in
16 the teacher's classroom?
17     A.  For the formal observations, it
18 had to be a minimum of thirty-five minutes.
19     Q.  And what would you do in
20 evaluating the teacher, just observe them
21 and --
22     A.  Observation of the classroom.
23     Q.  What would you look for?
24     A.  Student engagement, focus of the
25 lesson.

Page 11

1      Q.  Is there a set of criteria that
2  you would judge a teacher on?
3      A.  It's in the -- I don't recall
4  offhand what they were, but there's a rubric --
5  or not a rubric -- but there's what was agreed
6  upon in the contract.
7      Q.  And the contract between the
8  school district and the --
9      A.  Teacher's association.
10     Q.  The HEA, is it the Howell --
11     A.  Yes.
12     Q.  What else would you do to watch
13 over the teachers and make sure that they were
14 following school policies?
15     A.  Communication.
16     Q.  And what do you mean by
17 communication?
18     A.  Communication of expectations.
19     Q.  Would you have meetings or was
20 this done by e-mail?
21     A.  It could be both.
22     Q.  Were there certain trainings in
23 place before the school year began?
24     A.  There previously had been
25 trainings on various things.

Page 12

1      Q.  What kind of trainings?
2      A.  Making sure people -- staff knew
3  how to use the new grade book application, the
4  electronic grade book application, done various
5  trainings.
6      Q.  Was there ever trainings about
7  antibullying?
8      A.  Yes.
9      Q.  And if -- to the best of your
10 recollection, when did the training occur?
11     A.  It was a couple years ago, right
12 around this time or maybe -- yeah, right around
13 this time a couple years ago, sometime in
14 probably August.
15     Q.  In August of 2010?
16     A.  2010, yes.
17     Q.  And who gave the presentation on
18 antibullying?
19     A.  Dr. McEvoy.
20     Q.  Were you present at the
21 presentation?
22     A.  Yes.
23     Q.  And what was discussed?
24     A.  Basically, to address issues of
25 bullying and how to do those things.

AARON MORAN
September 5, 2012

Page 13

1  Q. And what do you mean by how to
2  address an issue of bullying, if you can give
3  me an example?
4  A. If you see something, address it.
5  It doesn't have to mean that you are going to
6  write up a discipline referral. Maybe it's two
7  kids -- you are not sure what -- you know, what
8  it is, but address it and find out what it is.
9  You know, hey, that's not how we act here at
10 Howell High School, so they know that that
11 behavior is not tolerated and that it's not
12 going to be acceptable behavior.
13 Q. Who was present at the training,
14 was it geared --
15 A. The high school staff.
16 Q. So teachers and administration of
17 Howell High School?
18 A. Yes.
19 Q. And who were called upon to
20 address the bullying, the teachers and
21 administrators?
22 A. Well, that's what it was -- that's
23 who the audience was, so that's who they
24 were -- that was one part of it.
25 Q. So a teacher is supposed to

Page 14

1  reprimand a student if they see behavior that
2  they consider to be antibullying [sic]?
3  A. That they consider to be bullying.
4  Q. Or, I'm sorry, bullying, you are
5  correct.
6  A. Yeah.
7  Q. And that was what the training was
8  teaching?
9  A. Going about how to address it.
10 Q. And address it directly?
11 A. Directly.
12 Q. And immediately upon seeing the
13 bullying activity?
14 A. (Nods head up and down.)
15 Q. I'm sorry, it has to be a verbal
16 answer.
17 A. I guess I'm not sure what you --
18 Q. Oh, I saw you nodding. If you
19 could answer the question with a yes or a no?
20 A. Could you repeat the question for
21 me then?
22 Q. To address the bullying
23 immediately upon seeing it occur?
24 A. Correct.
25 Q. I'm sorry, I should have covered

