# EXHIBIT 6

# GLOWACKI, ET AL v. HOWELL PUBLIC SCHOOL DISTRICT, ET AL

## JOHNSON MCDOWELL

May 29, 2012

*Prepared for you by*



NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

JOHNSON MCDOWELL
May 29, 2012

Page 13

1  A.  That's correct.
2  Q.  And in reaction to what occurred on the 25th of
3      October of 2010, did you make any statements to the
4      public or on a Facebook page?
5  A.  I made a statement about my suspension on a Facebook
6      page, yes.
7  Q.  And was it one statement or numerous statements?
8  A.  It was one statement.
9  Q.  In addition to this one statement and statements that
10     you made directly to school officials, was there
11     anything else that you did to memorialize what
12     happened?
13 A.  I don't remember, and I don't necessarily understand
14     your question.
15 Q.  Okay.  Do you keep a diary or write down events that
16     occur?
17 A.  No, I don't keep a diary; I thought that's what
18     Facebook was for.
19 Q.  Did you email friends with what happened?
20 A.  I don't recall emailing friends.  We're talking over a
21     year now.
22 Q.  So would it be specifically on your Facebook page, is
23     that how you would communicate with people what
24     happened?
25 A.  If I communicated to people about what happened, it

Page 14

1      would probably be face-to-face or through email.
2  Q.  Okay.  So there were emails that were sent in regard
3      to what occurred on the 20th of October?
4  A.  That's not what I said.
5  Q.  Okay.  So please clarify for me.
6  A.  I don't know if there are emails.
7  Q.  Okay.  Have you done a search of what's in your outbox
8      or sent emails to see if you sent anything in regard
9      to what occurred on the 20th of October?
10 A.  I have.
11 Q.  And how did you search for those emails?
12 A.  I searched under the name Dan Glowacki, and I also
13     searched under "school board" and searched under
14     "October 20th."  I believe those were the three search
15     terms I used.
16 Q.  Are you certain that that would encompass all of the
17     emails that you sent?
18 A.  I am certain that would.
19 Q.  So in all of your emails pertaining to this event, you
20     either used the words "Daniel Glowacki" or the date of
21     the event?
22         MS. BARTOS:  Wait.  You mischaracterized --
23     you mischaracterized.  He said he didn't send any.  He
24     looked under those terms.  He didn't find any, he
25     didn't send any.

Page 15

1         MS. MERSINO:  I asked a follow up question.
2         MS. BARTOS:  But you're saying in the
3     follow-up question, "The emails, that you sent would
4     include these phrases."  That's -- that's assuming
5     that he sent an email.
6  BY MS. MERSINO:
7  Q.  If you understood the question, you may answer.
8  A.  Repeat the question.
9  Q.  Okay.  So this search that you did, you searched three
10     things, correct?
11 A.  Uh-huh.
12 Q.  You searched the "school board"; is that right?
13 A.  That's correct.
14 Q.  You searched the name "Daniel Glowacki"?
15 A.  That's correct.
16 Q.  And you also searched the date of October 20th of
17     2010?
18 A.  That's correct.
19 Q.  Would this encompass all of the emails that you sent
20     to anyone in regard to this event?
21 A.  If I sent any emails, it would have been under those
22     three terms.
23 Q.  And so you know for a fact that those terms would have
24     absolutely been in your emails?
25 A.  Yes.

Page 16

1  Q.  Did you make any contact with the press regarding what
2      occurred?
3  A.  Did I initiate contact?
4  Q.  Yes.
5  A.  No.
6  Q.  Did you ever speak with anyone from the press?
7  A.  Yes.
8  Q.  And which parties did you speak with?
9  A.  I spoke with WDIV, Channel 4 in Detroit, and with
10     MSNBC.
11 Q.  And do you know how these interviews came about?
12 A.  They contacted my VP of Communications at HEA.
13 Q.  And that's Lindsey Forbes?
14 A.  At the time, yes.
15 Q.  Did you ever give Lindsey Forbes permission to contact
16     the media on your behalf?
17 A.  No.
18 Q.  Do you know if she independently contacted the media?
19 A.  I do not.
20 Q.  Do you know who would have contacted the media, by
21     chance?  Did anyone tell you that they did?
22 A.  No.
23         MARKED FOR IDENTIFICATION:
24         DEPOSITION EXHIBIT 1
25         1:50 p.m.

JOHNSON MCDOWELL
May 29, 2012

| Page 25 |
|---|
| 1  don't accept gays.' I've also been suspended for |
| 2  telling a student to remove the Confederate flag from |
| 3  her clothing.  Last year we had a hate group formed on |
| 4  Facebook that used the Confederate flag as their |
| 5  symbol.  Therefore, I considered it a controversial |
| 6  symbol." |
| 7  A.  Yes, I wrote that. |
| 8  Q.  And when did you write it? |
| 9  A.  October 25th, 2010. |
| 10 Q.  And who did you write it to? |
| 11 A.  It is a Facebook post. |
| 12 Q.  And can you describe for me exactly who the Facebook |
| 13     post would have gone out to? |
| 14 A.  It's a Facebook status. |
| 15 Q.  So this was your status after -- |
| 16 A.  This was my status on October 25th. |
| 17 Q.  And who are your friends on Facebook?  Are you open to |
| 18     the public or do you restrict -- |
| 19 A.  No, I restrict it to friends. |
| 20 Q.  And can you describe for me in general who your |
| 21     friends are on your Facebook? |
| 22 A.  Friends and family. |
| 23 Q.  And approximately how many people do you have as |
| 24     friends and family? |
| 25 A.  I don't know.  200, maybe.  I don't know.  I would |

| Page 27 |
|---|
| 1  A.  Yes, as far as I -- yes, because I went for a search |
| 2      for it and that's what I found. |
| 3  Q.  If I could have this marked as Exhibit 3. |
| 4              MARKED FOR IDENTIFICATION: |
| 5              DEPOSITION EXHIBIT 3 |
| 6              2:16 p.m. |
| 7  BY MS. MERSINO: |
| 8  Q.  I'm handing you what's been marked as Exhibit 3. |
| 9      Could you please review it for me. |
| 10 A.  Uh-huh. |
| 11 Q.  And do you recognize Exhibit 3? |
| 12 A.  I do. |
| 13 Q.  How do you recognize it? |
| 14 A.  I recognize it as actually the document that I |
| 15     reviewed on my computer last night before I came here, |
| 16     that I had under the statement of HEA press release. |
| 17 Q.  Okay.  You would agree that on October 3 it says, "Jay |
| 18     McDowell statement concerning his reprimand"? |
| 19 A.  Yes, it does. |
| 20 Q.  And it says -- the title of it is, "My response to my |
| 21     reprimand." |
| 22 A.  Correct. |
| 23 Q.  "Please read for an account of the events that day," |
| 24     by Jay McDowell, on Monday, November 1st, 2010 at 2:56 |
| 25     p.m., correct? |

| Page 26 |
|---|
| 1  have to check.  I would have to go back to October |
| 2  25th and find out how many I had then. |
| 3  Q.  Did you remove this after you posted it as your status |
| 4     update? |
| 5  A.  I do not remember, but I was able to find it on my |
| 6     Facebook, when requested. |
| 7  Q.  And is this the only post that you made to your |
| 8     Facebook account regarding what occurred in your |
| 9     classroom on October 20th, 2010? |
| 10 A.  Yes, I believe it is. |
| 11 Q.  And is it the only Facebook post that you made to your |
| 12     account regarding any actions by Daniel Glowacki? |
| 13 A.  This does not reference Daniel Glowacki. |
| 14 Q.  It is stemming from -- |
| 15 A.  It does not concern Daniel Glowacki; it concerns my |
| 16     suspension. |
| 17 Q.  Okay.  So when you wrote, "I don't accept gays," who |
| 18     would be the speaker saying that? |
| 19 A.  That would be Daniel Glowacki. |
| 20 Q.  Okay.  So you are quoting Daniel Glowacki in this |
| 21     Facebook post, correct? |
| 22 A.  Yes, I am. |
| 23 Q.  And is this the only Facebook post that you made |
| 24     concerning what occurred in your classroom or the |
| 25     school's actions subsequent to? |

| Page 28 |
|---|
| 1  A.  Correct. |
| 2  Q.  And did you, indeed, write this statement? |
| 3  A.  I did. |
| 4  Q.  Now, when you say that this is a statement that you |
| 5      reviewed, what do you mean by that? |
| 6  A.  When I looked -- I looked on my computer last night to |
| 7      see if I had -- see if I had a statement about the |
| 8      incident.  I found a document on there called HEA |
| 9      press release, but this was a document that was under |
| 10     that title.  So when I told you earlier I looked at |
| 11     the HEA press release, this was the document that had |
| 12     that title. |
| 13 Q.  So this is not -- Exhibit 3 is not the HEA press |
| 14     release? |
| 15 A.  No.  No, it's not.  That is the title it had in my |
| 16     computer. |
| 17 Q.  Can you please describe for me what Exhibit 3 is? |
| 18 A.  Exhibit 3 is a statement concerning my reprimand. |
| 19 Q.  And you wrote everything in Exhibit 3? |
| 20 A.  Yes, I did. |
| 21 Q.  And you posted this on Facebook? |
| 22 A.  I think I posted it in a notes section of it.  I |
| 23     don't -- |
| 24 Q.  Notes section of what? |
| 25 A.  Of Facebook.  I don't remember exactly where, but I |

JOHNSON MCDOWELL
May 29, 2012

---

Page 29

1    think it was posted in the notes section of Facebook.
2  Q.  Okay.  And this is something that we received from the
3    school district.  And at the bottom, it's handwritten
4    that it's from your Facebook page, and it was printed
5    on the 5th of November of 2010.  And I see here at the
6    top that -- is that when you posted it, Monday,
7    November 1st, 2010?
8  A.  I would assume so.
9  Q.  So you posted this to your Facebook page?
10 A.  I would assume so, yes, although I did not remember
11   posting it when I went back to get what counsel had
12   requested from me.
13 Q.  Okay.  And the subsequent pages look like Facebook
14   comments.  Is that, indeed, correct, are those
15   Facebook comments?
16 A.  They look like Facebook comments.
17 Q.  Is there anything else that you failed to disclose, in
18   addition to Exhibit 3, that you posted on your
19   Facebook page?
20 A.  No.
21 Q.  And you're positive of that?
22 A.  Until you show me otherwise, yes, I'm positive of
23   that.  I was positive before I saw this.
24 Q.  And what do you describe in the statement?
25 A.  I describe the events of that day.

