# EXHIBIT 9

# GLOWACKI, ET AL v. HOWELL PUBLIC SCHOOL DISTRICT, ET AL

## RONALD C. WILSON

September 10, 2012

*Prepared for you by*



**Bienenstock**
NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

RONALD C. WILSON
September 10, 2012

Page 33

1  A. I'm not sure. That's what was presented to me, that
2  the spirit group wants to have an anti-bullying day.
3  Q. Did Aaron Moran ever state to you that it was the
4  Gay/Straight Alliance Student Club?
5  A. No. No, he did not.
6  Q. Did you review any documents prior to coming to the
7  deposition today?
8  A. Yeah. I reviewed a few, yes.
9  Q. And which documents did you review?
10 A. I reviewed the suit that was filed by the Thomas More
11 Law Center.
12 Q. Would that be the complaint?
13 A. The complaint, yes. And I also had a chance to look
14 at our -- I believe all of the exhibits that we've
15 given I looked at too.
16 Q. Did you have an opportunity to review any of your
17 e-mails?
18 A. The e-mails related to this situation number in the
19 thousands and, interesting enough, when this whole
20 thing happened, I started getting hate mail from the
21 gay and lesbian community, and then after you filed
22 your suit, I got an equal number of e-mails from the
23 religious rights, and so I -- I am familiar with some
24 of the e-mails but, no, I didn't review the thousands
25 that I've received regarding this matter.

Page 34

1  Q. Did you review any of the internal e-mails between you
2  and the high school principal, Aaron Moran, or --
3  A. No.
4  Q. -- anyone else in -- the administrative Board or --
5  A. No.
6        MS. MERSINO: We'll mark this as Exhibit 31.
7        MARKED FOR IDENTIFICATION:
8        DEPOSITION EXHIBIT 31
9        10:57 a.m.
10 BY MS. MERSINO:
11 Q. If you could review what's been handed to you as
12 Exhibit 31, do you recognize what's in this exhibit?
13 A. Yes.
14 Q. And how do you recognize it?
15 A. It was an e-mail that came in on the 20th from Dan and
16 Sherri Hargrove, and it was originally addressed to
17 myself, and I also believe a copy of it was sent to
18 our Board president, Debi Drick.
19 Q. And this actually appears to be an e-mail strain; is
20 that correct?
21 A. Yes.
22 Q. And when did the first e-mail come in from Sherri
23 Hargrove?
24 A. 2:35 p.m. on October 20th of 2010.
25 Q. Okay. If you could go to the second page of Exhibit

Page 35

1  31 at the bottom --
2  A. Uh-huh.
3  Q. -- is that the first e-mail from Sherri Hargrove?
4  A. It looks like it based on the time and date that's on
5  there.
6  Q. And what is the time and date of that e-mail?
7  A. October 19, 2010, at 7:19 p.m.
8  Q. And who is Sherri Hargrove?
9  A. I believe it's a parent of one of our students.
10 Q. And what is she asking?
11 A. She is asking is it true that at Howell High School
12 there is a gay pride rally of some kind.
13 Q. And at some point was this e-mail forwarded to you?
14 A. It looks like it was forwarded to me at 7:36 p.m.
15 Q. On October 19th?
16 A. Yes.
17 Q. And what did you do with the e-mail?
18 A. I forwarded it on to the high school principal to see
19 if he knew anything about it.
20 Q. And what was his response?
21 A. It says no. It says -- well, let's see. It says --
22 this came in, actually, at the next -- the morning of
23 the 20th just before 7 o'clock. It says:
24     "No. The Gay/Straight Alliance Student Club has
25 a meeting next week. I heard today is

Page 36

1  anti-bullying day. Wear purple. The GSA using
2  this to stop homophobia. If I hear anything, I
3  will let you know."
4  Q. Do you know the GSA to be an acronym for the
5  Gay/Straight Alliance Student Club?
6  A. Yes.
7  Q. And it states in the e-mail that on the anti-bullying
8  day people are to wear purple and they're using it to
9  stop homophobia.
10 A. Yeah, that's what it says.
11 Q. And this was sent to you the morning of the 20th at
12 6:52 a.m.?
13 A. Correct. But recognize, you know, that I don't sit
14 and wait for e-mails to come in, you know. I
15 periodically will read my e-mails once or twice a day,
16 and so I don't even recall. Mr. Moran may have sent
17 this to me at 7:52 in the morning, but as far as when
18 I saw it and when I responded to it, I don't recall.
19 Q. So you have no recollection of when you opened this
20 e-mail?
21 A. No, no.
22 Q. Were you at your office that day?
23 A. Without going back and reviewing my calendar, I know I
24 was in the office part of that day.
25 Q. Which part were you in the office?

