# EXHIBIT 13

### Page 1

IN THE UNITED STATES DISTRCT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANDRA GLOWACKI, on behalf of her
minor children, D.K.G and D.C.G.,

  Plaintiffs,

    CASE NO. 11-cv-154891

vs

HOWELL PUBLIC SCHOOL DISTRICT,
JOHNSON "JAY" MCDOWELL, individually
and in his official capacity as a teacher
in the Howell Public School District,

  Defendants.
_____/

  The Deposition of DANIEL GUERNSEY, taken before me,
Jennifer Wall, CSR-4183, a Notary Public within and for the
County of Oakland, Acting in Washtenaw, State of Michigan, at
24 Frank Lloyd Wright Drive, Ann Arbor, Michigan on Friday,
October 12, 2012.

APPEARANCES:
 ERIN ELIZABETH MERSINO, ESQ.
 The Thomas More Law Center
 24 Frank Lloyd Wright Drive
 Ann Arbor, Michigan 48106
 (734) 827-2001
  Appearing on behalf of Plaintiff.

### Page 2

1 APPEARANCES, CONTINUING:
2
3  SUZANNE P. BARTOS, ESQ.
  Plunkett Cooney
4  535 Griswold, Suite 2400
  Detroit, Michigan 48226
5  (313) 983-4741
6   Appearing on behalf of Defendant McDowell.
7
8  ROY H. HENLEY, ESQ.
  Thrun Law Firm, PC
9  2900 West Road, Suite 400
  East Lansing, Michigan 48826
10  (517) 484-8000
11   Appearing on behalf of Howell Public Schools.
12 ALSO PRESENT: Sandra Glowacki
    Drake Glowacki
13    Cassandra Harmon-Higgins
14
15   W I T N E S S   I N D E X
16 Witness  Examined by  Page
17 DANIEL GUERNSEY Mr. Henley  3
18   Ms. Bartos  54
19   E X H I B I T   I N D E X
20 Exhibit No. Description  Page
21 Ex. No. 38 Report  4
22 *Ex. No. 39 Document  52
23 *(retained by counsel)
24
25   * * * * *

### Page 3

1 Ann Arbor, Michigan
2 Friday, October 12, 2012
3 10:10 a.m.
4  - - -
5  DANIEL GUERNSEY
6 was thereupon called as a witness herein, and after having been
7 first duly sworn to tell the truth, the whole truth and nothing
8 but the truth, was examined and testified as follows:
9  MR. HENLEY: The record should reflect that
10 this is the discovery only deposition of Dr. Daniel Guernsey
11 to be taken for that purpose under the Federal Rules of
12 Civil Procedure and noticed by co-defendant, Jay McDowell.
13  Dr. Guernsey, my name is Roy Henley,
14 and I represent the Howell Public Schools in this case.
15 I will be starting the questioning with you.
16  EXAMINATION
17 BY MR. HENLEY:
18 Q. Have you ever had your deposition taken before?
19 A. Yes.
20 Q. Okay. So you know to hopefully answer verbally as opposed
21  to a nod or a shake of the head or an uh-huh or an unh-unh.
22  Everyone forgets, I will remind you.
23 A. Yes.
24 Q. Additionally, if I ask a question that you don't understand
25  or if that is just plain unintelligible, please let me know

### Page 4

1  and I will rephrase it so you do understand.
2  Also if you'd like to take a break at any
3  time, I'm all in favor of breaks, please just let me
4  know and I'd only ask that we clear up questions that
5  are pending before we take a break, okay.
6  To start with, could you state your name for
7  the record, please, and spell your last name.
8 A. Daniel Patrick Guernsey, G-u-e-r-n-s-e-y.
9  MR. HENLEY: Just to make things go faster
10  I should probably should have done this, but let's mark this
11  as Exhibit No. 38.
12  (Deposition Exhibit No. 38, report, was marked
13  for identification.)
14  MR. HENLEY: Back on the record.
15 BY MR. HENLEY:
16 Q. Dr. Guernsey, let me hand you what's been marked as
17  Exhibit 38, and that is your report, correct?
18 A. Yes.
19 Q. And let's move back to Exhibit A of your report. That is
20  your curriculum vitae?
21 A. Yes, sir.
22 Q. Is there anything in your curriculum vitae which is
23  inaccurate or not up-to-date?
24 A. Not that I'm aware of.
25 Q. I'd like to start and talk a little bit about your

