UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SANDRA GLOWACKI, on behalf of
her minor children, D.K.G. and D.C.G.,

                 Plaintiffs,

v.

HOWELL PUBLIC SCHOOL DISTRICT;
JOHNSON ("JAY") MCDOWELL, individually
and in his official capacity as a teacher in the
Howell Public School District,

                 Defendants.

_____/

Case No. 2:11-cv-15481

Hon. Patrick J. Duggan

*AMICUS CURIAE* BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION AND
THE AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES ................................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 2

ARGUMENT .......................................................................................................... 3

I.   COMPREHENSIVE ANTI-BULLYING POLICIES CAN REDUCE BULLYING IN
     SCHOOLS AND MITIGATE THE DETRIMENTAL EFFECT THAT BULLYING
     HAS ON THE EDUCATION AND HEALTH OF YOUTH ......................................... 3

II.  PUBLIC SCHOOLS HAVE A LEGAL DUTY TO PREVENT HARASSMENT OF
     ALL STUDENTS, CONSISTENT WITH PROTECTIONS FOR STUDENT
     EXPRESSION. ................................................................................................... 6

   A. Statutes, courts, and the Executive Branch have all recognized that public schools are
      obligated to eliminate harassment and that anti-bullying policies can aid in that effort
      without curtailing constitutionally protected student speech. ........................................ 7

   B. The HPSD policy complies with the *Tinker* standard. ................................................... 9

   C. The HPSD policy successfully distinguishes between protected controversial student
      speech and unprotected bullying speech. ..................................................................... 11

   D. The HPSD policy is viewpoint-neutral. ........................................................................ 12

III. NEITHER THE CONSTITUTION NOR THE HPSD POLICY PERMIT
     MCDOWELL'S PUNISHMENT OF GLOWACKI FOR EXPRESSING HIS
     OPINION ABOUT HOMOSEXUALITY. .............................................................. 13

   A. Glowacki's nondisruptive expression of religious views in class is protected by the
      First Amendment and not curtailed by the HPSD policy ............................................. 13

   B. McDowell's actions are inconsistent with the current HPSD policy ........................... 14

# INDEX OF AUTHORITIES

**Cases**

Alexander v. Sandoval, 532 U.S. 275 (2001) (quoting 110 Cong. Rec. 6543) ........................ 8

Barber ex rel. Barber v. Dearborn Pub. Sch., 286 F. Supp. 2d 847 (E.D. Mich. 2003)........... 14

Brown v. Bd. of Educ., 347 U.S. 483 (1954)............................................................................ 7

Chandler v. McMinnville Sch. Dist., 978 F.2d 524 (9th Cir. 1992) ........................................ 12

Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629 (1999)..................................................... 8

Gillman ex rel. Gillman v. Sch. Bd. for Holmes Cnty., Fla., 567 F. Supp. 2d 1359 (N.D. Fla. 2008)......................................................................................................................... 12

Guiles ex rel. Guiles v. Marineau, 461 F.3d 320 (2d Cir. 2006) ............................................ 11

J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915 (3d Cir. 2011)....................... 10

Lowery v. Euverard, 497 F.3d 584 (6th Cir. 2007) ................................................................. 9

Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022 (9th Cir. 1998)............................ 3

Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200 (3d Cir. 2001) ........................................... 11

Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243 (3d Cir. 2002) ........................ 8

Tinker v. Des Moines Indep. Cmty. Sch. Dist, 393 U.S. 503 (1969) ..............................passim

Vance v. Spencer Cnty. Pub. Sch., 231 F.3d 253 (6th Cir. 2000)..................................... 8

**Statutes and Constitution**

20 U.S.C. §1681(a) ................................................................................................................ 7
Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a) ..................................... 7
Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d .................................................. 7
U.S. Const. amend. XIV ........................................................................................................ 7

**Articles and Other Publications**

CDC, *Understanding Bullying Fact Sheet* ............................................................................. 3

CDC, *Youth, Lesbian, Gay, Bisexual and Transgender Health* ........................................ 4, 5

HPSD Administrative Guidelines, §5610 (2012) .................................................................. 13