Page 15

1  that in my ground rules. If we nod or say
2  uh-huh or huh-uh, it's not picked up by the
3  court reporter. You actually have to say yes
4  or no, which is --
5  A. Not a problem.
6  Q. -- a habit that I have as well.
7  MR. HENLEY: It also drives the court
8  reporters to distraction.
9  BY MS. MERSINO:
10 Q. I'm sorry, I didn't mean to put
11 you on the spot there.
12 A. No, I'm fine.
13 Q. So this training occurred in
14 August of 2010, and then a couple of months go
15 by in the school year. And then it's
16 October 20th of 2010. Do you recall this date?
17 A. Yes.
18 Q. And what is your recollection of
19 this date in regards to Mr. McDowell?
20 A. Just that there was a phone call
21 to me by the superintendent that he wanted to
22 see Jen Goodwin over at his office, who is the
23 assistant principal at the high school, about
24 some issue.
25 Q. When did the phone call from the

Page 16

1  superintendent occur?
2  A. It was after school, I'm guessing
3  around 4:00 o'clock.
4  Q. Was this the first time that you
5  heard anything about this?
6  A. I don't recall.
7  Q. Do you remember if anyone came to
8  you prior to 4 p.m. that day to talk about
9  Mr. McDowell and what happened in his
10 classroom?
11 A. I don't recall.
12 Q. So what happens when you received
13 this phone call from the superintendent?
14 A. I contact Ms. Goodwin and ask her
15 to come over to the superintendent's office.
16 Q. Do you go with her?
17 A. No, I wasn't with her.
18 Q. Did you speak with Ms. Goodwin
19 about why you received the phone call?
20 A. I believe I told her about
21 something that happened in Mr. McDowell's
22 class.
23 Q. And did she say anything to you?
24 A. I don't recall.
25 Q. Were you curious why the

Page 45

1  you violated your student's First Amendment
2  right of speech.
3      Q.  And why was that asked of
4  Mr. McDowell?
5      A.  Because somebody thought it was
6  important to ask.
7      Q.  Did you think that it was
8  important to ask?
9      A.  I don't know. I don't recall.
10     Q.  Now, you said that you didn't
11 think that Mr. McDowell handled the situation
12 well. What do you mean by that?
13         MS. BARTOS: Objection. I think the
14 word was appropriate.
15         THE WITNESS: I just felt that it
16 didn't -- wasn't handled appropriately.
17 BY MS. MERSINO:
18     Q.  In what manner wasn't it handled
19 appropriately, in the way that the student,
20 Daniel Glowacki, was thrown out of class?
21     A.  Well, the manner it was handled
22 from the beginning to the end. Asking the
23 student -- I think in Mr. McDowell's statement,
24 he asked the student his opinion. He asked it
25 again. He didn't like the answer.

Page 46

1      Well, that doesn't make it okay to
2  kick him out of class because he doesn't agree
3  with you. I don't know about the
4  Constitution -- you know, his Constitutional
5  law rights, things like that.
6      Q.  So by that statement, do you
7  mean -- you are not an attorney, correct?
8      A.  Correct.
9      Q.  But in your experience and what
10 you learned in your two master's degrees and
11 what you know about administrating in a high
12 school, that was inappropriate behavior to
13 punish a student for stating his opinion in
14 class?
15     A.  It was inappropriate to do that.
16     Q.  Now, Exhibit 27, this is something
17 that you authored; is that correct? It says to
18 Johnson McDowell from Aaron Moran?
19     A.  No, this was something that I was
20 aware of this could be placed in his file.
21     Q.  You didn't, yourself, write this?
22     A.  No.
23     Q.  Do you know who would have written
24 it?
25     A.  The HR at the time authored it and