---

Page 30

1  Q.  And do you again quote Daniel Glowacki in this
2    statement?
3  A.  I quote, yes, Daniel Glowacki in the statement.
4  Q.  And you're positive that your Facebook page is
5    private?
6  A.  It is friends and family; it's not open to the public.
7  Q.  And how do you know that it's not open to the public?
8  A.  That's the way I set my privacy parameters.
9  Q.  And when did you set those privacy parameters?
10 A.  I think I've always had them set.
11 Q.  And you're positive that you only have approximately
12   200 friends?
13 A.  I said I -- I don't know how many friends I had.
14   Approximately 200 around October 25th of 2010.
15 Q.  And how many of those friends were students at Howell
16   High School?
17 A.  None.  I have a policy that I don't have friends that
18   are students.
19 Q.  And to this day, do you have any friends on Facebook
20   who are students of Howell High School?
21 A.  Not that I know of, no.  I just told my seniors after
22   you graduate, after graduation, then I'll friend you.
23 Q.  Okay.  So what is your typical policy when you receive
24   a friend request?
25 A.  If I know the student and -- and I know they're still

---

Page 31

1    a student in Howell High School, then I don't friend
2    them until after they graduate.  If I don't know them
3    at all, I look to see if there's any mutual friends.
4  Q.  So you're stating here today that once someone
5    graduates, then you will friend them on Facebook?
6  A.  Yes.
7  Q.  Going back to Exhibit No. 1, looking at the last
8    paragraph, paragraph 8 of the answer, we requested the
9    video that you showed to the class on October 20th of
10   2010.
11 A.  Uh-huh.
12 Q.  Is that an accurate website address to that video?
13 A.  That is one of many websites that carried that video.
14 Q.  Okay.  So the video can be found at
15   www.gaypolitics.com/2010/10/13/out-fort-worth-city-
16   councilman-tells-personal-bullying-story; is that the
17   correct website?
18 A.  That is one of many websites you can find it.
19 Q.  And that's where you have found the video?
20 A.  When asked by counsel to find the video, I did a
21   Google search for the video and took the first one
22   that popped up.
23 Q.  Okay.  So the video can be found at that website?
24 A.  Yes.
25 Q.  I know you may or may not have seen this.  This is the

---

Page 32

1    Notice of Deposition for today.  Do you recognize
2    this?
3  A.  No, I don't think I saw this.
4  Q.  We can agree that you're here today to testify?
5  A.  I will agree that I'm here today.
6  Q.  And you're here to testify about the events that
7    occurred on October 20th of 2010 in your classroom?
8  A.  Correct.
9  Q.  And you're here today and also we're continuing on
10   Tuesday, June 5th at 9:00 a.m, correct?
11 A.  If you need me to be there, yes.
12 Q.  And do you have a preference for the name that I
13   should call you?
14 A.  You can call me Jay, that's fine.
15 Q.  All right.  Have you been deposed before?
16 A.  I have never been deposed.
17 Q.  So have you ever been a plaintiff or defendant in a
18   lawsuit?
19 A.  I have not.
20 Q.  Have you ever been a plaintiff or a defendant in your
21   capacity as the president for the HEA?
22 A.  No.
23 Q.  Have you ever been involved in a lawsuit as a witness?
24 A.  No.
25 Q.  And your present employer is the Howell Public School

---

JOHNSON MCDOWELL
May 29, 2012

Page 45

1  A.  Not specifically, no.
2  Q.  According to what you gained from the training, what
3      exactly was it that you took from the training where
4      you thought a student could say this or could not say
5      that?
6  A.  I took from the --
7          MR. HENLEY:  Object to vagueness.
8          MS. BARTOS:  I was about to say that, too.
9  BY MS. MERSINO:
10 Q.  Answer if you can, and let me know if you want me to
11     restate.
12 A.  Restate.
13 Q.  Once you went to the training and received the
14     training, leaving that training and knowing what you
15     had been taught there, what was it in your head, using
16     what the school district put on with Dr. McEvoy, was
17     it that you believed after receiving the training you
18     could tell a student to say or not to say?
19         MR. HENLEY:  Object to foundation.
20         MS. BARTOS:  Yeah.  When he walked out of
21     there, what -- what did he believe a student could or
22     could not say?
23         MS. MERSINO:  Yes.
24         MS. BARTOS:  We could be here until next
25     Tuesday talking about what he --

Page 46

1  BY MS. MERSINO:
2  Q.  Answer, if you can.
3  A.  You're going to need to narrow the question.
4  Q.  Did you believe after leaving that training that there
5      were certain things that you had to stop a student
6      from saying?
7  A.  Yes.
8  Q.  And did you believe after that training that there
9      were certain things that you could allow a student to
10     say?
11 A.  Again, that question's too broad, because I -- yes, a
12     student can ask to go to the bathroom.
13 Q.  Okay.  So --
14         MS. BARTOS:  Yeah.
15 BY MS. MERSINO:
16 Q.  During the training, it was discussed students can say
17     some things but not others, correct?
18 A.  Correct.  As you know, in society we can say some
19     things and not others.
20 Q.  And were you called upon in the training to stop a
21     student from saying something they shouldn't say,
22     according to the training?
23 A.  Yes.  Yes.  Sweat the small stuff.  If you hear a
24     student calling another student the N word or the F
25     word, or something like that in the hallway, yes, stop

Page 47

1      it.
2  Q.  And were you called upon to immediately stop it with
3      that student right then and there?
4  A.  Yes, right then and there, immediate intervention,
5      yes.
6  Q.  According to the training, were you called upon to
7      stop the student's speech in the middle of the class?
8  A.  If the speech is inappropriate, yes.
9  Q.  And what did they say was inappropriate speech during
10     the training?
11         MS. BARTOS:  It's been asked and answered
12     like three times already.
13 BY MS. MERSINO:
14 Q.  Please answer the question.
15 A.  Speech that degrades or threatens a group or an
16     individual student.
17 Q.  And was there any other definition of what exactly
18     that speech would be?
19 A.  Not that I recall at this time, no.
20 Q.  So it was left up to the personal subjectivity of each
21     teacher?
22 A.  Yes.
23 Q.  During the training, was there ever discussion about
24     how different students could have different religious
25     viewpoints?

Page 48

1  A.  No.
2  Q.  Was it ever discussed that a discussion could occur in
3      the class if people disagreed upon something?
4  A.  Not in the way you're phrasing the question.  I mean,
5      I teach classes that call for students to disagree;
6      that's the concept behind social issues.  Or a
7      philosophy class, you want students to disagree, to
8      argue.  So in the broad sense that you're asking that
9      question, no, the training didn't touch on that.
10 Q.  So the training did not discuss that different
11     students could have an argument in class that would
12     further academic goals?
13 A.  It was anti-bullying training.
14         MARKED FOR IDENTIFICATION:
15         DEPOSITION EXHIBIT 4
16         2:47 p.m.
17 BY MS. MERSINO:
18 Q.  I'm handing you what has been marked as Plaintiff's
19     Exhibit 4.  Do you recognize this document?
20 A.  I do.
21 Q.  And how do you recognize it?
22 A.  It's Howell Public Schools Bylaws and Policies
23     regarding bullying and other aggressive behavior
24     towards students.  Is this the policies and bylaws
25     that were in effect on October 20th, 2010?

JOHNSON MCDOWELL
May 29, 2012

Page 89

1  administration and/or other documents, such as the
2  Student Code of Conduct that contains other
3  information. For example, this does not talk about
4  the length of skirts; however, we have a very strict
5  policy on the length of skirts that girls wear. That
6  is in the Student Code of Conduct.
7  Q. So you previously stated you had not read this policy,
8  Exhibit 9, prior to October 20th, 2010.
9  A. That's correct.
10  Q. And there were other policies, as well, that you had
11  not read prior to that date?
12  A. Sure.
13  Q. And the school did not mandate that you read every
14  last policy?
15  A. That's correct.
16  Q. The school did not mandate that you were familiar with
17  every policy?
18  A. I think the school assumes that we're familiar with
19  policies.
20  Q. They assume, but they don't check up on it?
21  A. That's correct.
22  Q. They don't make you sign anything to confirm that
23  you've read all the policies?
24  A. That's correct.
25  Q. And they don't do any training to make sure that

Page 90

1  you're familiar and know how to interpret the
2  policies?
3  A. That's correct.
4         MARKED FOR IDENTIFICATION:
5         DEPOSITION EXHIBIT 10
6         3:48 p.m.
7  BY MS. MERSINO:
8  Q. I'm handing you Exhibit 10, Controversial Issues
9  Policy 2240. Do you recognize this policy?
10  A. I do.
11  Q. How do you recognize it?
12  A. It is Controversial Issues Policy 2240.
13  Q. And had you read this policy prior to October 20th of
14  2010?
15  A. Yes.
16  Q. And in reading this policy, did you believe that it
17  was appropriate to discuss bullying in class?
18  A. Yes.
19  Q. Did you believe it was appropriate to discuss
20  homosexuality in class?
21  A. Counsel, are you saying that bullying and -- bullying
22  and homosexual issues are controversial issues?
23  Q. I'm asking you. In your interpretation of the policy,
24  do you believe that homosexualality is a controversial
25  issue?

Page 91

1  A. No, it's not a controversial issue. Do you believe
2  it's a controversial issue?
3  Q. I'm not the person answering questions here.
4  A. But ultimately, you are. When you go to sleep at
5  night, you must answer those questions for yourself.
6  Q. Okay. Back to the policy here in discussing
7  controversial issues, does the school give any sort of
8  definition for what controversial issues are?
9  A. You have the policy in front of you.
10  Q. But in your understanding, did they say homosexuality
11  is not a controversial issue?
12  A. They did not say homosexuality is a controversial
13  issue.
14  Q. So is it up to each individual teacher to determine
15  what is or is not a controversial issue?
16  A. There are no specific issues listed in this bylaw that
17  are stated as being controversial.
18  Q. So how would a teacher know how to interpret the
19  controversial issues policy?
20  A. That's a very good question.
21  Q. As a teacher of the Howell Public School District, how
22  do you believe a teacher would know how to interpret
23  this policy and know which issues are controversial?
24  A. I don't know how teachers would know which issues are
25  controversial when they're not listed in the policy.