RONALD C. WILSON
September 10, 2012

Page 57

1  A. No.
2  Q. And were you familiar with whether the student
3     assembly put on in 2011 was a mandatory student
4     assembly?
5         MR. HENLEY: Which student assembly in 2011?
6  BY MS. MERSINO:
7  Q. With Dr. McEvoy?
8  A. I don't recall whether it was mandatory or not.
9  Q. Who was involved in the planning of that?
10 A. I'm not sure. I can only venture a guess.
11 Q. Were -- was it required that a parent be informed of a
12    student assembly prior to it taking place?
13 A. I don't know.
14 Q. After the initial reprimand and punishment was issued
15    to Mr. McDowell, was there some point in time when it
16    was recalled?
17 A. The suspension or the day off without pay was removed.
18    However, the discipline as far as the reprimand and
19    the training stayed in place.
20 Q. It's my understanding that a different disciplinary
21    reprimand was replaced in the file and the original
22    was taken out; is that correct?
23 A. I believe that's correct, yes.
24 Q. And you said that the training was in place, the First
25    Amendment training?

Page 58

1  A. Yes.
2  Q. And has it taken place?
3  A. Yes, it did.
4  Q. And can you describe it for me?
5  A. We had a school attorney come in and he did some
6     research on public or First Amendment rights, and
7     provided I believe two separate training sessions for
8     Mr. McDowell, and we also provided it for all our
9     teachers, too, at a later day.
10 Q. And who put on the training?
11 A. Dave Revore, an attorney from the Thrun Law Firm.
12 Q. Could you spell the last name?
13        MR. HENLEY: I could. R-E-V-O-R-E.
14 BY MS. MERSINO:
15 Q. And when did this occur?
16 A. I believe it was February of 2011, I believe.
17 Q. Is there any written documentation of this?
18 A. Yes. There would have been a handout and it was -- I
19    believe it was done on a professional development day
20    so it would have been memorialized in our professional
21    development for that day.
22 Q. You said that Mr. McDowell had an individualized
23    training?
24 A. Correct.
25 Q. And how many people were present at the training?

Page 59

1  A. I'm not sure.
2  Q. Can you describe the training with the teachers for
3     me?
4  A. I did attend that and, essentially, it just went
5     through the current case law and -- regarding, you
6     know, First Amendment rights and free speech and --
7     which is presenting, you know, this is the
8     information, this is what we -- you know, in these
9     situations, this is what we recommend.
10 Q. And prior to February 2011, was there any First
11    Amendment training conducted at the school?
12 A. Not that I'm aware of, no.
13 Q. And why was it decided that First Amendment training
14    should take place at the school in February of 2011?
15 A. Well, given the incident that occurred on the 20th and
16    then subsequent questions about, you know, how we
17    should handle those types of situations, it seemed
18    somewhat self-evident that we needed to go ahead and
19    review this with our staff and make sure that we set
20    some clear guidelines to ensure that we don't have a
21    repeat.
22 Q. Are there clear guidelines in place now?
23 A. I think in referencing -- I think the guidelines that
24    are in place are clear, but I believe that
25    in referencing Mr. Revore's presentation, he

Page 60

1  specifically called out situations that -- you know,
2  where -- if -- appropriate conduct, given those
3  situations, I think was called out or made more
4  specific.
5  Q. So there were examples given during the training?
6  A. Uh-huh.
7  Q. Is that what you're referring to --
8  A. Yes.
9  Q. -- or was there something else?
10 A. It was an hour-long training and maybe more than an
11    hour and, like I said, there was a PowerPoint and
12    attachment, and it was basically designed to clarify,
13    you know, what our policies say and what our
14    expectations are.
15 Q. And was this training mandatory?
16 A. Uh-huh.
17        MR. HENLEY: That's a yes?
18        THE WITNESS: Yes.
19 BY MS. MERSINO:
20 Q. I should remind you. My fault. I apologize.
21        Now, after this occurred, after this
22    training, did you ever go back to the drawing board
23    with your policies to adapt or change any Howell
24    Public School policies?
25 A. We had asked counsel to review our policies to make