Page 49

```
 1    October 25th written reprimand. I think there were two.
 2 Q. Yes. The shorter one I think is the -- assuming -- well,
 3    strike that.
 4        Let me do things in better form.
 5        Assuming that the shorter reprimand was the
 6    reprimand that remained effective, would you have any
 7    criticism in that regard?
 8 A. Yes.
 9 Q. What would that be?
10 A. It's inadequate, especially when compared with the reprimand
11    of October 25th by Moran and Moore, that, in my estimation,
12    is a more appropriate articulation of the severity of what
13    happened in that classroom towards the denial of Daniel's
14    rights.
15 Q. Were you aware that any disciplinary references were removed
16    from Daniel's record?
17 A. Yes.
18 Q. In what way do you consider the latter reprimand, the short
19    one, to be inadequate?
20 A. Mr. McDowell was guilty of unprofessional, unethical conduct
21    which deprived the student of his rights. His behavior in
22    the classroom, as I articulated in my report, was grossly
23    inadequate, and unfair and created a hostile environment,
24    not just for Daniel, but for the other student as they
25    articulated in their response to the incidents.
```

Page 50

```
 1 Q. As head master at Donahue Academy, you have had experience
 2    with disciplining teachers, correct?
 3 A. Indeed.
 4 Q. And would it be fair to say that the purpose of teacher
 5    discipline is to correct a problem, or one of the primary
 6    purposes?
 7 A. Yes.
 8 Q. Did you review any personnel documents related to
 9    Mr. McDowell?
10 A. No.
11 Q. Do you know whether or not Mr. McDowell had any disciplinary
12    history before this incident?
13 A. No.
14 Q. Do you know whether he had any disciplinary history after
15    this incident?
16 A. Other than what was in the exhibits, no.
17 Q. Did you have an opportunity to review the teachers'
18    collective bargaining agreement?
19 A. No.
20 Q. Are you familiar at all with the Michigan Teachers Tenure
21    Act?
22 A. Not substantially, no. Not enough to form an opinion.
23 Q. In Catholic schools, in your experience, in private and
24    parochial education, do the boards of such schools typically
25    issue policies?
```

Page 51

```
 1 A. Yes.
 2 Q. Do some of those policies relate to classroom management?
 3 A. Classroom management is usually handled by the principal.
 4    The board approves policies, so insofar as the board creates
 5    or approves a policy related to classroom management, such
 6    as there will be no corporal punishment, in that sense, yes,
 7    the board would be involved.
 8 Q. At the Donahue academy, focusing the question a bit more,
 9    has the board passed any policies which are applicable to
10    the classroom?
11 A. The board approves the handbook which lists standards and
12    expectations for student behavior including in the
13    classroom, yes. The board is aware of that and approves it.
14 Q. And as head master at Donahue academy, do you expect your
15    teachers to be familiar with the handbook and those
16    standards?
17 A. Absolutely.
18 Q. You had mentioned that you had reviewed a number of school
19    district policies and guidelines, correct?
20 A. The ones that I mentioned in the exhibits, yes.
21 Q. Did you have any criticism of any of those policies and
22    guidelines?
23 A. No.
24 Q. Did you review any materials generated by Dr. Marcia McEvoy?
25 A. I briefly looked at some of her presentations, yes.
```

Page 52

```
 1 Q. Did you have any criticisms of presentations?
 2 A. Not from what I saw.
 3 Q. As part of your work on this case, did you review Michigan's
 4    anti-bullying legislation?
 5 A. No.
 6 Q. Are you familiar with it at all?
 7 A. No.
 8 Q. Does Florida have anti-bullying legislation that you know
 9    of?
10 A. I would imagine, but I do not specifically remember reading
11    it.
12 Q. Based on that, I assume that you have not run into issues as
13    head master with applications to any anti-bullying
14    legislation?
15 A. Not legislation, but bullying, absolutely.
16 Q. Bullying is bad?
17 A. Bullying is terrible.
18 Q. Are there any specific policies at Donahue Academy?
19 A. Yes. We prohibit bullying. We prohibit anything that works
20    contrary to the dignity of a human person.
21 Q. Have you done any studying at all or research regarding
22    anti-bullying mandates versus rights of free expression in
23    public classrooms?
24 A. No. I have done, you know, basic researching on bullying,
25    and what is bullying, how does it work, how can you prevent
```