HPSD Policies, §2240 (2012) ...................................................................... 11, 13, 14

HPSD Administrative Guidelines, § 8800B (2012) ................................................ 14

HPSD Policies, § 5517.01 (2012) ............................................................... 10, 12

Joseph G. Kosciw et al., *The 2011 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth in Our Nation's Schools*, Gay, Lesbian and Straight Education Network 40 (2012) ................................................................ 5

Lori Higgins, *Michigan schools face deadline to adopt anti-bullying policies*, Detroit Free Press (Jun. 4, 2012) .................................................................................. 4

Mental Health America, *Bullying: What to Do About It* ........................................ 4

National Center for Education Statistics, *Student Victimization in U.S. Schools: Results from the 2009 School Crime Supplement to the National Crime Victimization Survey* ............... 4

Stephenie Koehn, *(Rainbow) Flag stirs flap at Howell High*, Ann Arbor News (Dec. 23, 2004), http://www.freerepublic.com/focus/f-news/1307475/posts ....................... 4

Stopbullying.gov, *Bullying and LGBT Youth* ..................................................... 4

U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010) .............................................................................. 9

U.S. Dep't of Educ., Office for Civil Rights, *First Amendment: Dear Colleague* (July 28, 2003) ........................................................................................................... 9

## INTERESTS OF *AMICUS*

The American Civil Liberties Union (ACLU) is a nationwide, not-for-profit, nonpartisan organization with over 500,000 members dedicated to defending the principles embodied in the United States Constitution and our nation's civil rights laws.  The ACLU Fund of Michigan is the legal and educational wing of the ACLU of Michigan, and an affiliate of the national ACLU.  Since its founding in 1920, the ACLU has frequently advocated in support of the First Amendment right to free speech, and also in support of the right to be free from discrimination, both as direct counsel and as *amicus curiae*.  Because this case involves the intersection of claims for free speech and freedom from discrimination, its proper resolution is a matter of significant concern to the ACLU and its members.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Public schools have a constitutional obligation to provide all students with a safe environment to learn, while protecting students' right to free speech, including the right to participate in discussions of conflicting ideas.  There is nothing inherently contradictory about those goals.  Indeed, public schools may issue and enforce policies that regulate bullying and harassment in the school environment because protecting students' physical and mental wellbeing is crucial for maintaining an environment conducive to the educational process.  At the same time, these regulations must be carefully crafted and appropriately applied, bearing in mind that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist*, 393 U.S. 503, 506 (1969).

While *amici* believe that the speech restriction that occurred in this particular case was constitutionally impermissible, we submit this brief to explain the important goals that are advanced by anti-harassment policies, including the Howell Public School District (HPSD) anti-bullying policy, and to address the suggestion that such policies are inherently in conflict

2

with free speech rights.  When harassment policies properly distinguish between constitutionally permissible and impermissible speech, they advance the important interest in combating the bullying and harassment of students, while preserving students' free speech rights.

Put simply, the HPSD policy achieves the proper balance between First Amendment protections and student safety.  The HPSD policy protects all students from mistreatment, while simultaneously permitting all students to engage in controversial speech protected by the First Amendment, in service of the public education system's mission "to stimulate thought, to explore ideas, [and] to engender intellectual exchanges."  *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1032 (9th Cir. 1998).  In this way, the HPSD policy ensures that students can enjoy a safe and productive learning environment, while placing no restrictions on students' legitimate expression of religious and other viewpoints.

## ARGUMENT

### I. COMPREHENSIVE ANTI-BULLYING POLICIES CAN REDUCE BULLYING IN SCHOOLS AND MITIGATE THE DETRIMENTAL EFFECT THAT BULLYING HAS ON THE EDUCATION AND HEALTH OF YOUTH.