Page 47

1  made me aware of what the settlement was, that
2  this was going to be placed in the file, this
3  is what's going to replace it. I said okay.
4      Q.  Do you agree and accept as your
5  own the statements in Exhibit 18?
6      A.  Yeah.
7      Q.  So when it says you are receiving
8  a written reprimand after an investigation into
9  an incident that occurred in your classroom
10 substantiated that you displayed a serious lack
11 of professionalism when you slammed your door,
12 raised your voice, and attempted to discipline
13 students for their beliefs.
14         Is that a correct statement that
15 you adopt?
16     A.  Uh-huh.
17     Q.  I'm sorry, is that a yes?
18     A.  Yes, I'm sorry.
19     Q.  And would you agree then with the
20 second paragraph as well, further, you
21 disregarded a student's constitutionally
22 protected rights to self expression to wear a
23 belt buckle which you found personally
24 objectionable, notwithstanding the fact that
25 there was no disruption to the class as a

Page 48

1  result of the student's apparel?
2          MR. HENLEY: Objection to the extent
3  it calls for a legal conclusion.
4  BY MS. MERSINO:
5      Q.  Would you adopt that statement as
6  your own? Do you agree with it?
7      A.  Yes.
8      Q.  And the next sentence, in
9  addition, you loudly and angrily dismissed
10 another student from the class for expressing
11 an opinion which you deemed intolerant and
12 unacceptable in action which may have violated
13 the student's right to free speech?
14         MR. HENLEY: Objection to the extent
15 it calls for a legal conclusion.
16         THE WITNESS: Yes.
17 BY MS. MERSINO:
18     Q.  That's a statement that you would
19 adopt as your own?
20     A.  Uh-huh.
21     Q.  Going back to the 20th, do you
22 remember very early in that morning receiving
23 an e-mail from the superintendent, Ron Wilson,
24 in regard to an antibullying or Gay-Straight
25 Alliance day?

AARON MORAN
September 5, 2012

Page 49

1   A. Not a Gay-Straight Alliance day.
2       (Thereupon, Plaintiffs' Exhibit
3   No. 25, one-page series of e-mails, was marked for
4   purposes of identification.)
5   BY MS. MERSINO:
6   Q. I'll hand you what's been marked
7   as Plaintiff's Exhibit 25, if you could review
8   the e-mail, the top e-mail on that page.
9   A. It's not a Gay-Straight Alliance
10  day.
11  Q. Is that an e-mail that you wrote?
12  A. Yes.
13  Q. And who did you send the e-mail
14  to?
15  A. Superintendent Ron Wilson.
16  Q. And had the superintendent
17  inquired if there was some sort of special day
18  going on at the high school on October 20th of
19  2010?
20  A. No, no special day.
21  Q. Did he inquire if there were a
22  special day going on?
23  A. Yeah. He asked -- I have had
24  several or -- well, I don't know how this is
25  printed off. It doesn't appear out of context.

Page 50

1   Q. I'm just specifically asking about
2   your e-mail.
3   A. Today is an antibullying day.
4   Wear purple using this to stop homophobia. If
5   I hear of anything, I'll let you know.
6   Q. Okay. So which day was the
7   antibullying day?
8   A. There was a national antibullying
9   day on the 20th.
10  Q. The 20th of October?
11  A. October.
12  Q. And who was involved in the
13  antibullying day?
14  A. A lot of people. I don't know. I
15  mean, it was a national piece.
16  Q. A nationally sponsored --
17  A. Yeah. I heard on the radio,
18  again, different places were doing it. One
19  place got their colors wrong on it on the
20  radio. But it was supposed to be a national --
21  I mean, a national antibullying day.
22  Q. Did you hear about it then on the
23  radio? Did you hear a buzz about it at school?
24  A. I mean, I had seen a flyer, and I
25  approved it, to not be homophobic for the GSA

Page 51

1   flyer. I don't know.
2   Q. And when you say GSA, what is GSA?
3   A. Gay-Straight Alliance.
4   Q. And is that a club that's a
5   student club at Howell High School?
6   A. Correct.
7   Q. And how does it work? Is there,
8   like, a person who is a leader in the club who
9   will come to the office with a flyer for
10  approval or --
11  A. Uh-huh, correct.
12  Q. And do you remember was there,
13  like, an officer of the GSA at Howell who came
14  to the office?
15  A. The group had dropped off flyers
16  to know if it would be okay to put up.
17  Q. And what exactly was the flyer?
18  A. Stop homophobia maybe, or I -- I
19  don't know. I don't recall.
20  Q. Did the flyer specify that there
21  was a special day on the 20th of October of
22  2010?
23  A. I don't recall.
24  Q. Was there any sort of discussion
25  about people wearing purple on that day?