Page 92

1  Q. Do you think had you known which issues were
2  controversial and not controversial, you would have
3  been more able to conduct your class in accordance
4  with the First Amendment?
5         MR. HENLEY: Objection, calls for a legal
6  conclusion.
7         MS. BARTOS: Yeah, you're making really
8  broad assumptions there that he didn't conduct his
9  class in conformance with the First Amendment.
10  BY MS. MERSINO:
11  Q. Do you understand the question?
12  A. I do. It's very broad. I mean, I conducted my class
13  in accordance with the First Amendment, and I don't
14  know that the controversial issues bylaw would change
15  any of that.
16  Q. Okay. So if the school were to list which issues were
17  controversial and which issues were not listed as
18  controversial, would that help you, as a teacher,
19  interpreting this policy?
20  A. Yes.
21  Q. If it were listed that homosexuality was a topic that
22  was a controversial issue, would you have discussed it
23  in your sixth hour classroom on the 20th of October of
24  2010?
25         MS. BARTOS: Objection, calls for

JOHNSON MCDOWELL
May 29, 2012

Page 93

1   speculation.
2   BY MS. MERSINO:
3   Q.  You can answer.
4   A.  I -- there's -- it's not listed as a controversial
5       issue.
6   Q.  But if it were, would you have then --
7   A.  Why are we dealing with hypotheticals?  The facts on
8       the ground are that it was not listed as a
9       controversial issue.
10  Q.  I'm asking in your professional judgment, would you
11      have?
12  A.  In my professional judgment, it's not listed as a
13      controversial issue.
14          MR. HENLEY:  Let me toss in an objection as
15      to foundation, since the policy doesn't prohibit
16      discussion of controversial issues.
17          MS. BARTOS:  I think he's answered your
18      question, he doesn't know how to answer it.
19  BY MS. MERSINO:
20  Q.  Would you have discussed a topic if it were listed
21      that it was a controversial issue, without any prior
22      actions, without any notification to parents?
23          MS. BARTOS:  Calls for speculation.
24          MR. HENLEY:  Object to foundation.
25          THE WITNESS:  Until it is -- things are

Page 94

1       listed as a controversial issue and until I'm given
2       guidelines as to specifically what I'm supposed to do
3       in discussing it, if I discuss it, I don't know that I
4       can answer that question.
5   BY MS. MERSINO:
6   Q.  Now, you stated that you do not believe that
7       homosexuality is a controversial issue.
8   A.  That's correct, I do not believe that homosexuality is
9       a controversial issue.
10  Q.  Do you think sexuality, in general, is a controversial
11      issue?
12  A.  In what way do you mean?
13  Q.  In the general sense of sexuality.
14          MS. BARTOS:  In what, in speaking --
15  BY MS. MERSINO:
16  Q.  People choosing to or not to --
17  A.  People wearing short dresses, or what?
18  Q.  People choosing to or not to engage in sexual
19      activity.
20  A.  I think the question you're trying to ask is do I
21      think heterosexuality is a controversial issue; and
22      no, I don't.
23  Q.  I'm saying remove hetero, remove homo; sexuality, in
24      general, the sense of sex, do you believe that --
25  A.  Those are two different questions.  Sexuality is not a

Page 95

1   controversial issue.  I cannot teach about sex, and I
2   never have.
3   Q.  Okay.  And how do you distinguish the two?
4   A.  I don't understand the question.
5   Q.  What I'm asking is you said you can't teach about sex
6       and never have.
7   A.  Correct.
8   Q.  But sexuality is not a controversial issue.  So what
9       is it -- what's the difference to you?
10  A.  Sexuality I guess is the way that people express
11      themselves in a manner of who they're affectionate
12      with and who they're not.  There's probably a chapter
13      in the sociology book we use in sociology on
14      sexuality.
15  Q.  Okay.  And how do you distinguish that with a
16      discussion about sex?
17  A.  Well, we know what sex is; that's a specific act
18      between two people.
19  Q.  Okay.  So it has a narrow definition of only the act
20      between two people?
21  A.  I don't -- I don't know.  Some people might define it
22      differently.  I'm not understanding --
23  Q.  What is the spectrum of what is appropriate, in
24      accordance with this policy, for controversial issues?
25  A.  Are you saying that it lists sexuality as a

Page 96

1   controversial issue?  Because I don't see that.
2   Q.  No.  You said that it's not a controversial issue, in
3       your professional judgment.
4   A.  It's not listed as a controversial issue.
5   Q.  And your testimony, correct me if I'm wrong, is that
6       sexuality is not a controversial issue?
7   A.  That's correct.
8   Q.  But then you stated that sex is a controversial issue.
9           MS. BARTOS:  No.  No.
10          THE WITNESS:  The Michigan School Code does
11      not allow someone without a health certification to
12      teach anything about sex.
13          MS. BARTOS:  His testimony was that he
14      doesn't -- has never taught sex.
15          THE WITNESS:  There are teachers who are
16      certified to teach about the actual act of sex, and
17      they do that in ninth grade and I think fifth grade.
18      I'm not one of those teachers.
19  BY MS. MERSINO:
20  Q.  Okay.  Was it stated what's off limits to talk about
21      by the school district, referencing sex?
22          MR. HENLEY:  Object to foundation.
23          MS. BARTOS:  I don't understand what the
24      question is.
25          THE WITNESS:  I don't understand the

JOHNSON MCDOWELL
May 29, 2012

Page 101

1    already been approved as part of the curriculum.
2    Q.   When it's brought up in your sociology class, then in
3         your professional judgment do you believe that it is,
4         as well, not a controversial issue?
5    A.   That's correct, because it's already been approved as
6         an issue by the district, in the curriculum.
7    Q.   When an issue is brought up as part of the textbook,
8         is that guidance then that it is not a controversial
9         issue?
10   A.   That is my belief, yes.
11                MARKED FOR IDENTIFICATION:
12                DEPOSITION EXHIBIT 11
13                4:02 p.m.
14   BY MS. MERSINO:
15   Q.   Would you please review what has been handed to you as
16        Exhibit 11?
17   A.   Exhibit 11, 3216 Staff Dress and Grooming.
18   Q.   And do you recognize this?
19   A.   Uh-huh.
20   Q.   What is it?
21   A.   It is the staff dress and grooming policy.
22   Q.   And had you reviewed this prior to the 20th of October
23        of 2010?
24   A.   No, because I don't believe it existed before then.
25   Q.   So is this a newer policy then that has been enacted

Page 102

1    after October 20th of 2010?
2    A.   I believe so, yes.
3    Q.   And what was your understanding of what staff dress
4         and grooming could be prior to the 20th of October of
5         2010?
6    A.   My understanding of staff dress and grooming prior to
7         and including now is that the dress just be consistent
8         with professionalism.
9    Q.   And has anyone from the school district ever made a
10        comment to you about wearing a purple Tyler's Army
11        T-shirt?
12   A.   No.
13   Q.   So the school district allows you to wear a Tyler's
14        Army T-shirt?
15   A.   I wore it on one day.
16   Q.   On October 20th, 2010?
17   A.   Yes. Uh-huh.
18   Q.   And no one got into any trouble for that?
19   A.   Not me or any of the other teachers that work there.
20   Q.   So those were allowed under the policy; at this time,
21        they were okay?
22                MR. HENLEY:  Object as to foundation.
23   BY MS. MERSINO:
24   Q.   If you can answer.
25   A.   The school district allows teachers to wear a number

Page 103

1    of different types of T-shirts.  For example, every
2    Friday now we wear an anti-bullying T-shirt.  We also
3    wear college sweatshirts, college T-shirts and the
4    like.
5    Q.   Are students allowed to wear the same T-shirts?
6    A.   Students are allowed to wear the same T-shirts, yes.
7    Q.   Was any student reprimanded for wearing a purple
8         Tyler's Army T-shirt on the 20th of October?
9    A.   I sure hope not.
10   Q.   To your knowledge, were any students reprimanded?
11   A.   No.
12   Q.   If a student shows up to class wearing a T-shirt that
13        is anti Tyler's Army, would you have asked that the
14        student remove the T-shirt or change the T-shirt?
15   A.   That's a hypothetical question that didn't occur,
16        given the statement facts.  But no, I would not have
17        asked them to remove the shirt.
18   Q.   So you would have allowed it?
19   A.   Sure, just like I allow them to wear Michigan State
20        and Notre Dame shirts, even though I'm a U of M grad.
21   Q.   Is there a difference to you between someone wearing a
22        T-shirt and someone making a verbal comment?
23   A.   No, there's not.  If the T-shirt is vulgar, or
24        obscene, or degrades a person or group, no.  If
25        somebody came into school with an "I hate blacks"

Page 104

1    T-shirt, that would be inappropriate whether he said
2    it or not.
3    Q.   If someone had a T-shirt regarding their religious
4         beliefs and said "I do not believe in gays because I
5         am Catholic," would that person be allowed to wear
6         that T-shirt?
7    A.   That would be a question I would have for the school
8         district.  I would ask the school district to make a
9         determination on that.
10   Q.   But that would --
11   A.   It's strange that they wouldn't believe in gays.  It
12        would be like not believing fairies, but --
13   Q.   Okay.  I guess can you clarify that comment?
14   A.   To not believe in a group of people?  I don't believe
15        in blacks, I don't believe in Jews, is that what
16        you're getting at?
17   Q.   No.  If a student showed up in a T-shirt and it said
18        "I do not believe in gays" or "I do not accept gays
19        because I'm Catholic," would that be a --
20                MS. BARTOS:  Do not believe in and do not
21        accept are two different things.
22                THE WITNESS:  Yeah.  Would I be allowed
23        to -- would a student be allowed to do -- I -- they
24        are two very different things.
25   BY MS. MERSINO:

JOHNSON MCDOWELL
May 29, 2012

Page 105

1  Q.  Okay. And are either offensive to you?
2  A.  "I don't accept gays" is offensive.
3  Q.  Even when the T-shirt says "because I'm a Catholic"?
4  A.  Did a student wear a T-shirt that said such a thing?
5  Q.  No. I'm asking in your professional judgment, would
6       that cause you alarm?
7           MS. BARTOS: Calls for speculation, but you
8       can answer.
9           THE WITNESS: I would refer to -- I would
10      send the student to the office to have the school
11      district make a judgment on that.
12  BY MS. MERSINO:
13  Q.  So to you, it would cause some alarm at least enough
14      to notify --
15  A.  Yeah. "I do not accept gays part," yes.
16  Q.  Would you make the student take off the T-shirt in
17      your classroom?
18  A.  Which T-shirt?
19  Q.  If it said "I do not accept gays because I'm
20      Catholic."
21  A.  I just said I would send them to the office.
22  Q.  So you would ask for them to be removed from your
23      class?
24  A.  No, I would ask for -- just like when a girl comes in
25      with a skirt that may be too short, send them to the