Page 57

1  that in page 13 of your opinion about ten lines from the
2  bottom.
3  A. Can you repeat the question, please.
4  Q. My question to you is, did you believe that he intended on
5     posting or having a discussion about the homosexual
6     experience in economics class?
7  A. He -- from my understanding of the depositions, he was
8     intending to discuss bullying and its correlation with
9     homosexual students.
10 Q. Okay. Do you believe Dan's statement about -- again
11    paraphrasing, how come she, meaning that female student,
12    doesn't have a right to wear the confederate flag belt
13    buckle, but gays can fly the rainbow flag.
14          What does that have to do with gay marriage?
15 A. The teacher provoked the conversation on expression, and the
16    student asked an on-point question about the expression of
17    one's personal beliefs, religiously held beliefs.
18 Q. That statement about, you know, flying the rainbow flag,
19    does that mean, how come gays should have a right to marry?
20 A. The rainbow flag is culturally emblematic of a gay movement,
21    part of which pushes the notion that homosexuals have a
22    right to marry. That's part of the gay movement. That's
23    part of what that flag symbolizes.
24 Q. So if I'm understanding you correctly, Mr. McDowell should
25    have understood that Dan was really saying, in his own

Page 58

1  fumbling way, well, how come she can't wear her confederate
2  flag, but gays can marry?
3          MS. MERSINO: Objection. That is a
4  misstatement of what the testimony has been.
5  BY MS. BARTOS:
6  Q. You may answer. Is that what you're saying? Because you're
7     relating everything back to marriage, and what is the
8     question of why can they fly a rainbow flag have to do with
9     gay marriage?
10 A. I think Daniel's -- the Catholic concern with homosexuality
11    is clear. The church teaches that it is wrong to bully or
12    to abuse homosexual persons. It teaches that in, I believe,
13    it is the catechism probably about 2,359 paragraph, where it
14    says clearly one cannot bully or abuse homosexuals, they
15    have dignity.
16         But the church also clearly teaches that
17    human sexuality is only to be expressed between a man
18    and a woman.
19         If Daniel was interpreting the homosexual
20    movement right, as saying that it's okay for human
21    sexuality to be expressed outside of the bonds of man
22    and woman, then he would be right to say, how come
23    people can't express their beliefs in public. And
24    Dan's question was, can I express my belief in public,
25    or he didn't say that in particular, but he did it, he

Page 59

1  attempted to express his belief in public and got shut
2  down.
3  Q. Okay. I cut you off, I didn't give you time to answer my
4     earlier question.
5          So is it what you're saying that Mr. McDowell
6     should have read between the lines that Dan was
7     actually saying, how come she can't wear her
8     confederate flag, but gays can marry?
9  A. The larger question I think Dan was getting to was one of
10    free speech.
11 Q. Can you answer my question. Is that what Mr. McDowell
12    should have heard?
13 A. Mr. McDowell's responsibility is to ask professionally
14    probing questions to find out what the students are
15    attempting to learn or understand. He needs to understand,
16    what do they know, what do they need to know. All he had to
17    do was ask the same question you asked, and he didn't.
18 Q. My question to you though -- okay, he didn't ask the
19    question. But should he have heard Dan say, why can't she
20    wear her confederate belt buckle, but gays can marry?
21         Is that what he should have heard from Dan in
22    his fumbling way?
23 A. I don't know how to answer your question.
24 Q. Without a follow-up question of what do you mean by that,
25    Dan, was it proper for Mr. McDowell to attempt to explain

Page 60

1  the origin of the rainbow flag and how it actually started
2  with Jessie Jackson?
3  A. Assuming that the district and the school approved and was
4     in support of Mr. McDowell cancelling a section of his
5     economics course to engage in that discussion, under that
6     assumption, then, yes, that question was asked about freedom
7     of expression. That is an interesting topic to be explored.
8  Q. Was it appropriate for Mr. McDowell to explain, as he saw
9     the difference between the confederate flag being one of
10    oppression and the rainbow flag being one of, you know,
11    acceptance?
12 A. I think he was --
13 Q. Was he appropriate in responding --
14 A. He was attempting to address the student question. I think
15    he did poorly, but he was attempting to address a topic
16    raised -- a legitimate topic raised by the student.
17 Q. Okay.
18 A. Provoked by the teacher.
19 Q. Did Mr. McDowell violate -- well, off the record for a
20    second.
21         (A pause was had in the proceedings.)
22         MS. BARTOS: Back on.
23 BY MS. BARTOS:
24 Q. Did Mr. McDowell violate Adam's constitutional rights when
25    he kicked Adam out of the class?