The Centers for Disease Control and Prevention (CDC) recognizes school bullying as a public health problem.  The CDC explains that "[b]ullying can result in physical injury, social and emotional distress . . . death . . . [and] increased risk for poor school adjustment."  CDC, *Understanding Bullying Fact Sheet*.[1]  In addition, "[v]ictims and witnesses of bullying can experience mental health problems . . . [and] [t]hey are much less likely to succeed at school or go on to higher education."  *Id.*  The CDC also has found that bullying "is bad for the victim, the perpetrator, and even witnesses."  *Id.*; *see also* Mental Health America,

---

[1]   http://www.cdc.gov/ViolencePrevention/pdf/BullyingFactsheet2012-a.pdf (last visited Nov. 29, 2012).

*Bullying: What to Do About It* (affirming that "bullying is a form of violence that shouldn't be tolerated."). [2]

Despite this awareness, bullying in public schools remains prevalent. According to the Department of Justice, almost thirty percent of students aged twelve to eighteen were bullied during the 2008-09 school year. National Center for Education Statistics, *Student Victimization in U.S. Schools: Results from the 2009 School Crime Supplement to the National Crime Victimization Survey*.[3] Bullying impacts Michigan students as well, with more than 34,000 reported cases of bullying in state public schools during the 2010-11 school year.[4] Lori Higgins, *Michigan schools face deadline to adopt anti-bullying policies*, Detroit Free Press (Jun. 4, 2012).[5]

The CDC has also recognized that lesbian, gay, bisexual and transgender (LGBT) youth are more likely than their heterosexual peers to experience violence, including behaviors such as teasing, harassment, and physical assault. CDC, *Youth*, Lesbian, Gay, Bisexual and Transgender Health;[6] *see also* Stopbullying.gov, *Bullying and LGBT Youth* ("LGBT youth and those perceived as LGBT are at an increased risk of being bullied.").[7]

---

[2]   http://www.mentalhealthamerica.net/go/bullying (last visited Nov. 29, 2012).

[3]   http://nces.ed.gov/pubs2012/2012314.pdf (last visited Nov. 29, 2012).

[4]   Bullying may be a heightened risk in cities like Howell, where there has been a history of discrimination. In 2004, for example, Howell High's Diversity Club hung a rainbow flag, a gay pride symbol, which was intended to serve as a symbol of general diversity. This resulted in a furor in which there were "rumors about people wanting to bring in paint balls and fire them at the flag." Stephenie Koehn, *(Rainbow) Flag stirs flap at Howell High*, Ann Arbor News (Dec. 23, 2004), http://www.freerepublic.com/focus/f-news/1307475/posts  (reposting the original Ann Arbor News article).

[5]   http://www.freep.com/article/20120604/NEWS05/206040333/Schools-facing-a-deadline-to-adopt-a-bullying-policy (last visited Nov. 29, 2012).

[6]   http://www.cdc.gov/lgbthealth/youth.htm (last visited Nov. 29, 2012).

[7]   http://www.stopbullying.gov/at-risk/groups/lgbt/index.html (last visited Nov. 29, 2012).

According to a recent biannual survey with 8,584 student respondents from all fifty states, bullying targeted at LGBT students had a damaging effect on their educational opportunities: "LGBT students who reported higher severities of victimization because of their sexual orientation or gender expression were twice as likely as other students to report that they did not plan to pursue post-secondary education . . . ." Joseph G. Kosciw et al., *The 2011 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth in Our Nation's Schools*, Gay, Lesbian and Straight Education Network 40 (2012).[8]  The survey also indicated that "students were about three times as likely to have missed school in the past month if they had experienced higher severities of victimization related to their sexual orientation . . . or how they expressed their gender."[9]  *Id.* at 40-41.

In light of data showing that LGBT students face a particularly heightened risk of educationally disruptive bullying, the CDC has concluded that it is important for schools to recognize that exposure to violence can have harmful effects on the education and health of LGBT youth.  CDC, *Youth*, Lesbian, Gay, Bisexual and Transgender Health.[10]  The CDC recommends that schools "implement[] clear policies, procedures, and activities designed to prevent violence" to work to reduce bullying.  *Id.*  Indeed, the Gay, Lesbian and Straight Education Network (GLSEN) has found that "25.8% of students in schools with comprehensive policies . . . always reported incidents of victimization, compared to 13.8% or fewer of students in schools with partially enumerated policies, generic policies, or no

---

[8]  http://www.glsen.org/binary-data/GLSEN_ATTACHMENTS/file/000/002/2105-1.pdf (last visited Nov. 29, 2012).