Page 52

1   A. I think that might have been on
2   the flyer, but I'm not a hundred percent
3   positive.
4   Q. To wear purple. And do you know
5   if the day had, like, a special name? Was it
6   antibullying day?
7   A. Not off the top of my head, I
8   don't recall.
9   Q. Who is involved in the GSA? Is
10  there a teacher involved as well or just
11  students?
12  A. To have a student club you have to
13  have an adult mentor, you know, an adult
14  advisor. So we had a staff advisor.
15  Q. Who was the staff advisor for the
16  GSA, if you recall?
17  A. I believe it was Laura Stark.
18  Q. And what role would the staff
19  advisor have?
20  A. She would be at meetings basically
21  as a -- advisors are there just to supervise
22  students.
23  Q. Did you notice on the 20th of
24  October people wearing purple T-shirts?
25  A. No.

AARON MORAN
September 5, 2012

Page 53

1  Q. Did you hear at any time before
2  this or after that there were T-shirts made
3  that were purple that said Tyler's Army on
4  them?
5  A. Yes, afterwards.
6  Q. After. And do you know who was
7  involved in the making of those T-shirts and --
8  A. I believe it was -- Wendy Hiller
9  was the person. It was a teacher.
10  Q. And do you know, is she still
11  employed with Howell?
12  A. I believe so.
13  Q. And in addition to making
14  T-shirts, did you know of individuals who wore
15  the T-shirts on the 20th of October of 2010?
16  A. Afterwards.
17  Q. And who did it come to your
18  attention was wearing the T-shirts?
19  A. The only one I know is
20  Mr. McDowell, but I believe there were others.
21  Q. Were there students who were
22  wearing the T-shirts as well?
23  A. I do not know.
24  Q. And how many students would you
25  say are in the GSA, approximately?

Page 54

1  A. How many were there in there at
2  the time?
3  Q. Yeah.
4  A. Twenty maybe, fifteen.
5  Q. And would the GSA have a specific
6  bulletin board dedicated to them or is there,
7  like, a board for just student group
8  announcements?
9  A. No, they don't have a specific
10  board. What are you asking?
11  Q. Where would the flyer go after it
12  was approved?
13  A. They would put it up in areas of
14  the school where it would be noticed on walls
15  that were not, you know -- that are not -- not
16  putting on top of something, but they put it on
17  walls throughout the school, areas throughout
18  the school.
19  Q. Do you remember how many flyers
20  were approved?
21  A. No.
22  Q. More than one?
23  A. More than one.
24  Q. Less than twenty?
25  A. I don't know.

Page 55

1  Q. Was there, like, a stack of flyers
2  that were approved?
3  A. The flyers were approved. I don't
4  know how many. I don't know how many there
5  were.
6  Q. And once a flyer is approved to
7  advertise for a student event, then you said it
8  can be placed on different walls throughout the
9  school?
10  A. Correct.
11  Q. And the flyer for the GSA with the
12  antibullying day was placed throughout the
13  school?
14  A. I believe so.
15  Q. And it's approved with -- is it a
16  stamp or --
17  A. Correct.
18  Q. Was there any activities that you
19  knew about scheduled for this day?
20  A. None that I'm aware of. Like
21  within the school?
22  Q. With the GSA.
23  A. No.
24  Q. So it was advertising for an
25  antibullying day, wear purple?