Page 106

1       office for the office to make a decision on that skirt
2       is not disciplinary in nature; it's asking the
3       district to make a decision as to whether the student
4       is violating the dress code. If the district says
5       they're not, then they're not.
6   Q.  But the student would not be allowed to stay in class;
7       they would have to get a second opinion?
8   A.  It's a common procedure that if we believe a dress
9       code is being violated, for example, if a student wore
10      a Hooters' shirt in the past, not since this
11      lawsuit -- now they can wear whatever they want -- but
12      in the past, if someone had a Hooters' shirt on, there
13      were instances where that was deemed as being
14      offensive to women.
15          And so we would just send them down to the
16      office, and the district would make a decision and we
17      would abide by that decision. If a student wears a
18      shirt that says "I want you to rub my Johnson," we
19      send them to the office and ask them to make a
20      determination on whether that's offensive or vulgar or
21      not.
22  Q.  Okay. And when the student is going down to the
23      office, the student is not participating in the class?
24  A.  That is standard procedure, yes.
25  Q.  What about if a student wore a shirt that said "I

Page 107

1       support homosexuality"?
2           MS. BARTOS: What's your question?
3   BY MS. MERSINO:
4   Q.  Would that person be allowed to stay? Would they be
5       sent down to the office?
6   A.  And how is support for a group of people offensive?
7   Q.  That's what I'm asking you. Would that --
8   A.  Support for a group of people is not offensive. If a
9       student wore "I support Catholics," that's not
10      offensive.
11  Q.  Okay. So if the student wears "I support
12      homosexuality," that person will not be sent down to
13      the office?
14  A.  That's not offensive. Support for a group is not
15      offensive.
16  Q.  So the answer is no?
17  A.  No.
18          MARKED FOR IDENTIFICATION:
19          DEPOSITION EXHIBIT 12
20          4:09 p.m.
21  BY MS. MERSINO:
22  Q.  You've just been handed Exhibit 12. It's 8800(B),
23      Religious Expression in the District. Would you
24      please review this administrative guideline?
25  A.  Okay.

Page 108

1   Q.  Now, looking at really the second full paragraph,
2       beginning in -- with the word "generally," going to
3       the last sentence. It states, "School officials,
4       however, should intercede to stop student speech that
5       constitutes harassment aimed at a student group or a
6       group of students."
7   A.  Uh-huh.
8   Q.  Is that what you relied upon when you acted on the
9       20th of October of 2010?
10  A.  I did not rely upon 8800(B), I relied upon the school
11      district policy that talks about disruption in class
12      and being a behavioral issue in class.
13  Q.  Okay. Had you reviewed this administrative guideline
14      at all prior to the 20th of October of 2010?
15  A.  I have seen this, yes, because I teach religion.
16  Q.  So you were familiar with this policy?
17  A.  Uh-huh.
18  Q.  As a religion teacher, did you receive any specific
19      training in regard to the religious rights of students
20      in the classroom?
21  A.  Not as a religion teacher. I teach the academic
22      subject of religion. That's what I have the master's
23      degree in. So in terms of religious expression, did I
24      receive training, no.
25  Q.  Do you agree with this sentence here that, "School

JOHNSON MCDOWELL
May 29, 2012

Page 109

1   officials, however, should intercede to stop student
2   speech that constitutes harassment aimed at a student
3   group or a group of students"?
4   A.  I do agree with that.
5   Q.  And do you believe that your actions on the 20th of
6       October of 2010 were in compliance with this policy?
7   A.  I don't believe my -- I believe my actions were not in
8       violation of this policy, but I did not rely upon this
9       policy.  I relied upon other policies dealing with
10      disruptive students.
11  Q.  Specifically snap suspension?
12  A.  Uh-huh.
13          MARKED FOR IDENTIFICATION:
14          DEPOSITION EXHIBIT 13
15          4:14 p.m.
16  BY MS. MERSINO:
17  Q.  You've been handed Exhibit 13, which is dated October
18      25th, 2010.  And in the memorandum labeled as a
19      "written reprimand," are you familiar with this
20      document?
21  A.  I am.
22  Q.  And how are you familiar with it?
23  A.  It was presented to me October 25th; I signed it,
24      dated it.
25  Q.  And in this memorandum, you see that the school

Page 110

1   district decided that you had violated certain board
2   policies, correct?
3   A.  Yes.
4   Q.  And they stated that you had violated School Board
5       Policy 5610, Emergency Removal, Suspension and
6       Expulsion of Non-Disabled Students, correct?
7   A.  I see that in this written reprimand they say that I
8       violated that, yes.
9   Q.  And the school board or school district further stated
10      that you violated the controversial issues, School
11      Board Policy 2240, correct?
12  A.  I see that it says that, yes.
13  Q.  Were you surprised when the school board came back
14      with these?
15  A.  Yes, absolutely.
16  Q.  Why were you surprised?
17  A.  Because I hadn't violated any of them, and the
18      subsequent grievance process proved that.
19  Q.  And how did it prove that you had not violated these
20      board policies?
21  A.  Because this is no longer in my disciplinary file.
22  Q.  And what is now in your disciplinary file?
23  A.  A written reprimand, but it contains none of these
24      violations of school board policy.
25  Q.  Do you have a copy of the written reprimand?

Page 111

1   A.  Not on me, no.  I didn't bring it.
2   Q.  Do you possess it?
3   A.  It would be in my personnel file.
4   Q.  The school board also stated that you had violated the
5       student's First Amendment rights, according to this
6       memorandum, correct?
7   A.  According to this memorandum, yes.
8   Q.  And were you surprised in accordance with the training
9       that you received and with your belief of what the
10      policies were at the school district, that they
11      determined that you violated the --
12  A.  Yes.  I was surprised, yes.
13  Q.  And why were you surprised?
14  A.  I felt that I had followed school board policy and
15      procedures.
16  Q.  And why was that?
17  A.  Because I felt that I had followed school board policy
18      and procedures.
19  Q.  According to what the -- they taught you and trained
20      you to do?
21  A.  Yes, that's correct.
22          MARKED FOR IDENTIFICATION:
23          DEPOSITION EXHIBIT 14
24          4:17 p.m.
25  BY MS. MERSINO:

Page 112

1   Q.  Looking at Exhibit 14, do you recognize this?
2   A.  Yes, it is the settlement agreement on my grievance.
3   Q.  And looking at the last page, this is also dated
4       October 25th, 2010, and is titled Written Reprimand.
5       This is now what is in your personnel file?
6   A.  Yes, that's correct.
7   Q.  Okay.  Now, this states that you disregarded a
8       student's constitutionally-protected rights to self
9       expression to wear a belt buckle, which you found
10      personally objectionable, correct?
11  A.  Yes, that is what it states.
12  Q.  And it also states that in addition, you loudly and
13      angrily dismissed another student from the class for
14      expressing an opinion which you deemed intolerant and
15      unacceptable, an action which may have violated the
16      student's right to free speech; is that correct?
17  A.  That is what it says, yes.
18  Q.  And did you sign this document?
19  A.  Yes.
20  Q.  The one that's in your personnel file?
21  A.  Yes.
22  Q.  And by signing, you acknowledged the issues with what
23      occurred on the 20th of October of 2010?
24  A.  By signing it, I acknowledged this written reprimand,
25      yes.

JOHNSON MCDOWELL
May 29, 2012

Page 117

1   A.  No comment ever.
2   Q.  And after the 20th of October of 2010, has there ever
3       been any comment?
4   A.  Still no comment.
5   Q.  Has the school district ever come back and said, you
6       know, we looked at class rule No. 2 and we have any
7       concerns about it?
8   A.  They have never done that.
9   Q.  Has anyone ever asked you to define what you deem to
10      be homophobia?
11  A.  No one has ever done that.
12  Q.  What do you deem to be homophobia?
13  A.  Homophobia is the degradation and threatening of
14      homosexual students.
15  Q.  And again, no one from the school district has ever
16      talked to you about this?
17  A.  No.
18  Q.  And fair to say you have the same syllabus or same
19      class rules for all the classes you teach?
20  A.  Yes, that's correct.
21  Q.  And when did you implement these class rules?
22  A.  For certain I can say from 2009 on, but my guess is it
23      goes back as far as 2004, 2005, something to that
24      effect.
25  Q.  For all of your classes in 2010, did you have these

Page 118

1       same class rules, including class rule No. 2?
2   A.  Uh-huh.
3   Q.  And currently you have the same class rules?
4   A.  Uh-huh.
5   Q.  Can you tell me how anti-bullying day originated, when
6       you first found out about it?
7   A.  I can't tell you how --
8           MS. BARTOS:  That's two questions.  Why
9       don't you break it down.  How did he find out about
10      it, or how was it originated?
11  BY MS. MERSINO:
12  Q.  Are you able to answer the question?
13  A.  It would be better if you separated them, because they
14      are two very different questions.
15  Q.  Okay.  If you want to handle how it originated first.
16  A.  I don't know how it originated.  It's a -- it was a
17      national anti-bullying day, so I don't know how a
18      national thing originates.
19  Q.  Do you know any organizations that supported or were
20      behind the anti-bullying day?
21  A.  I would assume many organizations were behind it.
22  Q.  Could you name any personally?
23  A.  No, not really.
24  Q.  When did you first find out about it?
25  A.  I found out about it when I was asked if I wanted to

Page 119

1       buy a Tyler's Army T-shirt.
2   Q.  Who asked you that?
3   A.  Wendy Hiller.
4   Q.  Who is Wendy Hiller?
5   A.  She's an English teacher at the freshman campus.
6   Q.  The freshman campus, is that part of Howell High
7       School?
8   A.  Yes, that's part of the high school.
9   Q.  Are there two separate campuses?
10  A.  Two separate campuses.
11  Q.  And she asked you if you would want to purchase the
12      T-shirt?
13  A.  Uh-huh.
14  Q.  Did she describe the T-shirt to you?
15  A.  Yeah, she did.
16  Q.  How did she describe it?
17  A.  She described it as it says "Tyler's Army" on the
18      front, referring to Tyler Clementi, the young man who
19      killed himself.  And then "Army" refers to
20      Dumbledore's Army, a reference to Harry Potter.  And
21      on the back it says something like "killing evil with
22      kindness," or something to that effect.
23  Q.  Did you know about Tyler Clementi prior?
24  A.  Yes, I watched the shows, yes.
25  Q.  And you found out about him through just the