15 (Pages 57 to 60)

Page 61

1   A.  I don't recall there being enough information in what I saw
2       to make a definite judgment on that.
3   Q.  Well, Adam said, also said, "I don't accept gays". And
4       Mr. McDowell did not follow-up with further questioning, as
5       to ask him to explain what he meant. He just kicked him out
6       of class.
7           Is that a violation of his constitutional
8       rights?
9   A.  It could have been.
10  Q.  Was that based upon religion?
11  A.  It could have been.
12  Q.  And how would it be based upon religion by the statement of,
13      "I don't accept gays"?
14  A.  The question is, what do you mean when you say, you don't
15      accept gays. If by saying, "I don't accept gays" means I
16      don't accept homosexual activity, the answer is, that is a
17      correct statement of religious faith of a broad swath of
18      humanity and that speech cannot be exiled from the
19      classroom.
20          If it's specific to, I do not approve, I do
21      not accept sexual activity between same sex partners or
22      any activity outside of marriage, that has to be
23      protected, that cannot be removed form the public
24      square.
25  Q.  I understand. But the statement, "I don't accept gays",

Page 62

1       being kicked out of a class because of that statement, with
2       no follow-up questioning, except that, that's enough to
3       violate a student's rights?
4   A.  No -- I mean, excuse me, yes. Because if that student is
5       saying, just like Daniel was, that I don't accept homosexual
6       behavior because I find it morally offensive and it's
7       against my faith tradition, because my faith tradition says,
8       sexual behavior is between a man and a woman and the bond of
9       matrimony, that has to be protected. And that is part of
10      diversity and the teachers should have had a plan to deal
11      with that. I mean, that's critical.
12  Q.  If you can, please accept the statement -- this is a
13      hypothetical.
14          Please accept the statement, "I don't accept
15      gays", as not meaning a sexual relation, marriage,
16      anything along those lines, but it's a bullying
17      statement, "I don't accept gays, I don't accept
18      Catholics, I don't accept Jews, I don't accept blacks".
19      Doesn't that invade the rights of others in the room
20      that you're sitting?
21  A.  Again, you have to understand, if the question is "I don't
22      accept blacks" because I think that they lack human dignity
23      and human respect, the answer is yes, of course. That is
24      bullying and respect is one of the values of the Howell
25      school district and of all legitimate human culture.

Page 63

1       If that's what one means by accept, but
2       clearly in Daniel's deposition that's not what I meant
3       by "I don't accept gays". He has never bullied a gay,
4       he is against gay bullying, he is against bullying in
5       general. He says it, and yet this guy got kicked out
6       of class because the teacher, in my estimation, is
7       acting like a bully.
8   Q.  And your opinion to my question is based not just on the
9       statement, "I don't accept gays, blacks, Jews", whatever the
10      case, but what that person meant by that statement?
11  A.  Right, because if they're saying, I don't accept homosexual
12      behavior as being moral, that is a legitimate faith claim
13      that the student needs to be able to express in public.
14          If he's saying, "I don't accept homosexuals
15      as people worthy of dignity and rights", then that
16      would be against the cultural norm of human respect and
17      the rights of the individuals and needs to be stopped,
18      and the Catholic church teachers that.
19  Q.  I understand. Now I think I get where you're coming from.
20      You're looking at what the -- what Dan meant by that
21      statement as opposed to making that statement?
22          MS. MERSINO:  Objection. That is a
23      mischaracterization of his testimony. You may answer.
24          MS. BARTOS:  You need me to repeat?
25          THE WITNESS:  I need you to repeat.

Page 64

1   BY MS. BARTOS:
2   Q.  I think I'm finally understanding where you're coming from.
3           Your evaluation of this case is depending
4       upon on what Dan meant by that statement as opposed to
5       simply making that statement?
6   A.  Dan has a right to make that statement, if the statement, in
7       his understanding and mind, is my faith tradition teaches
8       that homosexual activity is sinful. I think that's what Dan
9       said he was saying, he couldn't -- it doesn't have the
10      language that I have, and I'm not -- you know, but he has to
11      be able to make those statements in a free society or we
12      will not be a free society.
13  Q.  I take that as a yes?
14          MS. MERSINO:  Objection --
15  BY MS. BARTOS:
16  Q.  Am I correct in my understanding of your position?
17  A.  I'm not sure.
18          MS. MERSINO:  Objection. Vague.
19          MS. BARTOS:  Perhaps we could take your
20      objection beforehand because I would care for you not to
21      interrupt the flow here.
22          Maybe the court reporter can read back
23      the question. I really need an answer to it.
24          (Whereupon the court reporter read back the
25      requested question.)

16 (Pages 61 to 64)