[9]  These numbers are likely to underreport the extent of the harassment experienced by LGBT youth.  The GLSEN survey found that the majority of students who had experienced harassment in the past school year "never reported incidents to staff (60.4%), and few students indicated that they regularly reported incidents of harassment or assault (13.7% reporting "most of the time" or "always")." Id.

[10]  http://www.cdc.gov/lgbthealth/youth.htm (last visited Nov. 29, 2012).

policies." Kosciw, *supra*. Research also found that staff in schools with comprehensive policies were more likely to "intervene[] when hearing homophobic remarks . . . or negative remarks about gender expression." *Id.*

As demonstrated above, empirical studies show that bullying can dramatically interfere with the education of students, particularly LGBT students. That disruption can consist of a "decline in students' test scores [or] an upsurge in truancy." *Nuxoll ex rel. v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 674 (7th Cir. 2008). Research also shows that anti-bullying policies play an important role in counteracting this type of disruption for all students.

## II.   PUBLIC SCHOOLS HAVE A LEGAL DUTY TO PREVENT HARASSMENT OF ALL STUDENTS, CONSISTENT WITH PROTECTIONS FOR STUDENT EXPRESSION.

Public schools have an obligation, imposed by both the United States Constitution and federal statutes, to prevent harassment of their students. This obligation does not conflict with the parallel duty of schools to comply with the First Amendment's guarantee of freedom of expression. In *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969), the United States Supreme Court articulated the standard under which schools must satisfy these obligations: student expression can be restricted only if "necessary to avoid material and substantial interference with schoolwork or discipline," or to prevent interference with the rights of other students.

A.    **Statutes, courts, and the Executive Branch have all recognized that public schools are obligated to eliminate harassment and that anti-bullying policies can aid in that effort without curtailing constitutionally protected student speech.**

Numerous federal laws, including Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d,[11] Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a),[12] and the Equal Protection Clause of the United States Constitution, U.S. Const. Amend. XIV,[13] protect the rights of students to receive an education free from harassment based on race, sex, sexual orientation, and other impermissible factors.

The Equal Protection Clause of the United States Constitution requires states to provide equal protection of the laws, including laws relating to education. The Supreme Court has held that educational opportunity, "where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). Bullying and harassment, which lead to outcomes such as absenteeism and reluctance to pursue higher education, threaten the equal provision of educational opportunity to all students.

Congress has expanded these constitutional protections through Title VI and Title IX. Title VI establishes that federal funds may not flow to educational entities that discriminate based on race, color, or national origin. This is because "[s]imple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination." *Alexander v.*

---

[11]   "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

[12]   "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ." 20 U.S.C. §1681(a).

[13]   "[N]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

7

*Sandoval*, 532 U.S. 275, 306 (2001) (quoting 110 Cong. Rec. 6543). Title IX, in turn, establishes that no person shall be excluded on the basis of sex from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving federal financial assistance.

In cases brought under Title IX, courts have considered the type and degree of conduct that constitutes "harassment." In *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999), the Court held that schools are responsible for preventing student conduct that "deprive[s] the victims of access to the educational opportunities or benefits provided by the school." One example the Supreme Court provided of such deprivation was the "overt, physical deprivation of access to school resources." *Id.* Other factors suggesting that the plaintiff in *Davis* had suffered a deprivation included a sharp decline in her grades and the development of severe depression and suicidal ideation. *Id.*; *see also Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir. 2000) (holding that a school's failure to address severe and pervasive sexual harassment violated Title IX).

Federal courts have recognized that anti-harassment policies can protect students from bullying and harassment without violating the First Amendment's freedom of expression clause. Indeed, the Third Circuit in *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264 (3d Cir. 2002), recognized that a policy enforcing a "prohibition [of harassment] accompanied by the threat of sanction is . . . a standard school response" to the abuse and intimidation of students.