Page 56

1  A. Yeah. It may have had -- I don't
2  know, but it may have had their next meeting
3  date on it, too. I don't know. I don't
4  recall.
5  Q. Did you receive any other contacts
6  from anyone prior to this happening in
7  Mr. McDowell's class involving the antibullying
8  day?
9  A. Not that I recall.
10  Q. Does the school district have a
11  certain policy regarding controversial issues?
12  A. Yes.
13  Q. And do you remember, was there
14  ever any discussion about whether or not there
15  should be a notice sent home to parents
16  regarding the purple T-shirt day, the
17  antibullying day?
18  A. No.
19  Q. Did Mr. McDowell ever ask for
20  permission to discuss teen suicide and
21  specifically issues with homosexual teenagers
22  committing suicide and discussing this in class
23  prior to October 20th?
24  A. Not that I'm aware of.
25  Q. Would you consider such a topic to

AARON MORAN
September 5, 2012

Page 57

1  be a controversial issue?
2  MR. HENLEY: As just in general or
3  under the policy's terms?
4  MS. MERSINO: Both.
5  THE WITNESS: It depends what you
6  are -- what you are discussing. It depends what
7  class you are in. If you are talking a health
8  class, suicide and things like that, I don't think
9  that would be controversial. I think it would be
10 part of your curriculum.
11 BY MS. MERSINO:
12 Q. In an economics class, do you
13 believe that such a topic would be
14 controversial?
15 A. Yes.
16 Q. Do you think parents of the
17 students should have been contacted prior to
18 Mr. McDowell bridging such a topic in his
19 classroom?
20 MR. HENLEY: Again, is this under
21 policy or is this otherwise, just generally?
22 MS. MERSINO: Both.
23 THE WITNESS: My advice would be not
24 to address it.
25 BY MS. MERSINO:

Page 58

1  Q. And, again, he never came to you
2  prior to this?
3  A. Not that I remember, not that I'm
4  aware of.
5  Q. Are you familiar with the school
6  district's policy regarding religious
7  expression in the district?
8  A. It's been awhile since I've
9  reviewed it.
10 Q. Are you familiar that school
11 officials are called upon to intercede to stop
12 students' speech that constitutes harassment
13 aimed at a student group or a group of
14 students?
15 A. Uh-huh.
16 Q. And is that a policy in place back
17 in 2010 in Howell?
18 A. I believe so.
19 Q. Now, going back to the
20 investigation, on the 25th of October, it was
21 deemed that Mr. McDowell should be reprimanded
22 for how he handled the situation with Daniel
23 McDowell [sic]. At some point, did you become
24 aware --
25 A. Could you say that again?

Page 59

1  Q. We had gone through now to the
2  25th of October.
3  A. Correct.
4  Q. And on that day, it was decided
5  that Mr. McDowell [sic] was going to be
6  reprimanded for how he behaved in the classroom
7  on the 20th of October.
8  A. With Daniel Glowacki?
9  Q. Yes.
10 A. Okay. I thought you said
11 McDowell.
12 Q. Oh, I'm sorry if I did.
13 MR. HENLEY: And I just have an
14 objection as to mischaracterizing former
15 testimony. I think the record reflects he was
16 initially suspended for one day rather than being
17 reprimanded. But with that on there --
18 BY MS. MERSINO:
19 Q. At some point later, did you
20 become familiar that Mr. McDowell had posted
21 certain statements on his Facebook page?
22 A. Yes.
23 Q. And how did you become familiar
24 with that?
25 A. I don't know, I think I might have

Page 60

1  just heard it from the superintendent,
2  possibly.
3  Q. So the superintendent discovered
4  that Mr. McDowell was posting information about
5  what happened with Daniel Glowacki on his
6  Facebook page?
7  MS. BARTOS: I'm going to object to
8  how you characterize that, but go ahead.
9  THE WITNESS: I don't know. I don't
10 recall exactly how I heard about it. I heard
11 about it. I don't have a Facebook page that I
12 deal with or go look around at. So I used one for
13 the school, and that's the only thing I used
14 Facebook was for, not to communicate anything. So
15 I don't have access to those things.
16 BY MS. MERSINO:
17 Q. Do you remember if Mr. McDowell's
18 statement from his Facebook page was ever
19 received by you?
20 A. I don't recall. I don't recall
21 ever seeing the --
22 Q. What did --
23 A. -- Facebook page.
24 Q. What did the school do after
25 learning this information?