Page 120

1       national --
2   A.  CNN, yes, NPR.
3   Q.  Was it described what color the T-shirt would be?
4   A.  I believe the day called for purple shirts, so I guess
5       I probably assumed it was a purple shirt.
6   Q.  Does that have any sort of significance?
7   A.  It's a color often associated with LGBT groups; but
8       besides that, I don't know if it has any significance.
9   Q.  Is the purpose of the shirt being purple to associate
10      it with an LGBT group or --
11  A.  I don't know why Miss Hiller chose purple.  Maybe she
12      likes Barney.
13  Q.  Was Tyler Clementi an individual who, to your
14      knowledge, associated with an LGBT group?
15  A.  Yeah.
16  Q.  Now, when you received this invitation to purchase the
17      T-shirt from Miss Hiller, what did you do?
18  A.  I said sure, I would take one.
19  Q.  And what was the arrangement to get the T-shirt?
20  A.  We were going to meet in a dark parking lot at
21      midnight.
22          MS. BARTOS:  For the record, you're joking.
23          THE WITNESS:  I'm joking.  I'm sorry, I'm
24      joking.  She just brought it to me the next day.
25  BY MS. MERSINO:

JOHNSON MCDOWELL
May 29, 2012

Page 121

1  Q.  Was there an exchange of money for the T-shirt?
2  A.  I think there was supposed to be, but I don't think I
3      ever paid her.
4          MS. BARTOS:  Nice.
5          THE WITNESS:  Well, you know.
6  BY MS. MERSINO:
7  Q.  Did she --
8  A.  Other things intervened.
9  Q.  Did she ask for money?
10  A.  Yeah.  I think she wanted to cover the cost of you,
11     know, creating the shirt.
12  Q.  And how much was the shirt?
13  A.  $5 or $10.
14  Q.  And it was Miss Hiller who came up with the design for
15     the T-shirt?
16  A.  I believe so.  It was her that brought the concept of
17     the T-shirt to me, so I don't know whether her -- who
18     designed it for her.  Whether she designed it herself,
19     I don't know.
20  Q.  Do you know if she had them made?
21  A.  I assume she had them made.  I would assume she had
22     them made at a T-shirt shop.
23  Q.  Was this in accordance with a group at school?
24  A.  That, I don't know.  I don't know why she made it.  I
25     do know that the Gay-Straight Alliance was promoting

Page 122

1      the national anti-bullying day, and that was approved
2      by the school.
3  Q.  And what is the Gay-Straight Alliance?
4  A.  It's a school organization.
5  Q.  Is it an organization at Howell High School?
6  A.  Uh-huh, many high schools across the nation.
7  Q.  And you said that this activity was approved by the
8      school.
9  A.  The Gay-Straight Alliance had put up posters about the
10     anti-bullying day around the school, and that was
11     approved by the school.  You can't put posters up
12     without approval.
13  Q.  What is the procedure for getting school approval to
14     put up a poster?
15  A.  You take it to the principal, and the principal
16     approves or disapproves it.
17  Q.  Do the principals have like a stamp they have on the
18     poster?
19  A.  Yes.
20  Q.  Were you ever able to see a stamp on the poster for
21     the anti-bullying day?
22  A.  Yes, it had Aaron Moran's name stamped on it.
23  Q.  For the anti-bullying day, which was on behalf of the
24     Gay-Straight Alliance?
25  A.  Uh-huh.

Page 123

1  Q.  What did the poster say on it?
2  A.  That, I don't remember.
3  Q.  But you remember that it specifically said something
4      about anti-bullying day?
5  A.  Right.  Uh-huh.
6  Q.  Was the poster approved by the school, or the entire
7      activity of the anti-bullying day?
8  A.  I don't know the answer to that question.  I do know
9      the poster was approved.  I believe that the
10     administration knew about the T-shirts.
11  Q.  Who on the administration would have known about the
12     T-shirts, to your knowledge?
13  A.  The principal and the assistant principals.
14  Q.  So Aaron Moran?
15  A.  Uh-huh.
16  Q.  Jen Goodwin and Dr. Mark Sharp?
17  A.  Yes.
18  Q.  Anyone else?
19  A.  Morrison Borders.
20  Q.  Who is a vice principal, as well?
21  A.  Uh-huh.
22  Q.  Does each student group have a designated teacher
23     sponsor?
24  A.  Yes, they do.
25  Q.  And who is the designated teacher sponsor for the

Page 124

1      Gay-Straight Alliance?
2  A.  At that time, I believe it was Laura Stark.
3  Q.  How do you spell her name?
4  A.  S-t-a-r-k.
5  Q.  Do you know if the Gay-Straight Alliance had anything
6      to do with the T-shirts?
7  A.  I do not.
8  Q.  Do you know individuals who are members of the
9      Gay-Straight Alliance?
10  A.  I do not.
11  Q.  How many people on the 20th of October were wearing
12     these T-shirts?
13  A.  Many.  That's all I -- I couldn't give you a specific
14     number.
15  Q.  How many people in your class were wearing the Tyler's
16     Army T-shirts?
17         MS. BARTOS:  In this class?  In 6th hour?
18  BY MS. MERSINO:
19  Q.  In 6th hour economics class.
20  A.  I believe in a statement somewhere I say how many, but
21     I don't remember how many that was, but there -- there
22     were several.
23  Q.  What does several mean to you?
24  A.  Seven to 10.
25  Q.  And throughout the day, adding together all of your

JOHNSON MCDOWELL
May 29, 2012

## Page 125

1  classes that day, how many students were wearing
2  Tyler's Army T-shirts?
3  A. 40, 50 in my classes.
4  Q. Were there any announcements made about this day?
5  A. I do not remember.
6  Q. In addition to the note that you received from Wendy
7  Hiller, what other information did you receive about
8  the anti-bullying day?
9  A. I don't -- I don't recall.
10  Q. Did you talk about it at all during HEA meetings?
11  A. No. It wouldn't be appropriate during HEA meetings.
12  Q. Did teachers make any sort of effort to discuss
13  anti-bullying day during the class?
14  A. Did other teachers?
15  Q. Yes.
16  A. I'm sure they did. I believe they did, yes.
17  Q. Had you talked with other teachers about anti-bullying
18  day?
19  A. Outside of the discussion regarding the T-shirt, I
20  don't think so, no. I'm a very busy man.
21  Q. And did Wendy Hiller have any sort of discussion about
22  anti-bullying day?
23  A. Probably while we were talking about the T-shirt.
24  Q. So you found out through her, and then you saw a
25  poster from the Gay-Straight Alliance?

## Page 126

1  A. That would be a rough chronology, sure.
2  Q. Did you see any sort of other information outside of
3  the school, like on the news or on different websites?
4  A. I may have, but I don't remember. It doesn't stand
5  out of note.
6  Q. I'm just wondering how you knew it was anti-bullying
7  day, beyond the email and the poster.
8  A. That would have been sufficient for me, for one
9  teacher to come to me. A teacher could come to me and
10  say it's -- it's leukemia awareness day, will you wear
11  a leukemia awareness T-shirt? Sure, I'll do that.
12  Q. Was there any discussion that this was specifically
13  about teen suicide of homosexual students?
14  A. I think teen suicide, in general, from bullying.
15  Q. How did --
16  A. It was shortly after the Irish girl killed herself,
17  the freshman.
18  Q. How did you come about the video that we referred to
19  earlier, that was referred to in your answer to
20  paragraph 8 of Exhibit 1, the video where you gave the
21  website address of the gay politics website?
22  A. I don't remember. I don't want to speculate. I don't
23  remember.
24  Q. How did you form the decision to play the video in
25  class?

## Page 127

1  A. I related to teen suicide due to bullying.
2  Q. And did you have a hard copy of the video at that
3  time, or was it something that you played from the
4  website?
5  A. Played from a website. Can we take a break?
6  MS. MERSINO: Sure.
7  (Off the record at 4:37 p.m.)
8  (Back on the record at 4:40 p.m.)
9  MARKED FOR IDENTIFICATION:
10  DEPOSITION EXHIBIT 16
11  4:40 p.m.
12  BY MS. MERSINO:
13  Q. I'm going to show you what has been marked as Exhibit
14  16. It's the last exhibit for this round.
15  (At about 4:54 p.m., CD played.)
16  Q. Do you recognize Exhibit 16?
17  A. I do.
18  Q. And how do you recognize it?
19  A. It is the full video, of which I showed part in class.
20  Q. Which part did you show in class?
21  A. The first three minutes and 30 seconds.
22  Q. And are you positive that's the first three minutes
23  and --
24  A. I just checked it.
25  Q. You showed this in your 6th hour economics class on

## Page 128

1  the 20th of October?
2  A. I did.
3  Q. And which other classes did you show it to?
4  A. Every other class.
5  Q. When you say "every other class," can you list those
6  classes for me?
7  A. The classes I taught that day, which would have been
8  world religions. I don't remember whether I had two
9  world religions and one economics, or one economics
10  and two world religions that semester, as well as
11  social issues. Social issues, I would have taught
12  five classes that day; what the exact combination of,
13  I don't remember.
14  Q. Did you show the video to each of the five classes?
15  A. Uh-huh.
16  Q. So five times that day?
17  A. Yes.
18  Q. Each time was it only the first --
19  A. Three minutes.
20  Q. Three minutes and 30 seconds?
21  A. Yes.
22  Q. Just a couple more questions before we wrap up. Was
23  it the school district's training, supervision,
24  policies, customs and procedures that were your
25  justification or the reason why you issued a snap

JOHNSON MCDOWELL
May 29, 2012

Page 129

1     suspension against Daniel Glowacki?
2     A. Yes, that's correct.
3     Q. And were they the moving force behind you issuing a
4     snap suspension against Daniel Glowacki?
5     A. Yes.
6     Q. Did you believe that it was those school district
7     training, supervision, policies, customs and
8     procedures that allowed you and gave you the authority
9     to issue the snap suspension against Daniel Glowacki?
10     A. Yes.
11         MR. HENLEY: Objection; overly broad, lacks
12     foundation, goes well beyond the previous testimony.
13     BY MS. MERSINO:
14     Q. Was it the school district's training, supervision,
15     policies, customs and procedures that gave you -- or
16     allowed you or gave you the authority to punish Daniel
17     Glowacki's position on homosexuality?
18         MR. HENLEY: Same objection.
19         THE WITNESS: I did not punish Daniel
20     Glowacki's position on homosexuality.
21     BY MS. MERSINO:
22     Q. You did remove him from class immediately after he
23     made the comment that he did not accept gays, correct?
24     A. That is correct, because it was a disruption in class.
25     Q. Was it then the training, supervision, policies,