Not only have courts recognized that anti-bullying and harassment policies are consistent with the U.S. Constitution, but the federal government also stresses their importance and encourages their adoption. As the Department of Education wrote in a communication to public schools throughout the United States, "[a]n effective response [to school-based harassment] also may need to include the issuance of new policies against

harassment . . . or wide dissemination of existing policies and procedures . . . ."  U.S. Dep't of

Educ., Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26,

2010).[14]  The Department of Education has also stressed that anti-harassment policies,

appropriately crafted and applied, are consistent with protecting speech permissible under the

First Amendment.  *See id.* at n.8; *see also* U.S. Dep't of Educ., Office for Civil Rights, *First

Amendment: Dear Colleague* (July 28, 2003) (harassment "must include something beyond

the mere expression of views, words, symbols or thoughts that some person finds

offensive").[15]

    **B.**    **The HPSD policy complies with the *Tinker* standard.**

    School anti-bullying and harassment policies, like the one adopted by HPSD, fit

within the Supreme Court's student speech jurisprudence—including *Tinker*—if those

policies target truly harassing speech, not merely expression of an unpopular opinion, and do

not discriminate based on students' viewpoints.

    In *Tinker*, the Supreme Court held that a school's discipline of students whose speech

consisted of wearing black armbands to protest the Vietnam War violated the First

Amendment because that speech did not materially disrupt school activities.  393 U.S. at 514.

The Court held that public schools may regulate student expression only when speech

"substantial[ly] disrupt[s]" school activities, or "impinge[s] upon the rights of other students."

*Id.* at 514, 509.  This Circuit has also recognized that school policies may ban harassing

speech in anticipation of disruption, even if disruptive events have not yet occurred, because

"*Tinker* does not require certainty, only that the forecast of substantial disruption be

reasonable."  *Lowery v. Euverard*, 497 F.3d 584, 592 (6th Cir. 2007).  Well-crafted school

---

[14]  http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf (last visited Nov. 29, 2012).

[15]  http://www2.ed.gov/about/offices/list/ocr/firstamend.html (last visited Nov. 29, 2012).

bullying policies thus comport with *Tinker* when they focus on preventing either substantial disruption of school discipline or interference with the rights of other students.

The HPSD policy is constitutional under the governing standard of *Tinker*. The language of Section 5517.01 of the HPSD policy defines bullying in terms that mirror the threshold at which *Tinker* held that student speech can be restricted. Bullying, according to the HPSD policy, is defined as conduct that "is intended or that a reasonable person would know is likely to harm" students by "substantially interfering with educational opportunities, benefits, or programs of one (1) or more students," "adversely affecting the ability of a student to participate in or benefit from the school district's educational programs or activities by placing the student in reasonable fear of physical harm or by causing substantial emotional distress," "having actual and substantial detrimental effect on a student's physical or mental health," or "causing substantial disruption in, or substantial interference with, the orderly operation of the school." HPSD Policies, § 5517.01 (2012).[16] Examples of bullying include physical conduct, verbal assaults such as "taunting, malicious teasing, insulting, name calling, [and] making threats," and psychological abuse such as "spreading rumors, manipulating social relationships, coercion, engaging in social exclusion/shunning, extortion, or intimidation." *Id.* Thus, the policy prohibits conduct that is likely to cause substantial disruption or interfere with the rights of other students; it does not prevent students from expressing opinions that may be unpopular or offensive.

In addition, the HPSD policy is not unconstitutionally vague because it "allow[s] a person of ordinary intelligence to determine what conduct it prohibits" and it does not "authorize[] arbitrary enforcement." *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 935 (3d Cir. 2011). The policy achieves this clarity by its accessible text and its unambiguous examples of impermissible behavior. When read together, these elements of the

---

[16]   http://www.neola.com/howell-mi/ (last visited Nov. 29, 2012).

HPSD policy prohibit conduct that substantially interferes with the rights of other students but allow the free exchange of ideas that is vital in an educational setting. *See id.* at 936 (noting that "the addition of specific examples" of impermissible conduct "articulates a comprehensible normative standard" for students to follow).