AARON MORAN
September 5, 2012

Page 61

1    A.  I don't know.
2    Q.  Did you ever talk to Mr. McDowell
3  about it?
4    A.  No.
5    Q.  Do you remember receiving a phone
6  call from Mrs. Glowacki?  This would be on
7  November 1st.
8    A.  I received a few phone calls from
9  her.
10   Q.  Do you remember when Mrs. Glowacki
11 called you at approximately 6:31 p.m. on
12 November 1st, and she was very upset?
13   A.  Yeah, I said I don't recall the
14 specific time or date, I just know I had a few
15 conversations with her on the phone where she
16 would call me.
17   Q.  And what happened during those
18 phone conversations?
19   A.  She was unhappy the way her son
20 was being portrayed.
21   Q.  And in what manner?  What was she
22 referring to with her son being portrayed in a
23 certain way?
24   A.  Being portrayed in the media.
25   Q.  And the school didn't go to the

Page 62

1  media, correct?
2    A.  I didn't go to the media.  I don't
3  know what others did or didn't do.  I didn't go
4  to the media.
5    Q.  Do you remember Mrs. McDowell
6  [sic] ever making statements about how Mr. --
7  or I'm sorry.  Do you remember Mrs. Glowacki
8  ever making statements about how Mr. McDowell
9  was treating her son after the incident?
10   A.  No, I don't recall because we
11 removed them from class.  So I don't think they
12 had -- I'm not aware of any other interactions,
13 but --
14        (Thereupon, Plaintiffs' Exhibit
15 No. 28, one-page statement entitled Incident on
16 10/20/10, by Jay McDowell, was marked for purposes
17 of identification.)
18 BY MS. MERSINO:
19   Q.  I'm handing you Exhibit 28.  Do
20 you recognize this?
21   A.  Okay.
22   Q.  Do you recognize Exhibit 28?
23   A.  Yeah.
24   Q.  And how do you recognize it?
25   A.  It's an e-mail that followed up --

Page 63

1  Mr. Wilson wanted to follow up on it.
2    Q.  And it's an e-mail.  It looks like
3  it's describing a phone call you had at 6:31
4  p.m.
5    A.  Uh-huh.
6    Q.  You followed up almost immediately
7  after at 7:35 p.m. on November 1st; is that
8  right?
9    A.  Yeah.
10   Q.  And would this be right after you
11 received the phone call from Mrs. Glowacki?
12   A.  Yeah -- yes.
13   Q.  And this was correct as to your
14 memory of what occurred during that phone call?
15   A.  Yes.
16   Q.  And you said that Daniel was taken
17 out of Mr. McDowell's class, correct?
18   A.  Correct.
19   Q.  Was that prior to November 1st?
20   A.  Yes.
21   Q.  And can you describe how he was
22 taken out, why he was taken out?
23   A.  I believe the mother made a
24 request, and we honored the request to move him
25 to a different teacher.