Page 130

1     customs and/or procedures that allowed you, in your
2     mind, to remove Daniel Glowacki?
3         MR. HENLEY: Same objection.
4         THE WITNESS: Because he was a disruption in
5     class, yes.
6     BY MS. MERSINO:
7     Q. For making his comments about homosexuality?
8     A. He was a disruption in class when he made the comments
9     about homosexuality.
10     Q. His comment that he did not accept gays?
11     A. He did not accept gays, and that caused a disruption
12     in class because he continued to speak, and to argue,
13     and to be belligerent in class and insubordinate.
14     Q. What do you mean by disruption in class?
15     A. He was insubordinate and he was belligerent to me, as
16     a teacher.
17     Q. With his comments?
18     A. With his comments, his attitude, and his continual --
19     his continuing of the discussion, yes.
20     Q. How many comments did he make?
21     A. Enough that I removed him from the classroom.
22     Q. Okay. On October 20th, 2010, were you acting pursuant
23     to the school district's training, supervision,
24     policies, practices, customs and procedures when you
25     spontaneously suspended Daniel Glowacki from your

Page 131

1     class after he made his comments?
2         MR. HENLEY: Same objection. Again, if I
3     could, so I don't have to keep interrupting, I would
4     like a continuing objection.
5     BY MS. MERSINO:
6     Q. You may answer.
7     A. I removed Daniel Glowacki from the classroom because
8     he was being disruptive.
9     Q. And was that because you were allowed to under the
10     school district's training, policy --
11     A. Under the school district's training, I'm allowed to
12     remove disruptive students.
13     Q. Was your issuance of the snap suspension for the
14     purpose of stopping Daniel Glowacki from further
15     participating in a discussion?
16     A. It was to stop his disruptive behavior.
17     Q. Was it to stop him from commenting further on his
18     position on homosexuality?
19     A. It was not.
20     Q. So you welcomed his position on homosexuality in your
21     classroom?
22     A. No, I did not welcome his position on homosexuality in
23     my classroom, just like I wouldn't welcome any
24     position of any students on any number of topics,
25     because they're not appropriate in class.

Page 132

1     Q. Did Daniel Glowacki's speech motivate you to issue the
2     snap suspension?
3     A. No. He was a disruption in class.
4     Q. So his comments did not motivate you to issue a snap
5     suspension?
6     A. He was a disruption in class by being belligerent and
7     insubordinate.
8     Q. Through his comments?
9     A. Through a number of means.
10     Q. Did he do anything else, in addition to the comments
11     that he was making?
12     A. He did -- he was loud, he was boisterous, he was
13     engaging in arguments with other students.
14     Q. So it was -- the discussion that he was having that
15     made you issue the snap suspension, correct?
16     A. No, it was his disruption of the classroom
17     environment, the arguments he was having with other
18     students, his loud and boisterous --
19     Q. What other students were engaged in the argument?
20     A. I do not remember at this time.
21     Q. How many students were engaged in an argument?
22     A. I would probably say half the class.
23     Q. And how were they engaged in that argument?
24     A. Daniel was engaging them in discussion over his -- you
25     know, him -- his comments.

JOHNSON MCDOWELL
May 29, 2012

Page 133

1  Q.  And so half the class were talking with Daniel?
2  A.  I would say at least a third, yeah.
3  Q.  So now it's a third of the class were talking with
4      Daniel?
5  A.  Not talking; arguing.
6  Q.  Arguing?
7  A.  This was a substantial disruption that Daniel created
8      in the classroom, hence the snap suspension.
9  Q.  And how long did this argument take place?
10  A.  Probably for 10 minutes before I decided that that was
11     enough and we needed to get back to work.
12  Q.  Given the fact that the school district reprimanded
13     you on the 25th of October, 2010, and now there is
14     some sort of written reprimand of some sort currently
15     in your file, do you believe that the school district
16     failed to adequately train or supervise you with what
17     occurred in the classroom on the 20th of October of
18     2010?
19         MS. BARTOS:  Wait.  You're -- wait a minute.
20     You're making the assumption that Mr. McDowell did
21     something wrong, and he's not accepting that
22     assumption.  You're saying okay, you weren't trained
23     correctly, were you; that's why you messed up.  That's
24     what your question was.
25  BY MS. MERSINO:

Page 134

1  Q.  Do you understand the question?
2  A.  I do understand the question, and I do not believe
3     that I messed up in class.  I followed school board
4     policies and removed a disruptive student.
5  Q.  Okay.  So the fact that the school district now says
6     that you did not follow policies, does that make you
7     believe that they inadequately trained you?
8  A.  I believe that I acted within the school board
9     policies and removed a disruptive student.
10  Q.  Do you believe that the school district did everything
11     they could so you understood the policies as you
12     should have, in order not to be reprimanded?
13  A.  I believe the school board has policies that I
14     followed in snap suspending Daniel Glowacki.
15  Q.  And the school district has since reprimanded you for
16     what you did on the 20th of October 2010; is that
17     correct?
18  A.  That is correct.
19         MS. MERSINO:  Does counsel have questions
20     for today?
21         MR. HENLEY:  None for today.
22         MS. MERSINO:  I think we're done.  We'll see
23     on you the 5th.
24         (The deposition was concluded at 5:05 p.m.
25     Signature of the witness was not requested by

Page 135

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

    counsel for the respective parties hereto.)

Page 136

1           CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN  )
3          ) SS
4  COUNTY OF BAY    )
5
6      I, MARIE M. PUCHEL, certify that this
7  deposition was taken before me on the date
8  hereinbefore set forth; that the foregoing questions
9  and answers were recorded by me stenographically and
10  reduced to computer transcription; that this is a
11  true, full and correct transcript of my stenographic
12  notes so taken; and that I am not related to, nor of
13  counsel to, either party nor interested in the event
14  of this cause.
15
16
17
18
19
20
21
22      MARIE M. PUCHEL, CSR-0212
23      Notary Public,
24      Bay County, Michigan
25  My Commission expires:  August 27, 2013

JOHNSON G. McDOWELL, IV
June 5, 2012

Page 145

1　Q.　Okay.  What was the presentation that you were
2　　　giving at the beginning of class?  You said you
3　　　started to discuss anti-bullying day?
4　A.　Right, discussed that it was National
5　　　Anti-Bullying Day, and that the school district
6　　　had put forward an anti-bullying program that we
7　　　had been trained on that by Marcia McEvoy before
8　　　school started, and that bullying was a bad thing
9　　　and they shouldn't do it.
10　Q.　And you say that the anti-bullying day was
11　　　sponsored by the school?
12　A.　I said that it was anti-bullying day.  I don't
13　　　know if I told the students it was sponsored by
14　　　the school or not.
15　Q.　Did you believe it to be sponsored by the school?
16　A.　I believed it to be okayed by the school, yes.
17　Q.　And prior to your classes that day, what exactly
18　　　had you prepared?  You said you gave a
19　　　presentation.  What did the presentation entail?
20　A.　There was nothing that I prepared ahead of time.
21　　　It's just -- I mean, I just talked about bullying
22　　　is a bad thing, cyber bullying is a bad thing, you
23　　　know, don't bully.
24　Q.　And you were wearing the purple Tyler's Army
25　　　T-shirt?

Page 146

1　A.　That's correct.
2　Q.　And you had planned to show the video in each of
3　　　your classes?
4　A.　Um-hmm, and did without incident.
5　Q.　And that would be Exhibit 16 that we viewed on
6　　　the 29th of May?
7　A.　I believe that is Exhibit 16, yes.
8　Q.　Now, you stated in your presentation that you
9　　　discussed Marcia McEvoy's teachings.  How did --
10　A.　I just mentioned we were doing this anti-bullying
11　　　push, yes.
12　Q.　And what was it that you relayed to the students
13　　　that you learned at the in-service from the
14　　　school?
15　A.　That we would be taking a tough stance on
16　　　bullying.
17　Q.　Anything else?
18　A.　Not that I remember, no.
19　Q.　What exactly did you tell the class?
20　A.　I don't remember exactly what I told the class.
21　Q.　Do you remember how you started the conversation?
22　　　Did you --
23　A.　I don't remember.
24　Q.　Did you reference your T-shirt?
25　A.　I don't know.

Page 147

1　Q.　You don't know?  You don't remember?
2　A.　I don't remember.
3　Q.　And you began each of your five classes that day
4　　　in the same way?
5　A.　That's correct, except for the one that Dan was in
6　　　because he wouldn't let me begin the same way.
7　Q.　Okay.  And can you describe what happened when
8　　　you began your fifth hour economics class.
9　A.　Basically even before I opened my mouth, Daniel
10　　　blurted out, you know, what's that T-shirt for.
11　Q.　What time did that class start?
12　A.　You'd have to look at the class schedule from that
13　　　year.
14　Q.　It was your last class of the day?
15　A.　Yes.
16　Q.　Okay.  So take me through it step by step.
17　　　You're in the classroom prior to the students
18　　　getting there, right?
19　A.　Um-hmm.
20　Q.　And were all the students seated when you began
21　　　your lesson plan for the day?
22　A.　Would be normally, yes.
23　Q.　And do you remember if they were all seated on
24　　　the 20th of October?
25　A.　I don't, no.

Page 148

1　Q.　Did you wait until the bell rang and your class
2　　　was to begin before --
3　A.　I assume that I waited for the bell to ring, yes.
4　　　That would be normal procedure.
5　Q.　Okay.  And then after the bell rings, what's
6　　　happening in your class?
7　A.　After the bell rang, then I would be at the front
8　　　of the classroom, and would be about to begin
9　　　whatever it is that I'm going to do, whether it's
10　　　to start the lesson plan, whether it's to talk to
11　　　the students about something.
12　Q.　Okay.  So on the 20th of October you planned to
13　　　talk to the students about Anti-Bullying Day?
14　A.　Correct.
15　Q.　And what do you first say?
16　A.　I don't remember what I first said.
17　Q.　You said something?
18　A.　Right.  I said something, but you told me not to
19　　　speculate.  I don't remember.
20　　　　　　MS. BARTOS:  The witness has already
21　　　said a few times he doesn't remember exactly what
22　　　he said, but he gave you an idea of what the
23　　　discussion was about.
24　BY MS. MERSINO:
25　Q.　If you can answer the question.