> **C.      The HPSD policy successfully distinguishes between protected controversial student speech and unprotected bullying speech.**

Importantly, the HPSD policy expressly protects the nondisruptive expression of unpopular opinions. Section 2240 of the HPSD administrative guidelines reinforces that "the consideration of controversial issues has a legitimate place in the instructional program of the schools." HPSD Administrative Guidelines, § 2240 (2012).[17] The policy defines a controversial issue as "a topic on which opposing points of view have been promulgated by responsible opinion, and is likely to arouse both support and opposition in the community." *Id.* Students may initiate the discussion "provided that [the issues] are presented in the ordinary course of classroom instruction and [the discussion] is not substantially disruptive to the educational setting." *Id.*

In protecting discussion of controversial issues, the HPSD policy protects speech that numerous courts have found to be permissible, recognizing that "the mere fact that someone might take offense at the content of the speech is not sufficient justification for prohibiting it." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001). More specifically, courts have held that the mere objection of individual students, parents, and teachers to controversial speech does not amount to substantial disruption. *See, e.g., Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 330-31 (2d Cir. 2006) (holding that a high school could not censor a student's T-shirt depicting President George Bush as a drug addict and chickenhawk because objections to the shirt by one student and one parent were insufficient

---

[17]   http://www.neola.com/howell-mi/ (last visited Nov. 29, 2012).

to constitute substantial disruption); *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524 (9th Cir. 1992) (holding that students who had worn buttons with the slogans "I'm not listening scab" and "Do scabs bleed?" in support of a teacher's strike without causing disruption could not have their expression restricted).

Indeed, for controversial student speech to qualify as "substantial," it must produce effects that are unusual in comparison to the routine administration of the school. In *Gillman ex rel. Gillman v. Sch. Bd. for Holmes Cnty., Fla.,* 567 F. Supp. 2d 1359 (N.D. Fla. 2008), the court held that school principals cannot prohibit students from saying "gay pride" in the hallways or wearing symbols to show their support of equal rights for gay people. Because the whispering, note passing, debating, and petition-circulating that were associated with this speech were "indistinguishable from the typical background noise of high school," the Court found no substantial disruption. *Id.* at 1373. These cases demonstrate that courts applying *Tinker* have consistently resisted watering down the Supreme Court's standards. To satisfy *Tinker*, controversial speech may not be censored unless it produces some greater effect than the mere displeasure of individual students, teachers and administrators.

### D.     The HPSD policy is viewpoint-neutral.

Finally, the HPSD policy targets all bullying by all students, regardless of motivation, and thus is not viewpoint discriminatory. The policy is designed to "provide a safe and nurturing educational environment for all students. HPSD Policies, § 5517.01 (2012). The HPSD policy applies equally "regardless of the subject matter or motivation" of the harassment or bullying, protecting students uniformly without differentiating between students' beliefs. *Id.* In other words, the HPSD policy targets behaviors, not viewpoints.

Similarly, discussion of controversial issues is not limited to expression on one side of the issue. The HPSD policy requires that discussion "does not tend to indoctrinate or persuade students to a particular point of view" and "encourages open-mindedness." HPSD

Policies, § 2240.  The "controversial issues" policy, like the anti-bullying policy, is

viewpoint-neutral as required by the First Amendment.

III.   **NEITHER THE CONSTITUTION NOR THE HPSD POLICY PERMIT MCDOWELL'S PUNISHMENT OF GLOWACKI FOR EXPRESSING HIS OPINION ABOUT HOMOSEXUALITY.**

    A.   **Glowacki's nondisruptive expression of religious views in class is protected by the First Amendment and not curtailed by the HPSD policy.**

In contrast to the harassing conduct prohibited by the HPSD policy, Glowacki's

speech—although potentially offensive or controversial to some—is not restricted under

either the HPSD policy or the First Amendment.  As noted above, Section 2240 of the HPSD

policy provides that discussion of "[c]ontroversial issues . . . may be initiated by the students

themselves provided they are presented in the ordinary course of classroom instruction and

[the discussion] is not substantially disruptive to the educational setting."  HPSD Policies,

§2240 (2012).