Page 64

1    Q.  And do you know why the request
2  was made?  Was there ever any statement by
3  Mrs. Glowacki?
4    A.  I believe there's a statement
5  somewhere requesting it, and we did.
6    Q.  And why did you honor the request
7  of Mrs. Glowacki?
8    A.  That was the best interest of
9  everyone, to honor the request.
10   Q.  So Daniel Glowacki didn't have to
11 go back into the classroom?
12   A.  Correct.
13   Q.  Now, after the initial
14 investigation meeting, was there a second
15 meeting that occurred?
16   A.  I don't know.
17   Q.  Do you remember if there were
18 follow-up questions that you were asked to
19 voice to Mr. McDowell?
20   A.  Yeah.  I don't know the time
21 frame, but I was asked to follow up on it.
22   Q.  Would it help to refresh your
23 recollection to review an e-mail?
24   A.  Yeah.
25   Q.  After reviewing this, is your

AARON MORAN
September 5, 2012

Page 69

1   A.  Yes.
2   Q.  Does the syllabus have to be
3   approved by the principal or an administrator
4   before it's passed out to the class?
5   A.  They are all turned in to me or
6   administration before or the beginning of the
7   year.
8   Q.  And then you would review the
9   syllabus and approve its use?
10  A.  Uh-huh.
11  Q.  And you did that with
12  Mr. McDowell's syllabus?
13  A.  He handed it in or e-mailed it to
14  me, and I reviewed it.
15  Q.  What do you remember about the
16  class rules about homophobia in Mr. McDowell's
17  class?
18  A.  I don't remember anything specific
19  about that.  I remember about racism -- racism,
20  bigotry, things like that would not be
21  tolerated, which is one of our school code of
22  conducts as well.
23  Q.  Do you remember anything about
24  respecting a person's religion in
25  Mr. McDowell's class rules?

Page 70

1   A.  No.
2   Q.  Would it help to review?  I'm
3   handing you Exhibit 15.
4       MS. BARTOS:  Off the record.
5       (Thereupon, an off-the-record
6   discussion was had.)
7   BY MS. MERSINO:
8   Q.  After reviewing Exhibit 15, does
9   it refresh your memory?
10  A.  I don't recall anything about
11  freedom of religion in there.  I didn't see it.
12  Q.  And you are aware that some
13  religions have views that the correct
14  orientation, I guess, of sex would be for a man
15  to be with a female?
16  A.  Yes.
17  Q.  And that some religions disapprove
18  of the act of homosexual relations?
19  A.  Yes.
20  Q.  Are you familiar with the Catholic
21  religion holding that view?
22  A.  Yes.
23  Q.  Were you part of the settlement
24  process?
25  A.  No.

Page 71

1   Q.  So were you privy to any of the
2   meetings where Mr. McDowell was challenging the
3   reprimand and the one day without pay?
4   A.  I was at the initial piece in
5   November, but I don't know about -- I don't
6   know what else besides the end when I was aware
7   that a settlement had been reached and a
8   written reprimand.
9   Q.  Were you ever contacted if you
10  agreed with the settlement?
11  A.  I don't believe so.
12  Q.  And were you aware that the
13  October 25th reprimand and one day unpaid
14  suspension are now removed from Mr. McDowell's
15  personnel file?
16  A.  Yes.
17  Q.  I'm handing you what's already
18  been admitted as Exhibit 13.  Is that the
19  reprimand that you were talking about earlier?
20  A.  Correct.
21  Q.  And was that issued on the 25th
22  of --
23  A.  Yes.
24  Q.  -- October of 2010?
25  A.  Correct.

Page 72

1   Q.  And it says that that memo is to
2   Mr. McDowell from yourself?
3   A.  And Sandra Moore.
4   Q.  Were you one of the people who
5   wrote this reprimand with Sandra Moore?
6   A.  I was the -- I viewed it.
7   Q.  Do you approve what's in the
8   reprimand on October 25th, 2010, Exhibit 13?
9   A.  Yeah -- yes.
10  Q.  If you want an opportunity to
11  review the statements again -- do you adopt and
12  agree with the statements in Exhibit 13?
13  A.  Yes.
14  Q.  And I think we discussed this.  Do
15  you remember receiving anything that was
16  pertaining to Mr. McDowell's Facebook, like a
17  statement that he wrote out on Facebook?
18  A.  I don't know.  I don't recall.
19  Q.  Do you remember receiving this
20  (indicating) via e-mail?
21  A.  No.
22  Q.  So it could have been just
23  verbally that you found out about Mr. McDowell
24  posting items?
25  A.  Yeah, I don't -- that looks like a