JOHNSON G. McDOWELL, IV
June 5, 2012

Page 157

1    until the mid 19 -- or 1990s.
2  Q. Do you know of the Catholic religion not
3    accepting Asians or Jews or blacks?
4  A. I think you have a mixed history of 2000 years of
5    Catholic history on Jews, sure.
6  Q. Did you ever ask Daniel what he meant by not
7    accepting gays?
8  A. No, because the purpose was to stop the discussion
9    not to continue the discussion about why don't you
10   accept gays.
11 Q. Did you ever ask him about Catholic social
12   teaching?
13 A. No, I did not ask him about Catholic social
14   teaching.
15 Q. I'm just wondering if you clarified at all.
16 A. No, I would not ask it. I wouldn't assume that he
17   would know Catholic social teaching.
18 Q. He pronounced he was Catholic, correct?
19 A. That is correct. I also am Catholic.
20 Q. And he stated that he did not accept gays because
21   he was Catholic?
22 A. Right.
23 Q. And did you have any further discussion about if
24   he had anything actually against people who are
25   gay?

Page 158

1  A. I don't remember that, no.
2  Q. Did he say -- did he use any offensive language?
3  A. I considered someone saying he doesn't accept a
4    group of people as offensive.
5  Q. Did he use any derogatory terms to describe
6    people who are gay?
7  A. No.
8  Q. Beyond saying that he did not accept gays because
9    he was Catholic, did he make any statements about
10   disliking people who are gay?
11 A. No, I don't believe he did.
12 Q. Did he make any statements about treating people
13   who are gay poorly because they were gay?
14 A. No, I don't believe he did, no.
15 Q. Did he make any statements about wanting to do
16   something to hurt anyone who was gay?
17 A. Beyond the veiled threat contained in I don't
18   accept gays, no.
19 Q. Do you know exactly what he meant by it --
20 A. No.
21 Q. -- from his statement?
22 A. That he doesn't accept gays, that he doesn't
23   accept them as a group of people who have a right
24   to exist on the face of the earth would be my
25   assumption.

Page 159

1  Q. Did you ask him if he meant that?
2  A. No.
3  Q. Did you ever have any sort of discussion about
4    views and hating the sin but not the sinner or
5    anything to that effect?
6  A. No, I did not and I didn't inform him that the
7    Catholic catechism actually says you have to
8    accept gays because that would not have been
9    appropriate at that time in the classroom.
10 Q. And where is that in the Catholic catechism?
11 A. I don't remember the exact citation, but you can
12   look it up.
13 Q. The Catholic catechism I'm aware of is that the
14   church teaches that marriage is between a man and
15   a woman, however, you always treat everyone
16   individually with respect.
17 A. I believe if you look in -- if you do a search on
18   homosexuality you'll find the word "accept" in
19   there.
20 Q. Did you ever ask -- how old is Daniel, by the
21   way?
22 A. Since he just graduated on Saturday, I would
23   assume 18.
24 Q. And how old was he when he was in your class?
25 A. As a junior, I would assume 16.

Page 160

1  Q. So juniors are typically 16 or 17?
2  A. They usually drive, yes.
3  Q. And what's the typical maturity of a 16- or
4    17-year-old in your classes?
5  A. In Howell Public Schools, probably more mature
6    than most people would assume teenagers are.
7    We're dealing with teenagers that drive, teenagers
8    that are exposed to drugs, exposed to premarital
9    sex, exposed to violence in the home at times,
10   exposed to the workforce -- pretty mature.
11 Q. Would you agree Daniel Glowacki was a minor?
12 A. By definition, yes.
13 Q. He was a teenager?
14 A. Yes.
15 Q. He was a teenage boy?
16 A. That's correct.
17 Q. He was not an adult yet?
18 A. No.
19 Q. He has not been to college obviously?
20 A. Um-hmm.
21 Q. And he's still growing up?
22 A. Yes.
23 Q. What was the initial question that Daniel
24   Glowacki asked?
25 A. Why does she have to take off the Confederate flag

JOHNSON G. McDOWELL, IV
June 5, 2012

Page 161

1    if gays get to fly their rainbow flag.
2    Q.  Was that a topic of discussion in class that day?
3    A.  It was not.
4    Q.  Where do you think the student got the reference
5        to a rainbow flag?
6    A.  That, I have no idea.
7    Q.  Did you have anything in your room that signified
8        a rainbow flag or was like a sticker or anything
9        on the bulletin board?
10   A.  There was no rainbow flag in the room.  There
11       might have been a sticker on the door, number
12       of -- I change rooms, so I don't have a dedicated
13       classroom.  I share rooms with other teachers.
14       And several teachers have had safe place stickers
15       on their doors to signify that their classroom is
16       a safe place for LGBT students.  It signifies that
17       those students won't be discriminated against by
18       teachers and won't be allowed to be bullied by the
19       teachers that are in the classroom.
20   Q.  What does the sticker look like, the safe place
21       sticker?
22   A.  I think it has a rainbow triangle on it.  It's a
23       small little thing.  Sometimes you see them in
24       restaurants you might go into.
25   Q.  When you say a small little thing, approximately

Page 162

1        how many inches tall and wide?
2    A.  Probably an inch wide and three inches tall.
3    Q.  And you said it's a triangle and it's a
4        rainbow-colored triangle?
5    A.  I believe so, yes.
6    Q.  And the classroom you were in on the 20th of
7        October teaching economics may have had that
8        sticker?
9    A.  May have had, yes.
10   Q.  How sure are you it would have that sticker?
11   A.  60 percent sure, 70 percent sure.  I don't teach
12       in that classroom anymore, so I don't -- I don't
13       know if it's on the door or not on the door.
14   Q.  Do you know certain teachers who put up the
15       sticker?
16   A.  I do not.  Again, I move from classroom to
17       classroom to classroom.
18   Q.  Okay.  So Daniel asks why someone is allowed to
19       fly a rainbow flag.
20   A.  No, that's not what he said.  He said why do gays
21       get to fly their rainbow flag.  His wording is
22       very important.  As we talk about wording and we
23       talk about belligerence and we talk about the
24       interruption to the learning process in the class,
25       the wording is very important.

Page 163

1    Q.  So he states why are guys allowed to fly their
2        rainbow flag?
3    A.  Um-hmm.
4    Q.  And why is this female student not allowed to
5        wear the Confederate flag belt buckle?
6    A.  That's correct, although he doesn't say it in
7        those nice, kind, polite words.
8    Q.  Okay.  What is it exactly he said?
9    A.  I said it three times.  He said, why can't she
10       wear her rainbow -- why can't she wear her
11       Confederate flag if gays get to wear their rainbow
12       flag or fly their rainbow flag.
13   Q.  And at that point, you start discussing what a
14       Confederate flag signifies to you?
15   A.  Correct.  At that point I then explained why the
16       Confederate flag can be seen as a symbol of hate
17       and as a symbol that should not be allowed
18       necessarily in the school or in the classroom.
19   Q.  Is there any discussion at that point about the
20       rights of homosexuals?
21   A.  No.
22   Q.  So at that point when he asks the question, you
23       only address what a Confederate flag means and
24       that's it?
25   A.  And what the original rainbow -- where the rainbow

Page 164

1        flag came from, as I stated before.
2    Q.  Did Daniel make any comments about the T-shirt
3        you were wearing in class that day at that point?
4    A.  I think after he asked about the rainbow flag,
5        then I think he asked about the T-shirt.  So you
6        can see I have not even had a chance to begin my
7        lesson plan, and Daniel has hijacked the class.
8    Q.  What was your lesson plan?
9    A.  Well, as before, I was going to talk about
10       anti-bullying and then start in economics.  Every
11       other hour talked about anti-bullying for five
12       minutes, started the lesson plan.  This class,
13       Daniel decided that he would hijack the class and
14       the lesson plan was not going to be able to be
15       implemented.
16   Q.  So he's asking questions to you at the beginning
17       of class, correct?
18   A.  He is making statements that are inappropriate.  I
19       think we can -- we can understand that if the
20       student with the Confederate flag asked me why she
21       had to remove it, that would be one thing, but
22       Daniel sitting one or two rows behind blurting out
23       why she doesn't get to wear the Confederate flag
24       would be inappropriate.  And even Mrs. Glowacki at
25       two different times stated that that was something

JOHNSON G. McDOWELL, IV
June 5, 2012

|  | Page 181 |
|---|---|

1   A.  I don't remember.
2   Q.  Was the other student in class to hear the
3       entirety of what occurred?
4   A.  No, no.
5   Q.  What would the other students have heard?
6   A.  I don't know. I wasn't focused on the door, so he
7       could have been standing at the door for five or
8       ten minutes or he could have been there for three
9       or four minutes.
10  Q.  Was the other student seated at a seat when you
11      asked him to get into the hallway as well?
12  A.  No, he had just walked in -- he had walked into
13      class and said I don't accept gays either, can I
14      leave. And I said, yep.
15  Q.  Did you ask him what he meant by that comment?
16  A.  No.
17  Q.  At what point did you decide to issue the snap
18      suspension against Daniel?
19  A.  At the point when I asked him to stop talking and
20      he didn't stop talking, I would assume that would
21      be the point.
22  Q.  And which point exactly was that at?
23  A.  Counsel, I couldn't give you an exact point. This
24      is something that's building in class where Daniel
25      is being belligerent and causing -- hijacking the

|  | Page 182 |
|---|---|

1       class, allowing me not to follow my lesson plan,
2       and at that point pretty typical of a teacher, we
3       will send a student into the hallway.
4   Q.  At this point are you also getting more
5       frustrated with the situation, more angry?
6   A.  I'm getting more frustrated, yes.
7   Q.  Are you getting heated?
8   A.  I was getting frustrated.
9   Q.  Would you say yes, you were getting more heated?
10          MS. BARTOS: It's a relative team.
11      What do you mean by more heated?
12  BY MS. MERSINO:
13  Q.  Upset, angry.
14          MS. BARTOS: You asked him if he got
15      upset and he said no. He said frustrated.
16  BY MS. MERSINO:
17  Q.  Do you understand the question?
18  A.  I got frustrated, yes.
19  Q.  So you were not angry?
20  A.  I got very frustrated. I mean, probably bordering
21      on angry, sure.
22  Q.  Bordering on angry but not angry?
23  A.  Bordering on angry, yes.
24  Q.  So as this is occurring, then you're getting
25      frustrated, bordering on angry, and at that point