In other words, on its face, the HPSD policy permits Glowacki's expression of his

beliefs about homosexuality, whether or not the acceptance of LGBT students is considered a

controversial stance.  As previously discussed, the policy prohibits only speech that is

"substantially disruptive" or that interferes with the rights of other students.

Similarly, the HPSD policy's criteria for emergency suspensions echo the *Tinker*

standard and did not permit McDowell's removal of Glowacki from the classroom for the

nondisruptive expression of his religious beliefs.  The suspension policy outlined in Section

5610 of the HPSD administrative guidelines states that for emergency suspensions not subject

to a prior hearing, "[a] student may be removed or excluded from a classroom or a school

when s/he poses a continuing danger to persons or property or represents an on-going threat

of disrupting the educational process taking place in the classroom."  HPSD Administrative

Guidelines, §5610 (2012).  This standard mirrors the "substantial disruption" prong of *Tinker*,

which has been interpreted by this Court to require "serious threat of imminent harm."

*Barber ex rel. Barber v. Dearborn Pub. Sch.*, 286 F. Supp. 2d 847, 850 (E.D. Mich. 2003) (Duggan, J.). This standard is not met if the speech merely prompts "one student's and one teacher's comments" in disapproving the speech. *Id.* at 856. In short, both the HPSD policy and judicial precedent set a high bar that an isolated and non-dangerous expression of a student's religious or moral beliefs simply does not meet.

### B.   McDowell's actions are inconsistent with the current HPSD policy.

The HPSD policy protect students' religious speech and require disclaimers in connection with teachers' presentation of their own views. McDowell, however, asked Glowacki to leave the classroom under threat of suspension after Glowacki expressed his religiously-based disapproval of homosexuality during a class discussion. Section 8800B of the HPSD administrative guidelines states that "[t]eachers and administrators also are prohibited from discouraging activity because of its religious content . . . ." HPSD Administrative Guidelines, § 8800B (2012).[18] Section 8800B also provides that "[s]tudents may express their beliefs about religion in the form of . . . oral assignments free of discrimination based on the religious content of their submissions." *Id.*

Additionally, Section 2240 of the HSPD policies allows the consideration of controversial issues in the classroom and specifies that "a teacher may express a personal opinion, but shall identify it as such, and must not express such an opinion for the purpose of persuading students to his/her point of view." HPSD Policies, §2240 (2012). McDowell's actions were inconsistent with the current HPSD policy because punishing Glowacki's speech by threatening suspension rather than recognizing the speech as legitimate classroom participation.

---

[18]    http://www.neola.com/howell-mi/ (last visited Nov. 29, 2012).

## CONCLUSION

For the foregoing reasons, *amici* respectfully urge this Court to reject any facial challenge to the HPSD policy, because the policy permissibly protects against substantial disruption of the educational environment without infringing upon students' First Amendment rights to freedom of expression. The plaintiff's First Amendment rights appear to have been violated in this particular case due to an individual teacher's misinterpretation or misapplication of the policy, but that does not make the policy itself unconstitutional. Indeed, anti-bullying policies such as that adopted by HPSD are a vital component of guaranteeing the rights of all students to learn in a safe and non-discriminatory environment.

Respectfully submitted,

/s/ Michael J. Steinberg
Michael J. Steinberg (P43085)
Kary L. Moss (P49759)
Daniel S. Korobkin (P72842)
Jay D. Kaplan (P38197)
American Civil Liberties Union
    Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814
msteinberg@aclumich.org


/s/ Rose Saxe
Rose Saxe*
Senior Staff Attorney
ACLU LGBT & AIDS Project
125 Broad Street, 18th Fl.
New York NY 10004
212.549.2605
rsaxe@aclu.org

*With assistance from Columbia Law School Sexuality and Gender Law Clinic students Helen Yoon, Rosie Wang, Matheus Oriolo and Michael Ruthenberg-Marshall.


DATED:   March 6, 2013

15

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I certify that a copy of the foregoing has been served by ordinary U.S. Mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

/s/ Brenda Bove_____
Brenda Bove

16