AARON MORAN
September 5, 2012

Page 73

1   Facebook piece. I don't know.
2        Q.  Now, after everything occurred on
3   the 20th of October of 2010, who decided to
4   have Dr. Marcia McEvoy come back to the school
5   to teach about antibullying?
6        A.  That was decided a long time ago.
7        Q.  So that was in place prior to this
8   event happening?
9        A.  Correct.
10       Q.  Were you aware of the event that
11  occurred on February 1st of 2011 in the
12  auditorium about antibullying?
13       A.  If I recall correctly, it never
14  occurred on the -- it didn't occur on
15  February 1st.
16       Q.  It did not?
17       A.  It did not occur on February 1st.
18       Q.  Was the event cancelled?
19       A.  Correct. It was rescheduled.
20       Q.  Rescheduled. And when did Marcia
21  McEvoy come back to Howell?
22       A.  It's a couple weeks or a month
23  later.
24       Q.  And what was the discussion that
25  Marcia McEvoy had when she came back?

Page 74

1        A.  Just ways for -- ways to help
2   prevent bullying, to address bullying.
3        Q.  And what exactly was it that she
4   was discussing when she was talking about
5   bullying? Was it bullying certain groups of
6   students?
7        A.  No, just bullying, period.
8        Q.  And I'm wondering, why was this
9   presentation given after October 20th of 2010?
10       A.  Just her schedule.
11       Q.  So it was always planned?
12       A.  Yeah, that was part of the -- part
13  of the package is my understanding. My
14  understanding, this was decided on -- I believe
15  it was decided on. Back then, we just couldn't
16  get her in until January. Because she came in
17  with students in January, but that was the
18  quickest we could get her in, I believe.
19       Q.  Did she give a presentation two
20  times that winter in 2011 to students?
21       A.  To parents?
22       Q.  To students and the community
23  or --
24       A.  She was there for multiple days
25  for students.

Page 75

1        Q.  And what exactly was her role in
2   giving a presentation to the students? When
3   did it occur?
4        A.  Ways they could help combat
5   bullying.
6        Q.  Was this during school hours?
7        A.  Yes.
8        Q.  And was it, like, a school-wide
9   assembly? Was it, like, a private meeting?
10       A.  I would say it was classified more
11  school-wide. We don't have a place that holds
12  everybody together. So we had different groups
13  of students coming in, their English classes or
14  something like that.
15       Q.  Were all the students in the high
16  school at some point given the presentation?
17       A.  I don't think it was all of them.
18  I think it was -- it might have been ninth,
19  tenth, eleventh grade students. I don't recall
20  all the specifics.
21       Q.  Do you recall what grade Daniel
22  Glowacki was in in 2010 and 2011, that school
23  year?
24       A.  It must have been eleventh grade.
25       Q.  Was he given the presentation by

Page 76

1   Dr. McEvoy?
2        A.  I don't know. I assume so, but I
3   don't know if he was present when it occurred
4   or not.
5        Q.  Did you attend the presentation or
6   presentations?
7        A.  Which one?
8        Q.  The one -- the presentation or
9   presentations with the students.
10       A.  I was in some of the student
11  presentations.
12       Q.  Were you in the presentation where
13  Daniel Glowacki was present?
14       A.  I don't know if he was there or
15  not. I couldn't -- I don't recall.
16       Q.  Have you gone through the
17  different literature by Dr. McEvoy?
18       A.  Uh-huh.
19       Q.  Are you aware that she says -- she
20  brings up different examples of things to bring
21  up with students?
22       A.  Uh-huh.
23       Q.  Like calling another person gay?
24       A.  Uh-huh.
25       Q.  Would this be a sample situation