|  | Page 183 |
|---|---|

1       you issue the snap suspension?
2   A.  That would be correct.
3   Q.  Does Daniel immediately go out into the hallway?
4   A.  Yes, he does.
5   Q.  Does Daniel make any other comments?
6   A.  Not that I remember, no.
7   Q.  How soon after you order Daniel do get into the
8       hallway do you have this interaction with the
9       other student in class?
10  A.  I believe they passed each other.
11  Q.  So are you saying that Adam, the other student,
12      was walking in as Daniel was walking out?
13  A.  I believe so, yes.
14  Q.  And how does the interaction with the other
15      student begin? Does the student volunteer the
16      information about I don't accept gays, either?
17  A.  The student volunteered the information.
18  Q.  And what do you say to him?
19  A.  Yes, you can get out in the hallway.
20  Q.  And at that point are you angry or are you
21      frustrated?
22  A.  Frustrated, sure.
23  Q.  Are you angry or --
24  A.  Frustrated.
25  Q.  So at this point you've ordered both students

|  | Page 184 |
|---|---|

1       into the hallway?
2   A.  That's correct.
3   Q.  What is the class doing?
4   A.  At that point, I don't know. Probably talking to
5       each other like most classes will do.
6   Q.  When did you decide to issue a snap suspension
7       against the additional student, Adam?
8   A.  When he said I don't accept gays.
9   Q.  Was Adam arguing?
10  A.  No.
11  Q.  How did he say the comment? Was he calm?
12  A.  He said I don't accept gays either, can I go out
13      in the hallway.
14  Q.  Was he that monotone about it? Was he calm?
15  A.  Yes.
16  Q.  Yes?
17  A.  Yes.
18  Q.  So the class is talking. And do you continue to
19      stay with the class or do you go out into the
20      hallway?
21  A.  I went out into the hallway and explained to them
22      again that what he said was inappropriate, that
23      some people could compare it to racism, and that
24      they couldn't come back in class.
25  Q.  When you went into the hallway, did you keep the

JOHNSON G. McDOWELL, IV
June 5, 2012

---

Page 225

1    anything about the treatment of homosexuality in
2    the classroom?
3    A.  No, I have not.  It's more about Snyder taking
4    away our pay.
5    Q.  As the president of HEA, has the organization
6    taken up any social issues?
7    A.  Yes.  We donate upwards of $500 a year to LaCasa,
8    which is a shelter for battered women and children
9    who have suffered through domestic and sexual
10   violence.
11   Q.  And is this the only --
12   A.  We also have donated money to The Connection,
13   which is as runaway youth home in Livingston
14   County.  We're real liberals.
15   Q.  Do you remember around the 5th of November trying
16   to initiate a parent meeting with Mrs. Glowacki?
17   A.  I know that I tried to initiate a parent meeting
18   several times with Mrs. Glowacki and the Glowacki
19   family.  I went so far as to have the former HEA
20   president try and have a meeting that would be
21   moderated by the Glowacki priest at Saint Mary
22   Magdalen.  To my knowledge, both the meetings that
23   I tried to have with the Glowackis through the
24   school district and Mr. Ron Wilson were turned
25   down by the Glowackis, and the meeting to be

---

Page 226

1    mitigated -- or moderated by their parish priest
2    was also turned down by the Glowackis.
3    Q.  Was it communicated to you why these meetings
4    were turned down?
5    A.  It was not.
6    Q.  Do you remember requesting to put a statement
7    forward on behalf of the Glowackis and Daniel
8    Glowacki?
9    A.  I don't remember, but I might have done that.
10   Q.  Would it refresh your recollection to look at an
11   e-mail chain?
12   A.  Sure.
13   Q.  Reviewing this, does this refresh your
14   recollection?
15   A.  Yeah.  I believe multiple attempts were made by me
16   to smooth over the situation with the Glowacki
17   family, and to put forward a statement on Daniel
18   Glowacki's behalf, but that was all rebuffed by
19   the Glowacki family.
20   Q.  So on Friday, November 5th of 2010, did you
21   contact the superintendent of Howell Schools via
22   e-mail?
23   A.  I did.  And I was trying to set up a meeting
24   through the secretary, Jan Stewart, to meet with
25   Mrs. Glowacki and Daniel and anybody else from the

---

Page 227

1    family, and that -- as Ron says on here, she said
2    no, because she intended to pursue litigation.  I
3    guess a meeting would have interrupted that
4    ability.
5    Q.  And you stated in your e-mail that you wanted to
6    put forth a statement on the student and family's
7    behalf?
8    A.  That's correct.  If the issue truly was that the
9    Glowackis felt that their son was not being
10   treated fairly by the media, then I would put
11   forth a statement on his behalf as I did in the
12   WDIV interview when I said that he was a good kid.
13   Q.  Do you acknowledge that you received an e-mail
14   from the superintendent of schools in response on
15   the 5th of November of 2010?
16   A.  Um-hmm.
17   Q.  And in that e-mail the superintendent stated to
18   you "The media frenzy prompted by your Facebook
19   page has harmed the Glowacki family and our
20   district?"
21   A.  Yes, I just read that, and that she intended to
22   pursue litigation, even after repeated attempts by
23   me to try and smooth over the situation.
24   Q.  I'm reviewing the e-mail on the 5th of November
25   of 2010 from the superintendent.  In this e-mail

---

Page 228

1    it says "The parent has refused your request for
2    a meeting and has indicated she plans to initiate
3    litigation against you and the MEA.  I can't
4    imagine the family would allow you to put forth a
5    statement on their behalf.  The media frenzy
6    prompted by your Facebook page has harmed the
7    Glowacki family and our district.  I'm not
8    surprised the Glowacki family does not wish to
9    meet with you.  Moving forward, I would encourage
10   you to use extreme caution."  Is that correct?
11   A.  That is what it says, yeah.
12   Q.  From that did you garner that the Glowacki family
13   was struggling due to the media frenzy that has
14   occurred in this case?
15   A.  I garnered from it the Glowacki family was looking
16   for a law firm in order to sue.
17   Q.  Okay.  So when you read this, did you have any
18   concern with what was being put forth on your
19   Facebook page?
20   A.  There was not anything else being put forth on my
21   Facebook page.
22   Q.  Any reason why the superintendent of schools
23   would have written this to you?
24        MS. BARTOS:  Objection, lack of
25   knowledge that he's going to know why Mr. Wilson

---

JOHNSON G. McDOWELL, IV
June 5, 2012

Page 229

1    did anything.
2         THE WITNESS:  I can't assume why
3    Mr. Wilson would send that e-mail and make those
4    statements.
5  BY MS. MERSINO:
6  Q.  Did the superintendent ever discuss this with
7    you?
8  A.  Through the e-mail chain.
9  Q.  I'm going to play for you what's been marked as
10   Exhibit 20.
11        (Videotape played at 11:48 a.m.)
12 BY MS. MERSINO:
13 Q.  Do you think that's a fair and accurate
14   representation of your interview with MSNBC?
15 A.  It is.
16 Q.  And how did this interview come about?
17 A.  I believe, again, that MSNBC -- I think that's
18   Jansing and Company -- contacted my vice president
19   of communications.
20 Q.  And Graeme Taylor, he does not go to Howell
21   Public Schools, correct?
22 A.  He didn't.
23 Q.  And he was not in the classroom on the 20th of
24   October of 2010?
25 A.  He was not.

Page 230

1  Q.  In the interview you discuss the diversity forum.
2  A.  Um-hmm.
3  Q.  And this was a joint effort between yourself and
4    the school district; is that correct?
5  A.  It was put on by the school district.  I don't
6    know that it was a joint effort.  Members of the
7    school board felt it necessary to hold a separate
8    forum.  It was originally going to be a school
9    board meeting, but then I think only two school
10   board members showed up, so it wasn't considered a
11   school board meeting at that point.  So it was
12   just a forum for the community to express their
13   concerns on diversity, and it was not focused on
14   gay issues at all.  It was any and all diversity
15   issues within the Howell school district.
16 Q.  Have you had any sort of interaction with Graeme
17   Taylor's dad?
18 A.  Graeme Taylor's dad is a teacher in Hartland.
19 Q.  And is he also the head of the MEA?
20 A.  No, he's not.
21 Q.  Or the local Hartland school district union?
22 A.  He's not, as far as I know.  In the past I know he
23   has been their bargaining chair.
24 Q.  Now, you just said "gay issues."  To you is the
25   word "gay" synonymous with the word "homosexual?"

Page 231

1  A.  It is.  I don't mean happy issues.
2  Q.  I just mean you wouldn't take the word "gay" as
3    being offensive or vulgar by any means?
4  A.  No.
5  Q.  Do you remember contacting the superintendent
6    about the diversity forum?
7  A.  I may have.  I don't remember off the top of my
8    head.
9  Q.  Did you ever meet at a Big Boy's with the
10   superintendent or plan to meet at a Big Boy's?
11 A.  We meet monthly, first at Big Boy, and now we meet
12   at Brunner's, but that's part of the contract
13   between HEA and HPS, that the superintendent and
14   the president meet monthly.  B-r-u-n-n-e-r-'-s.
15 Q.  And that's another restaurant?
16 A.  Yes, just another restaurant.
17 Q.  Is anyone else present at these meetings?
18 A.  No, it's just him and I.
19 Q.  And did you meet at a Big Boy to discuss the
20   diversity forum specifically at some point?
21 A.  I don't remember.
22 Q.  Were you part of the diversity forum?
23 A.  I was in attendance and I did speak, I believe.
24 Q.  And what did you speak about?
25 A.  I don't remember the exact topic, but more than

Page 232

1    likely it would have been about the need for the
2    adults in the school district to create a safe
3    environment for all students.
4  Q.  Was this the same as a teach-in?
5  A.  No.
6  Q.  What's a teach-in?
7  A.  I don't know.
8  Q.  Do you remember giving a speech about this
9    incident at a teach-in?
10 A.  I remember giving this -- giving a speech about
11   the need for the adults, again, to provide a safe
12   place for all kinds of students at a forum that
13   was hosted by Phil and Matt Letten, yes.  I don't
14   know if it would be characterized as a teach-in in
15   a classic 1960 sense.
16 Q.  Who are Phil and Matt Letten?
17 A.  They're local community members.
18 Q.  Are they involved in the school district?
19 A.  No.
20 Q.  Are they students at Howell Public Schools?
21 A.  No.
22 Q.  Are they residents of Howell?
23 A.  They were at the time.  I don't know if they are
24   now.
25 Q.  Do they have children that attend Howell Public