IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SANDRA GLOWACKI, on behalf of her minor children, D.K.G. and D.C.G.,<br><br>Plaintiffs,<br><br>v.<br><br>HOWELL PUBLIC SCHOOL DISTRICT, and JOHNSON ("JAY") MCDOWELL, individually and in his official capacity as a teacher in the Howell Public School District,<br><br>Defendants. | Case No. 2:11-cv-15481<br><br>Hon. Patrick J. Duggan<br><br>Mag. Judge David R. Grand |

## OPINION AND ORDER ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

This case highlights a tension that exists between public school anti-bullying policies and the First Amendment's guarantee of free speech. Far from being irreconcilable, however, this tension merely illustrates the well-established principle that public schools must endeavor to balance competing interests: public schools must strive to provide a safe atmosphere conducive to learning for all students while fostering an environment that tolerates the expression of different viewpoints, even if unpopular, so as to equip students with the tools necessary for participation in a democratic society. This delicate balancing act has led the Supreme Court of the United States to recognize that while the First Amendment undoubtedly applies to students in public schools, school officials have greater authority to regulate speech than government officials in other settings.

The events giving rise to this action occurred on October 20, 2010, a day that people around the nation recognized as "Anti-Bullying Day."  After an in-class exchange, a Howell High School teacher removed a student from class after the student made statements disapproving of homosexuality on religious grounds.  Plaintiffs – the student and his younger brother – filed this 42 U.S.C. § 1983 action against Defendants Howell Public School District and teacher Johnson ("Jay") McDowell asserting claims arising under the First Amendment's Free Speech Clause and the Fourteenth Amendment's Equal Protection Clause.  As relief, Plaintiffs pray for injunctive relief, a declaration that Defendants' actions violated the Constitution, nominal damages, and costs and fees.

After completing discovery, Plaintiffs and each Defendant separately filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.   The parties' cross motions for summary judgment are presently before the Court.  The Court has reviewed the briefs and evidence submitted by the parties and held a motion hearing on April 25, 2013.  For the reasons stated herein, the Court grants Defendant School District's Motion for Summary Judgment in its entirety, grants Plaintiffs' Motion with respect to the removed student's First Amendment claim against Defendant McDowell but denies Plaintiffs' Motion in all other respects, and denies Defendant McDowell's Motion with respect to removed student's First Amendment claim against him but grants McDowell's Motion in all other respects.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

**A.      The Parties**

Plaintiff Daniel Glowacki[1] was, at the time of the events giving rise to this action, a junior at Howell High School.[2]  Plaintiff Sandra Glowacki is Daniel's mother.  Ms. Glowacki also has a minor son, Plaintiff D.C.G.  D.C.G., who was a freshman at Howell High School during the 2010-2011 school year, still attends the school.  Plaintiff D.C.G. files this case through Ms. Glowacki, his next of friend.

Defendant Howell Public School District (hereinafter "School District") is a Michigan public school district.  Howell High School is operated by and located within the School District.  Defendant McDowell was and remains a teacher at Howell High.  During the 2010-2011 academic year, McDowell taught Daniel's sixth hour economics class.

**B.      Background Events**

Members of the Howell High School Gay Straight Alliance wanted to participate in a national campaign aimed at raising awareness of the bullying of gay, lesbian, bisexual, and transgendered youth on October 20, 2010.  As such, the student group submitted a flyer its members hoped to post around the high school with information about Anti-Bullying Day to Principal Aaron Moran.  The flyer, which was ultimately approved and placed throughout the school, identified October 20, 2010 as Anti-Bullying

---

[1] At the time this suit was brought, Daniel was a minor and the suit was brought on his behalf by his mother.  Since that time, Daniel has reached the age of majority and is therefore substituted for his mother as a plaintiff.

[2] Daniel graduated from Howell High School in 2012.

3

Day and asked students and teachers to wear the color purple in recognition of the day.[3]

Other than approving the posting of the flyer, the school did not sanction activities or

events in connection with Anti-Bullying Day.[4]  (Moran Dep., Pls.' Mot. Summ. J. Ex. 7,

at 50-52, 54:11-55:17, 55:18-23.)

Wendy Hiller, a high school teacher with no policymaking responsibilities,

independently printed purple t-shirts for Anti-Bullying Day.  Having been moved by the

well-publicized September 22, 2010 suicide of Tyler Clementi, a Rutgers student whose

roommate allegedly live-streamed video of Clementi engaging in a non-sexual

---

[3] Anti-Bullying Day is alternatively referred to as "Spirit Day."  Plaintiffs contend that "Spirit Day is a day in which activists exploit the tragic suicidal deaths of homosexual teenagers to promote acceptance of homosexuality in the public schools." (Compl. ¶ 26.)  "On Spirit Day, people who support the acceptance of homosexuality wear the color purple because[ it] symbolizes 'spirit' on the rainbow flag, a symbol for LGBT Pride[.]"  (*Id.* ¶ 27.)

[4] Plaintiffs repeatedly insinuate that Howell High School called upon students to support the homosexual lifestyle.  (*See, e.g.*, Pls.' Br. in Supp. of Pls.' Mot. Summ. J. 1 ("This case presents the same issues decided by [Chief] Judge Rosen in 2003, where[,] as here – the Court examined '. . . the ironic, and unfortunate, paradox of a public high school celebrating diversity by refusing to permit the presentation to students of an unwelcomed viewpoint on the topic of homosexuality and religion, while actively promoting the competing view.'") (quoting *Hansen v. Ann Arbor Pub. Schs.*, 293 F. Supp. 2d 780, 782 (E.D. Mich. 2003) (internal quotation marks omitted).)  The Court notes that the notion the school somehow embraced or endorsed homosexuality refers to the fact that the school allowed the Gay Straight Alliance to post the Anti-Bullying Day flyers around the school.

The Court also takes this opportunity to note that despite Plaintiffs' attempt to cast this case as indistinguishable from *Hansen*, *Hansen* was a "school-sponsored" speech case governed by a distinct line of Supreme Court precedent and a different standard of scrutiny than the pure student speech at issue here.  *Hansen*, 293 F. Supp. 2d at 795 (indicating that the case is properly analyzed pursuant to the "school-sponsored" speech cases, specifically *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S. Ct. 562 (1988)).  For more on this distinction, see note 7, *infra*.

4

homosexual encounter, Hiller printed purple t-shirts with the slogan "Tyler's Army" on the front and "Fighting Evil with Kindness" on the back.[5]  (Hiller Dep., Sch. Dist.'s Mot. Summ. J. Ex. 6, at 9:1-3, 9:10-14.)  Hiller thought that the t-shirts aligned nicely with Anti-Bullying Day, explaining that the Clementi tragedy was "not . . . really about[]" homosexuality, but "was really about bullying[.]"  (*Id.* at 13:23-25.)  Because the t-shirts were intended only to make a statement against bullying, Hiller did not consider the shirts controversial.  (*Id.* at 16:11-13.)  She sold some t-shirts at cost to students and teachers who asked for them.  (*Id.* at 14.)  Principal Moran was not aware of the Tyler's Army t-shirts until after the events giving rise to this action took place.  (Moran Dep., Pls.' Mot. Summ. J. Ex. 7, at 53:1-5.)

## C.    Events Giving Rise to the Instant Action

McDowell wore a purple Tyler's Army t-shirt to school on Anti-Bullying Day.  (McDowell Dep., Sch. Dist.'s Mot. Summ. J. Ex. 7, at 145:24-146:1.)   Before proceeding with his lesson plans that day, McDowell engaged his students in a brief discussion about bullying and showed a short video about an individual who committed suicide as a result of being bullied due to his sexual orientation. (*Id.* at 148:12-14, 144:16-21.)  This presentation caused no problems until McDowell's sixth hour class.  (*Id.* at 144:22-25.)

As students began filtering into McDowell's economics class, McDowell noticed a female student wearing a Confederate flag belt buckle and asked that she remove it.  (*Id.*

_____

[5] Prior to Anti-Bullying Day, Hiller had the same slogans printed on a black t-shirt and wore the shirt to school.  (Hiller Dep., Sch. Dist.'s Mot. Summ. J. Ex. 6, at 9:1-14.)

at 149:12-20.)  Daniel, who arrived to class a "little late," witnessed this interaction. (Daniel Dep., Pls.' Mot. Summ. J. Ex. 1, at 58:9-11.)  From this point forward, the events in question become muddled as the participants and witnesses have different versions.

During his deposition, Daniel testified that after the student removed her belt buckle, class began and McDowell "started to explain about Tyler's Army, his purple shirt, what it represented and what it meant." (*Id.* at 58:14-15.)  At this time, Daniel "calmly raised [his] hand" and asked McDowell why the female student could not wear a Confederate flag belt when students and teachers could wear purple shirts and display rainbow flags. (*Id.* at 58:16-19; McDowell Dep., McDowell's Mot. Summ. J. Ex B, at 153:23-24.)  McDowell responded by explaining "the difference in symbolism between the Confederate flag and the rainbow flag." (McDowell Dep., McDowell's Mot. Summ. J. Ex B, at 154:1-2.)  According to Daniel, this explanation included statements "that the [C]onfederate flag represented [the] hanging and slashing of [African Americans], [] that it wasn't allowed in his classroom[,] [a]nd that it was discrimination against blacks[.]" (Daniel Dep., Pls.' Mot. Summ. J. Ex. 1, at 58:21-24.)  Daniel then apparently voiced his concern that the purple shirts discriminated against Catholics.[6] (*Id.* at 58:24-59:1.)

McDowell testified that after providing the symbolism explanation Daniel said "I don't accept gays." (McDowell Dep., McDowell's Mot. Summ. J. Ex B, at 154:16.) According to McDowell, he told Daniel that he could not say that in class, to which Daniel responded "I don't accept gays because I'm Catholic." (*Id.* at 154:23-155:2.)  In a

---

[6] The Court uses the modifier "apparently" because the affidavits of two student-witnesses relied upon by Plaintiffs make no mention of this.

written statement concerning what transpired in his classroom, McDowell indicated that he conveyed to Daniel that it was fine if Daniel's religion was opposed to homosexuality but that saying such things was inappropriate in a classroom setting. (McDowell Statement, Pls.' Mot. Summ. J. Ex. 5.) McDowell admits that he became emotional during this discussion but tried to illustrate the statement's inappropriate nature by analogy. (*Id.*) McDowell explained that one cannot say "I don't accept gays" any more than one can say "I don't accept blacks." (*Id.*) McDowell "then asked [Daniel] if he accepted gays or not. [Daniel] said he did not." (*Id.*) At this point, "[McDowell] threw [Daniel] out of class and wrote up a referral for unacceptable behavior." (*Id.*) At this point, another student asked, "I don't accept gays either[,] can I leave[?]" (*Id.*) McDowell said yes. (*Id.*)

In a slightly modified version of events, Plaintiffs rely on the affidavits of two students in the classroom. Danielle Kollath's affidavit indicates that "[a]s Mr. McDowell was getting ready to show the movie clip on anti-bullying, Daniel [] raised his hand and said that it was against his religion to accept gays." (Kollath Aff., Pls.' Mot. Summ. J. Ex. 3, at 2.) Then, "Mr. McDowell told Daniel that if he did not accept gays to get out of his class." (*Id.*) Brandon Szuch's affidavit explains that after "Mr. McDowell started talking about gay rights and how gays are discriminated against[,] Dan [] said it was against his religion to be gay." (Szuch Aff., Pls.' Mot. Summ. J. Ex. 2, at 1.) After Daniel said this, "Mr. McDowell looked at him and asked if he supported gays. Dan said no, it was against his religion." (*Id.*)

After Daniel and the other student departed, those remaining in the classroom asked "why [McDowell] had thrown them out and why didn't they have free speech." (McDowell Statement, Pls.' Mot. Summ. J. Ex. 5.)  McDowell "explained that a student cannot voice an opinion that creates an uncomfortable learning environment for another student."  (*Id.*)

As a result of the above-described interaction, the School District conducted an investigation.  Although Daniel was removed from class, all record of any discipline was removed from Daniel's file and he was placed in another economics class by parental request.  The School District did, however, issue McDowell a reprimand.  The written reprimand provided that McDowell "disciplined two students for holding and stating personal beliefs, to which you disagree.  You disciplined them in anger under the guise of *harassment* and *bullying* because you opposed their religious belief and were offended by it.  The students were causing no disruption to the educational process."  (10/25/2010 Memo., Pls.' Mot. Summ J. Ex. 11, at 1 (emphasis in original).)  The reprimand further indicated that McDowell "discipline[d] two students who told you that they do not accept gays due to their religion.  After a failure of getting one student to recant, you engaged in an unsupported snap suspension, rather than allow the student his beliefs."  (*Id.* at 2.)  The reprimand opined that McDowell "modeled oppression and intolerance of student opinion . . . This could be construed as teacher-to-student bullying; ironic of the Anti-Bullying Day intent."  (*Id.*)  The School District suspended McDowell for one day without pay and ordered McDowell to participate in First Amendment training.  (*Id.*)  After McDowell filed a grievance, the School District reduced the sanctions and replaced

8

the initial reprimand with a far tamer one.  The replacement provided: "You are receiving a written reprimand after an investigation into an incident that occurred in your classroom substantiated that you displayed a serious lack of professionalism when you slammed your door, raised your voice and attempted to discipline students for their beliefs.  These actions were in violation of District policies and guidelines."  (10/25/2010 Letter, Pls.' Mot. Summ. J. Ex. 12.)

D.     **Plaintiffs' Complaint**

On December 14, 2011, Plaintiffs instituted this action against the Howell Public School District and Jay McDowell, sued in his individual and official capacities, pursuant to 42 U.S.C. §§ 1983 and 1988 for Defendants' violation of Plaintiffs' rights under the First and Fourteenth Amendments.  Specifically, Daniel alleges Defendants violated his rights to freedom of speech and equal protection while D.C.G. asserts that the events giving rise to his brother's claims have chilled the exercise of his First Amendment rights.  (Compl. ¶¶ 67-69, 77-84, 70.)  Plaintiffs seek injunctive relief, a declaration that Defendants acted unconstitutionally, nominal damages, and costs and fees.

On November 15, 2012, after having completed discovery, Plaintiffs and each Defendant separately filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  On November 30, 2012, the American Civil Liberties Union and the American Civil Liberties Union Fund of Michigan (collectively, the "ACLU") filed a Motion for Leave to File *Amicus Curiae* Brief, which this Court granted in an Opinion and Order dated March 5, 2013.  This matter is presently before the Court on the parties' cross motions for summary judgment.

9

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2012).  A court assessing the appropriateness of summary judgment asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distributors Benefits Ass'n v. Northfield Ins. Co*., 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986)).

The initial burden of proving the absence of a genuine dispute rests with the movant, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986), who "must support the assertion by: (A) citing to particular parts of materials in the record…; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact[,]" Fed. R. Civ. P. 56(c)(1)(A)-(B).   While this inquiry requires the Court to construe factual disputes, and the inferences there from, in the light most favorable to the non-moving party, only disputes over facts that might affect the outcome of the suit preclude the entry of summary judgment.  *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

If the moving party discharges their initial burden using the materials specified in Federal Rule of Civil Procedure 56(c), the burden of defeating summary judgment shifts to the non-movant who must point to specific material facts – beyond the pleadings or

10

mere allegation – which give rise to a genuine issue of law for trial.  *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2514.  A mere scintilla of evidence supporting the non-movant's claim will not prevent summary judgment; rather, there must be evidence on which a jury could reasonably find for the non-movant.  *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011).

Moreover, if, "after adequate time for discovery and upon motion," the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial[,]" a court should enter summary judgment in favor of the moving party.  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.  When this occurs, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* 477 U.S. at 323, 106 S. Ct. at 2552.  Thus, if the non-movant does not support the elements of a claim or defense, the moving party is "entitled to judgment as a matter of law."

Courts evaluate cross motions for summary judgment under the same standard.  *La Quinta Corp. v. Heartland Props., L.L.C.*, 603 F.3d 327, 335 (6th Cir. 2010) (citing *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004)).  When faced with cross motions for summary judgment, each motion is examined on its own merits.  *Id.*

### III.   ANALYSIS

In light of the various claims asserted in the instant action and the necessity of determining whether a constitutional injury was visited upon Plaintiffs before reaching the issues of qualified immunity and municipal liability, the Court analyzes the First

Amendment claims against McDowell before addressing whether qualified immunity is available as a defense and whether the School District should be held to account for any constitutional violation.  Plaintiffs' claims arising under the Fourteenth Amendment's Equal Protection Clause are addressed last.

## A.   FIRST AMENDMENT CLAIMS

## 1.   Applicable Standard

The First Amendment embodies a national commitment to "robust political debate[,]" *Hustler Magazine v. Falwell*, 485 U.S. 46, 51, 108 S. Ct. 876, 879 (1988), providing, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I.  The First Amendment has been incorporated and therefore applies to the States by virtue of the Fourteenth Amendment's Due Process Clause.  *See, e.g.*, *Gitlow v. New York*, 268 U.S. 652, 666, 45 S. Ct. 625, 630 (1925) (assuming that "freedom of speech . . . - which [is] protected by the First Amendment from abridgment by Congress – [is] among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States").

As the Seventh Circuit has explained, "a rule which forbids any class of remarks, however narrowly defined and whatever the justification, [abridges] free speech.  But that observation is the beginning of the constitutional analysis, not the end."  *Nuxoll v. Indiana Prairie Sch. Dist. No. 204*, 523 F.3d 668, 674 (7th Cir. 2008).   Thus, while the First Amendment's text appears absolute, "[t]he number of restrictions on freedom of speech that have survived constitutional challenge is legion."  *Id.*  The answer to whether

12

a particular speech restriction abridges free speech regularly turns on the nature of the forum in which an individual speaks. *Hansen v. Ann Arbor Pub. Schs.*, 293 F. Supp. 2d 780, 792-93 (E.D. Mich. 2003) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800, 105 S. Ct. 3439, 3448 (1985)). This is because the nature of the forum dictates the standard courts apply in evaluating whether a speech regulation survives legal scrutiny.

In this case, the speech occurred within the confines of a public high school classroom. Surely, "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Morse v. Frederick*, 551 U.S. 393, 396, 127 S. Ct. 2618, 2621 (2007) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 89 S. Ct. 733, 736 (1969)). Notwithstanding this bold declaration, the Supreme Court has clearly explained that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S. Ct. 3159, 3164 (1986). Instead, the constitutional rights of students "must be 'applied in light of the special characteristics of the school environment[.]'" *Morse*, 551 U.S. at 397, 127 S. Ct. at 2621 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S. Ct. 562, 567 (1988) (quoting *Tinker*, 393 U.S. at 506, 89 S. Ct. at 736)).

When it comes to pure student speech, such as the speech at issue here, *Tinker* provides the framework for assessing whether a particular speech restriction comports

13

with the constitutional guarantee of free speech.[7]   Pursuant to *Tinker*, public schools possess authority to regulate student expression when speech "substantial[ly] disrupt[s]" school activities or "impinge[s] upon the rights of other students." [8]  *Tinker*, 393 U.S. at 514, 89 S. Ct. at 740.  In determining whether a regulation interferes with the rights of other students, courts must ensure that school officials target truly harassing speech, not mere expressions of unpopular opinions, and the policies must not discriminate on the basis of student viewpoints.  *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391, 112 S. Ct. 2538, 2547 (1992) ("The First Amendment does not permit [state actors] to impose special prohibitions on those speakers who express views on disfavored subjects."); *Nuxoll*, 523 F.3d at 676 (Rovner, J., concurring) ("*Tinker* straight-forwardly tells us that, in order for school officials to justify prohibition of a particular expression of opinion, they must be able to show that this 'action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'") (quoting *Tinker*, 393 U.S. at 509, 89 S. Ct. at 738).

---

[7] During the motion hearing, the School District's counsel suggested that this case would be more appropriately analyzed under *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S. Ct. 562 (1988).  *Kuhlmeier* involved a high school principal's decision to excise two pages from a student newspaper published in connection with a journalism class.  The Court distinguished *Kuhlmeier* from *Tinker* explaining that *Tinker* addressed pure student speech whereas *Kuhlmeier* involved students' expressive activities in a school-sponsored forum.  *Id.*, 404 U.S. at 270-71, 108 S. Ct. at 569-70.  When student speech is or appears to be sponsored or endorsed by the school, school officials have more authority to regulate that speech.  *Id.*, 404 U.S. at 271, 108 S. Ct. at 570.  The speech at issue in this case does not fall within the category of school-sponsored speech and *Kuhmeier* is therefore inapplicable.

[8] While not relevant to the instant dispute, schools may also restrict student "speech that can reasonably be regarded as encouraging illegal drug use."  *Morse v. Frederick*, 551 U.S. 393, 397, 127 S. Ct. 2618, 2622 (2007).

**2.      Did McDowell Violate Daniel's First Amendment Rights?**

*a.      Was Daniel's Speech Protected?*

As explained immediately above, school authorities may regulate student speech if it "impinge[s] upon the rights of other students[]" or "substantial[ly] disrupt[s]" school activities. *Tinker*, 393 U.S. at 514, 89 S. Ct. at 740.  The Court finds that Daniel's comments did neither and that his Anti-Bullying Day speech was therefore protected by the First Amendment's Free Speech Clause.

*i.      Impinging upon the Rights of Other Students*

McDowell argues that Daniel's speech was not protected because Daniel's statement "I don't accept gays" was a "bullying statement[]" that intruded upon the rights of at least one homosexual student in his classroom.[9]  (McDowell's Br. in Supp. of McDowell's Mot. Summ. J. 5-7; McDowell Dep., McDowell's Mot. Summ. J. Ex. B, at 80:9-12 ("In my opinion, Daniel Glowacki saying 'I do not accept gays' would cause students to possibly fear for their personal safety and definitely falls under personal degradation to not accept a group of people.").)  It intruded upon at least one student's rights because McDowell "suspected there were gay students in the classroom[,]" "felt [Daniel]'s statement was a form of threat to the other students[,]" interpreted Daniel's speech to constitute "a bullying remark[,]" and because "[o]ther students felt upset by the comment made by [Daniel.]"  (*Id.* at 8 (citing deposition testimony).)

_____

[9] McDowell also contends that the speech was not protected because "[P]laintiff did not insert 'religion' into the discussion until after he made the bullying statement." (McDowell's Br. in Supp. of McDowell's Mot. Summ. J. 6.)  The Court finds this line of argument unpersuasive as student speech is protected regardless of whether or not such speech is religiously motivated.

15

While the Court certainly recognizes that schools are empowered to regulate speech to prevent students from invading the rights of other students, "people do not have a legal right to prevent criticism of their beliefs or for that matter their way of life." *Nuxoll*, 523 F.3d at 672 (citing *R.A.V.*, 505 U.S. at 394, 112 S. Ct. at 2549 and *Boos v. Barry*, 485 U.S. 312, 321, 108 S. Ct. 1157, 1163-64 (1988)). Relatedly, a "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 550 U.S. 123, 134, 112 S. Ct. 2395, 2404 (1992) (citations omitted). While a student or perhaps several students may have been upset or offended by Daniel's remarks, "*Tinker* straight-forwardly tells us that, in order for school officials to justify prohibition of a particular expression of opinion, they must be able to show that this 'action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *Nuxoll*, 523 F.3d at 676 (Rovner, J., concurring) (quoting *Tinker*, 393 U.S. at 509, 89 S. Ct. at 739). Simply put, the law does "not establish a generalized 'hurt feelings' defense to a high school's violation of the First Amendment rights of its students[.]" *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 877 (7th Cir. 2011).

Perhaps recognizing the thin reed on which his impinging upon the rights of others argument hangs, McDowell attempts to distinguish a district court case which held that a student's anti-gay t-shirt did not impinge upon the rights of other students by suggesting that if the words had been spoken as opposed to merely written on a t-shirt, the outcome would have been different. (McDowell's Br. in Supp. of McDowell's Mot. Summ. J. 7 (discussing *Nixon v. N. Local Sch. Dist. Bd. of Educ.*, 383 F. Supp. 2d. 965, 974 (S.D.

16

Ohio 2005).)  The Court is not persuaded.  The Court does not believe that Daniel's comments, addressed as they were to McDowell during a classroom discussion initiated by McDowell, impinged upon the rights of any individual student.  In fact, as in *Nixon*, McDowell "point[s] to no authority interpreting what 'invasion on the rights of others' really entails."  383 F. Supp. 2d. at 974.  Language from *Tinker* implies that some sort of threat or direct confrontation is a necessary predicate.  In holding that students had a right to wear black armbands as a sign of protest against the hostilities in Vietnam, the *Tinker* Court explained there was "no evidence . . ., actual or nascent, . . . of collision with the rights of other students *to be secure and to be let alone*."  *Tinker*, 393 U.S. at 508, 89 S. Ct. at 738 (emphasis added).

There is no indication from the evidence here that the negative comments Daniel made about homosexuality threatened, named, or targeted a particular individual or, for that matter, that Daniel even knew that there was a homosexual student in his economics class.  (McDowell Dep., McDowell's Mot. Summ. J. Ex. B, at 80:13-17.)  Given that the speech did not identify particular students for attack but simply expressed a general opinion – albeit one that some may have found offensive – on the topic of homosexuality, the Court finds that Daniel's expressive conduct did not impinge upon the rights of other students.  *See generally* Emily G. Waldman, *A Post-Morse Framework for Students' Potentially Hurtful Speech (Religious and Otherwise)*, 37 J.L & Educ. 463, 468-69, 499-503 (2008) (suggesting a framework for analyzing potentially hurtful student speech by asking whether the speech was directed at a particular individual, and if not, assessing the impact of such speech on the educational performance of students hearing the speech).

17

*ii.*     *Substantial Disruption*

The Court is also not persuaded by McDowell's argument that Daniel's speech was unprotected because it caused a substantial disruption.  (McDowell's Br. in Supp. of McDowell's Mot. Summ. J. 10.)  While legal authority suggests that "[s]chool authorities are entitled to exercise discretion in determining when student speech crosses the line between hurt feelings and substantial disruption of the educational mission, because they have relevant knowledge of and responsibility for the consequences[,]" *Zamecnik*, 636 F.3d at 877-78, McDowell made an inaccurate assessment of whether Daniel's speech crossed that line.

McDowell offers two pieces of evidence in support of this substantial disruption argument: (1) Daniel apologized for disrupting class the day after the incident; and (2) "another student believed he could get out of class also by joining the plaintiff's opinion."  (McDowell's Br. in Supp. of McDowell's Mot. Summ. J. 10.)  Even assuming this evidence shows that Daniel's remarks caused a disruption, *Tinker* requires a material and substantial disruption with school activities.  393 U.S. at 514, 509, 89 S. Ct. at 740, 738.  A material and substantial disruption "might include a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school[.]"  *Zamecnik*, 636 F.3d at 876. There is simply no evidence that a disruption of this magnitude occurred.

Having rejected both of McDowell's arguments, the Court finds that Daniel engaged in protected conduct under the First Amendment.

**b.**     ***Did a First Amendment Violation Occur?***

In light of the finding that Daniel's speech was protected, the Court further finds that McDowell engaged in impermissible viewpoint-based discrimination and therefore violated Daniel's First Amendment rights.

"[V]iewpoint-specific speech restrictions are an egregious violation of the First Amendment." *Castorina v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 540 (6th Cir. 2001) (citing *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829, 115 S. Ct. 2510, 2516 (1995) and *R.A.V*, 505 U.S. at 391, 112 S. Ct. at 2547).  Viewpoint-based restrictions are also antithetical to the educational mission of public high schools.  As emphasized by the *Tinker* Court and other courts, "students benefit when school officials provide an environment where they can openly express their diverging viewpoints and when they learn to tolerate the opinions of others."  *Barber v. Dearborn Pub. Schs.*, 286 F. Supp. 2d 847, 858 (E.D. Mich. 2003); *see also id.* ("It is incumbent upon the school, the parents, the students, and the community . . . to work together so that divergent viewpoints, whether they may be political, religious, or social, may be expressed in a civilized and respectful manner.")  (quoting *Chambers v. Babbitt*, 145 F. Supp. 2d 1068, 1073 (D. Minn. 2001).  Certainly, "[m]aintaining a school community of tolerance includes the tolerance of even the most intolerant or disagreeable viewpoints." *Chambers*, 145 F. Supp. 2d at 1073.

McDowell admitted to reacting emotionally upon hearing Daniel utter the words "I don't accept gays."  (McDowell Statement, Pls.' Mot. Summ. J. Ex. 5.)  McDowell further admitted that he "threw" Daniel out of class after Daniel responded to McDowell's question of whether or not he accepted gays in the negative.  (*Id.*)

19

Moreover, McDowell permitted a second student to leave class when that student indicated that he also did not support homosexuality. (*Id.*) This evidence, when coupled with the lack of evidentiary support for McDowell's arguments that Daniel impinged upon the rights of other students and caused a substantial disruption, supports the contention that McDowell's decision to remove Daniel from the classroom was primarily motivated by his disagreement with Daniel's opinion on homosexuality. "When the government targets not the subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829, 115 S. Ct. at 2516. Accordingly, the Court finds that McDowell violated Daniel's First Amendment rights.

### 3.      Is McDowell Entitled to Qualified Immunity?

McDowell argues that he is entitled to qualified immunity with respect to his decision to remove Daniel from class. (McDowell's Br. in Supp. of McDowell's Mot. Summ. J. 5.) Plaintiffs predictably disagree. Prior to engaging in a qualified immunity analysis, the Court finds it necessary to address certain arguments made by the parties.

### a.      *Individual-Capacity and Official- Capacity Actions*

Plaintiffs argue that because McDowell is sued in his official capacity, qualified immunity does not apply. (Pls.' Resp. to McDowell's Mot. Summ. J. 10.) Plaintiffs seemingly ignore that they named McDowell as a defendant in both his individual and official capacities. Plaintiffs' arguments suggest that they misapprehend the distinction between official- and individual-capacity actions.

Qualified immunity protects officials from monetary damages in their individual capacities only and cannot be the basis for dismissal of an official capacity suit.  *See, e.g.*, *Garcia v. Dykstra*, 260 F. App'x 887, 895 (6th Cir. 2008).  Thus, to the extent McDowell is sued in his official capacity, Plaintiffs are correct that qualified immunity does not apply.  (Pls.' Resp. to McDowell's Mot. Summ. J. 10.)  What Plaintiffs fail to recognize, however, is that naming McDowell in his official capacity is redundant in a suit that also names the School District as a defendant.  *See, e.g.*, *Briner v. City of Ontario*, 370 F. App'x 682, 699 (6th Cir. 2010) ("An official capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (internal quotation marks and alterations omitted); *Moore v. City of Harriman*, 272 F.3d 769, 776 (6th Cir. 2001) (en banc) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office . . . as such, it is no different from a suit against the State itself.") (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989)).  Because the claims against McDowell in his official capacity are in actuality claims against Defendant School District, the Court dismisses McDowell from this suit in his official capacity.  *Faith Baptist Church v. Waterford Twp.*, No. 10-1406, 2013 U.S. App. LEXIS 7434, at *14 (6th Cir. Apr. 11, 2013) (unpublished) (explaining that the district court properly dismissed the official-capacity suit against a township's prosecuting attorney because the township, the real party in interest, was already a defendant in the lawsuit).

**b.      *Monetary Relief and Equitable Remedies***

An official's qualified immunity does not preclude injunctive or declaratory relief. *See Smith v. Leis*, 407 F. App'x 918, 930 (6th Cir. 2011) ("[A] court could award both declaratory and injunctive relief in an action against a defendant protected by qualified immunity."); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996) ("[I]mmunity only precludes claims for monetary damages against officials in their individual capacities, and not claims for injunctive or declaratory relief."). Because McDowell remains in this action in his individual capacity, he may assert a qualified immunity defense with respect to any monetary damages Plaintiffs seek from him.

**c.      *Qualified Immunity Analysis***

The doctrine of qualified immunity shields "government officials performing discretionary functions [] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would know." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). For many years, courts followed a sequential approach, holding that a "defendant enjoys qualified immunity on summary judgment unless the facts alleged and evidence produced, when viewed in the light most favorable to plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010) (citations and internal quotation marks omitted). Subsequent to the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223, 227, 129 S. Ct. 808, 813 (2009), courts no longer must address these sequentially. Rather, courts may exercise their discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed

22

first in light of the circumstances of the particular case at hand." *Jefferson*, 594 F.3d at 460 (citing *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818).

The Court has already engaged in the first inquiry, finding that McDowell violated Daniel's First Amendment rights. The Court must now inquire as to whether the constitutional right in question was clearly established. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 263 (6th Cir. 2006). In order to assert a violation of a "clearly established" right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987). In other words, "in light of the pre-existing law the unlawfulness must be apparent." *Id.* The Court utilizes an "objective reasonableness" standard to determine whether a government official would believe that a right is clearly established. *Sandul v. Larion*, 119 F.3d 1250, 1254 (6th Cir. 1997) (citation omitted). This test "focuses on whether an official, given the facts that the official knew or reasonably should have known about the situation, should have known that his [] particular conduct would not pass scrutiny when applied to the law." *Id.* (quotation omitted).

Plaintiffs argue that Daniel's "right to engage in expression of speech and religious viewpoint to respond to a teacher's inquiry was clearly established on October[] 20, 2010." (Pls.' Resp. to McDowell's Mot. Summ. J. 10 (citations omitted).) McDowell argues that a reasonable person would not have known that the conduct at issue would violate Daniel's First Amendment rights. (McDowell's Br. in Supp. of McDowell's Mot. Summ. J. 7.) In support of this position, McDowell points to the following facts: (1) he

23

received no First Amendment training but had received training on preventing bullying; (2) he felt he was losing control of the classroom; (3) he interpreted Daniel's comments to be threatening and derogatory bullying remarks, particularly since there was at least one homosexual student in the classroom; and (4) that the intersection between student free speech rights and anti-harassment policies is complicated. (*Id.* at 8 (citing deposition testimony).)

As the authorities cited in this Opinion and Order demonstrate, there can be no serious question that Daniel's free speech rights were the subject of well-known and well-developed law on October 20, 2010. *Tinker*, decided in 1969, clearly delineates the point at which school officials may intercede upon student speech. Applying the objective reasonableness standard, a reasonable teacher should have known that the words spoken by Daniel amounted to protected speech. That McDowell subjectively believed Daniel's remarks interfered with the rights of other students and were substantially disruptive does not make it so. As a reasonable teacher, McDowell should have known that Daniel's protected speech could not serve as the basis for discipline or as the basis for believing a School District policy was violated. *Cf. Sandul*, 119 F.3d at 1256 (holding that a police officer could not have had probable cause that an individual violated the city's disorderly conduct ordinances because his actions were protected by the First Amendment).

With respect to McDowell's position that qualified immunity is appropriate because of the tension between pure student speech rights and anti-bullying policies, the Court notes that public officials are expected to be aware of the state of clearly

24

established law governing their conduct.  In this vein, the Sixth Circuit has indicated that "state employees may not rely on their ignorance of even the most esoteric aspects of the law to deny individuals their [constitutional] rights."  *Sandul*, 119 F.3d at 1256 (citations and internal quotation marks omitted) (alteration in original).

In sum, because the undisputed material facts establish that McDowell should have understood that his conduct was unlawful, he is not entitled to qualified immunity with respect to Plaintiffs' request for nominal damages.

**4.     Is the School District Liable for the Constitutional Injury?**

*a.     Constitutional Challenge to School District Policies*

In seeking summary judgment, Plaintiffs argue that the "School District's free speech restriction[,] both facially and as applied[10] to [Daniel]'s expressive conduct on October 20, 2010," violated Daniel's rights pursuant to the Free Speech Clause of the First Amendment.  (Pls.' Br. in Supp. of Pls.' Mot. Summ. J. 17.)  Plaintiffs further contend that "the School District's free speech restriction has a chilling effect on Plaintiff D.C.G.'s free speech rights."  (*Id.*)

The Plaintiffs' reference to the School District's "free speech restriction" appears to refer to two policies both of which permit the restriction of speech when it rises to the level of bullying.  School anti-bullying policies highlight "the very real tension between anti-harassment laws and the Constitution's guarantee of freedom of speech."  *Zamecnik*, 636 F.3d at 877 (quoting *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 209 (3d

---

[10] At the motion hearing, Plaintiffs' counsel acknowledged that the "as applied" challenge is better understood as a *Monell* claim.  As such, the Court does not address the "as applied" challenge.

Cir. 2001)).  In spite of this tension, student speech may be regulated if it comports with *Tinker*.  Thus, well-crafted anti-bullying policies are constitutionally permissible when they focus on preventing either substantial disruption of school activities or interference with the rights of other students.  (ACLU Br. 9-10); *see also Zamecnik*, 636 F.3d at 877 (school policies banning harassing speech comport with *Tinker*'s substantial disruption standard as "[s]evere harassment . . . blends insensibly into bullying, intimidation, and provocation, which can cause serious disruption of the decorum and peaceable atmosphere of an institution dedicated to the education of youth").  School policies may ban harassing speech in anticipation of disruption, even if disruptive events have not yet occurred, because "*Tinker* does not require certainty, only that the forecast of substantial disruption be reasonable."  *Lowery v. Euverard*, 497 F.3d 584, 592 (6th Cir. 2007).

Distilling these legal principles, it may be stated that in order to survive scrutiny under *Tinker*, school policies restricting student speech must target truly harassing speech, not mere expressions of unpopular opinions, and the policies must not discriminate on the basis of student viewpoints.  *See, e.g.*, *R.A.V.*, 505 U.S. at 391, 112 S. Ct. at 2547 ("The First Amendment does not permit [state actors] to impose special prohibitions on those speakers who express views on disfavored subjects."); *Nuxoll*, 523 F.3d at 676 (Rovner, J., concurring) ("[I]n order for school officials to justify prohibition of a particular expression of opinion, they must be able to show that this 'action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'") (quoting *Tinker*, 393 U.S. at 509, 89 S. Ct. at 738).

26

i.    *Facial Challenge*

Plaintiffs contend that the School District's "policy and practice is to intercede upon student speech." (Pls.' Reply to Pls.' Mot. Summ. J. 3.) It appears as though Plaintiffs challenge the constitutionality of Howell Public Schools Administrative Guideline 8800B, entitled "Religious Expression in the District," (hereinafter "Religious Expression Policy"). (Religious Expression Policy, Sch. Dist.'s Resp. to Pls.' Mot. for Summ. J. Ex. 1.) While not entirely clear despite the multiple pleadings filed in this suit, Plaintiffs also appear to challenge Howell Public Schools Bylaws & Policies § 5517.01, entitled "Bullying and Other Aggressive Behavior toward Students" (hereinafter "Anti-Bullying Policy"). (Anti-Bullying Policy, Sch. Dist.'s Resp. to Pls.' Mot. for Summ. J. Ex. 2.) These two policies restrict student speech insofar as they purport to permit teachers to stop speech that may be construed as bullying.

Plaintiffs have plucked one sentence from the Religious Expression Policy as evidence of its unconstitutionality; the sentence provides: "School officials . . . should intercede to stop student speech that constitutes harassment aimed at a student or a group of students." (Religious Expression Policy, Sch. Dist.'s Resp. to Pls.' Mot. Summ. J. Ex. 1.) Placing this "speech restriction" into context, however, it is clear that the School District's policy is valid. The policy discusses the importance of the expression of ideas, whether political or religious, and emphasizes that schools "may not structure or administer [] rules to discriminate against religious activity or speech." (*Id.*)

The Anti-Bullying Policy similarly evidences the School District's respect of its students' First Amendment rights. It provides:

27

> This policy is not intended to and should not be interpreted to interfere with legitimate free speech rights of any individual. However, the District reserves the right and responsibility to maintain a safe environment for students, conducive to learning and other legitimate objectives of the school program.

(Anti-Bullying Policy, Sch. Dist.'s Resp. to Pls.' Mot. Summ. J. Ex. 2, at 1.)  The Anti-Bullying Policy defines bullying in terms that mirror the threshold at which *Tinker* held that student speech may be restricted.  Bullying is conduct that "is intended or that a reasonable person would know is likely to harm" students  by "substantially interfering with educational opportunities, benefits, or programs of one [] or more students," "adversely affecting the ability of a student to participate in or benefit from the school district's educational programs or activities by placing the student in reasonable fear or physical harm or by causing substantial emotional distress," "having actual and substantial detrimental effect on a student's physical or mental health," or "causing substantial disruption in, or substantial interference with, the orderly operation of the school."  (*Id.* at 2-3.)  The policy also illustrates what bullying looks like by providing examples.  (*Id.* at 3.)  The Anti-Bullying Policy prohibits conduct that is likely to cause substantial disruption or interfere with the rights of other students; on its face, it does not prevent students from expressing opinions that may be unpopular or offensive. Moreover, the policy targets all bullying by all students, regardless of motivation, and is therefore not discriminatory on the basis of viewpoints.  (*Id.* at 1 ("This policy protects all students from bullying/aggressive behavior regardless of the subject matter or motivation for such impermissible behavior.").)

28

Plaintiffs have not pointed to anything in the record supporting their contention that the School District's policies are facially unconstitutional rendering the argument both legally and factually frivolous. The Court finds that the School District's policies balance the need to protect individual students from bullying with the equally important goal of fostering diversity of opinion in the classroom. As such, the School District is entitled to summary judgment on Plaintiffs' facial challenge. Relatedly, the Court will not enjoin the enforcement of the School District's policies.[11]

ii.     *Chilling Effect*

The School District argues that summary judgment should be granted on Plaintiff D.C.G.'s "factually frivolous claim that his older brother's experiences unconstitutionally chilled his right to free expression." (Sch. Dist.'s Br. in Supp. of Sch. Dist.'s Mot. Summ. J. 4. (citing Compl. ¶¶ 69-71).) In making this argument, the School District suggests that Plaintiff D.C.G. lacks standing to make this claim. (*Id.*)

Standing is a fundamental element of "federal jurisdiction over a 'case' or 'controversy' as set forth in Article III of the United States Constitution." *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 608 (6th Cir. 2008); *see also Raines v. Byrd*, 521 U.S. 811, 818, 117 S. Ct. 2312, 2317 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (quotation omitted)). "By

---

[11] Because Plaintiffs seek injunctive relief only in connection with the School District's "harassment policy[,]" (Compl. 17), the Court's express indication that it will not enjoin the enforcement of the policies forecloses any need to further analyze whether an injunction should issue.

now, it is axiomatic that a litigant demonstrates Article III standing by tracing a concrete and particularized injury to the defendant—whether actual or imminent—and establishing that a favorable judgment would provide redress." *Morrison*, 521 F.3d at 608 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992)).  For purposes of this action, this Court must determine whether Plaintiff D.C.G.'s alleged chill constitutes a cognizable injury-in-fact.

In the First Amendment context, if a plaintiff can "objectively establish an imminent threat that chills protected activity, that chill alone is a cognizable injury-in-fact." *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 834 (6th Cir. 2001).  On the other hand, mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13, 92 S. Ct. 2318, 2325-26 (1972); *Morrison*, 521 F.3d at 608.

Plaintiffs contend that D.C.G.'s statement in his deposition that he joined the lawsuit so "[t]hat other students or me would not be punished for speaking my beliefs in class," (D.C.G. Dep., Sch. Dist.'s Mot. Summ. J. Ex. 13, at 9:24-25), suffices to establish standing, (Pls.' Resp. to Sch. Dist.'s Mot. Summ. J. 16).  Irrespective of D.C.G.'s declared intentions, his sworn deposition testimony objectively demonstrates that he suffered no injury-in-fact.  *See Morrison*, 521 F.3d at 609 n.7 ("Subjective emotions simply do not transform into objective facts—and thus a concrete injury—with the passage of time.")  During his deposition, D.C.G. testified that: (1) he has never made a comment about his religion in class; (2) he has never been told that he could not comment about his religion in class; (3) he is not aware of other students who have been punished

30

for speaking their beliefs in class; (4) he is unaware of any other discussions regarding homosexuality in school either before or after October 20, 2010; (5) there is nothing he wanted to do but did not do in school because of what happened to his brother; and (6) that there is nothing he wanted to say at school but did not say because of what happened to his brother.  (D.C.G. Dep., Sch. Dist.'s Mot. Summ. J. Ex. 13, at 8:22-24, 8:25-9:2, 10:1-3,  11:6-11, 11:12-14, 11:15-17.)  The gist of this testimony is that D.C.G. admittedly did not refrain from saying or doing anything in school as a result of the events transpiring on Anti-Bullying Day.  The implication of this testimony is that D.C.G.'s First Amendment rights were not chilled.  Because Plaintiffs cannot point to anything beyond D.C.G.'s deposition testimony and his allegations of a chilling effect to substantiate an injury-in-fact for standing purposes, any and all claims brought on behalf of D.C.G. are not properly before this Court.

**b.**     ***Municipal Liability for Constitutional Violation***

In a § 1983 suit, "[a] municipal liability claim . . . must be examined by applying a two pronged inquiry: (1) Whether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) Whether the [municipality] is responsible for that violation."  *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996) (second alteration in original).  In this case, the first prong is satisfied.  The remaining issue is whether the School District should be held to account for that violation.

"A plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury."[12]  *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658, 690-91, 98 S. Ct. 2108, 2036 (1978); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 1388 (1997) (citations omitted).  "[T]o prove the existence of a municipality's policy or custom, plaintiffs 'can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final [policy]-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.'"  *Mann v. Helmig*, 289 F. App'x 845, 848-49 (6th Cir. 2008) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).  In this case, Plaintiffs contend that "the Defendants' free speech restriction, training under Dr. Marcia McEvoy, and failure to properly train its employees all caused the Plaintiffs injury." (Pls.' Br. in Supp. of Pls.' Mot. Summ. J. 18.)  These contentions indicate that Plaintiffs seek to impose municipal liability by pursuing the first and third options.

i.      *Did the School District's Policies Cause the Constitutional Injury?*

---

[12] Identifying a "'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04, 117 S. Ct. 1382, 1388 (1997) (citation omitted).  If an act is "performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker" a municipality may fairly be subjected "to liability on the theory that the relevant practice is so widespread as to have the force of law."  *Id.* at 404, 117 S. Ct. at 1388 (citation omitted).

A municipal entity such as the School District "cannot be held liable *solely* because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691, 98 S. Ct. at 2036 (emphasis in original).  Rather, a municipality may be held liable only for those acts which may fairly be said to be its own. *Id.* at 694, 98 S. Ct. at 1037-38; *Brown*, 520 U.S. at 404, 117 S. Ct. at 1388 ("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.").

As discussed earlier in this Opinion and Order, the challenged policies are constitutional and cannot, therefore, be said to have been the impetus for McDowell's actions or the cause of the underlying constitutional violation suffered by Daniel. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (providing that one way *Monell* liability may attach is if the policy is "facially unconstitutional as written or articulated").  Thus, *even if* McDowell believed he acted in accordance with the policies when removing Daniel from class, a teacher's mistaken belief that the School District adopted a policy tolerating unconstitutional restrictions of expression "does not show that the District deliberately adopted such a policy," *Beard v. Whitmore Lake Sch. Dist*, 244 F. App'x 607, 613 (6th Cir. 2007), nor does it show that the policies caused the constitutional injury.

In sum, the challenged polices are entirely lawful and there is simply no basis for holding the School District accountable for Daniel's injury.

ii.      *Did Inadequate Training Cause the Constitutional Injury?*

Plaintiffs alternatively contend that (1) the Anti-Bullying training provided to the School District by Dr. Marcia McEvoy and (2) the lack of training on First Amendment rights caused Daniel's constitutional injury.[13]  (Pls.' Br. in Supp. of Pls.' Mot. Summ. J. 18.)  Dr. McEvoy was hired by the School District to provide anti-bullying training to Howell High School teachers.[14]  (Moran Dep., Pls.' Mot. Summ. J. Ex. 7, at 12:6-8.)  Dr. McEvoy's training emphasized the need to "address the bullying immediately upon seeing it occur[.]"  (Moran Dep., Pls.' Mot. Summ. J. Ex. 7, at 14:22-24.)  Plaintiffs contend the training was problematic because it "never addressed what was appropriate to say under the First Amendment and how teachers were to treat the religious viewpoints of its students."  (Pls.' Br. in Supp. of Pls.' Mot. Summ. J. 11.[15])

A municipality's failure to train or failure to provide adequate training is another method of demonstrating the existence of an unlawful policy or custom supporting municipal liability under § 1983.  *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197 (1989); *Ellis*, 455 F.3d at 700.  "A municipality may be liable under § 1983 for a failure to train its employees or to institute a policy to avoid the alleged harm where

---

[13] Despite the numerous allegations in the Complaint referring to a failure to train or supervise and despite the arguments made in support of their summary judgment motion, Plaintiffs have stated that "Plaintiffs' primary theory of liability is ***not*** failure to train[,]" and that the "failure to train theory . . . does *not* serve as the true basis or Plaintiffs' claim that the School District[]" is liable pursuant to § 1983.  (Pls.' Resp. to Sch. Dist.'s Mot. Summ. J. 17, 19 (emphases in original).)

[14] Presumably, this training was conducted because the Anti-Bullying Policy requires the Superintendent to establish a bullying prevention training program.  (Anti-Bullying Policy, Sch. Dist.'s Resp. to Pls.' Mot. for Summ. J. Ex. 2, at 2.)

[15] Plaintiffs' Brief cites page 44 of McDowell's deposition testimony in support of this assertion.  However, Plaintiffs did not attach page 44 of the deposition transcript.

34

the need to act 'is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'" *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012) (quoting *Harris*, 489 U.S. at 390, 109 S. Ct. at 1205).

To prevail on a failure to train claim, a plaintiff must establish three elements: "(1) the training [] was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis*, 455 F.3d at 700 (citation omitted).  The School District argues that for purposes of summary judgment, the second prong is dispositive. (Sch. Dist.'s Br. in Supp. of Sch. Dist.'s Mot. Summ. J. 13.)  The Court agrees.

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [its] action." *Connick v. Thompson*, --- U.S. ---, 131 S. Ct. 1350, 1361 (2011) (citation omitted).  The risk of a constitutional violation must be "plainly obvious[,]" "[a] showing of simple or even heightened negligence will not suffice." *Brown*, 520 U.S. at 410, 407, 117 S. Ct. at 1391, 1390.  The negligent administration of an otherwise sound policy is also not sufficient to impose municipal liability. *Harris*, 489 U.S. at 390-91, 109 S. Ct. at 1206.

In the Sixth Circuit, "deliberate indifference" may be proven in two related ways: (1) failure to provide adequate training in light of foreseeable consequences that could result from lack of instruction; or (2) failure to act in response to repeated complaints. *Ellis*, 455 F.3d at 700-01 (citing *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)). Because the second avenue is subsumed by the first, the Court addresses them together.

In a case alleging a failure to train, "the plaintiff must show that the need to act should have been 'plainly obvious to the [municipality's] policymakers, who, nevertheless, are deliberately indifferent to the need.'" *Heyerman*, 680 F.3d at 648-49 (alteration in original) (internal quotation marks omitted) (quoting *Harris*, 489 U.S. at 390 n.10, 109 S. Ct. at 1205 n.10). Such cases arise "'in a narrow range of circumstances' where 'a violation of federal rights may be a highly predictable consequence of [the municipality's failure to act].'" *Id.* at 649 (alteration in original) (emphasis removed) (quoting *Brown*, 520 U.S. at 409, 117 S. Ct. at 1391). For example, "where city policymakers know that their police officers will be required to arrest fleeing felons and have armed the officers with firearms in part to accomplish this task, the need to train the officers in the constitutional limitations on the use of deadly force is 'so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights.'" *Heyerman*, 680 F.3d at 649 (quoting *Harris*, 489 U.S. at 390 n.10, 109 S. Ct. at 1205 n.10)).

The record here is devoid of evidence that students at Howell High School, or any other public school in the district, faced disciplinary action for expressing their religious beliefs in a classroom. (Wilson Aff., Sch. Dist.'s Mot. Summ. J. Ex. 11, at ¶ 5.) This is important because the absence of prior complaints "has a bearing on the inherent foreseeability of the issues that might arise in the classroom." *Currie v. Sch. Dist. of the City of Saginaw*, 452 F. Supp. 2d 723, 732-33 (E.D. Mich. 2006), *aff'd* 513 F.3d 570 (6th Cir. 2008). "The point, of course, is that the lack of prior incidents reinforces the conclusion that a reasonable administrator cannot be found to have been deliberately

indifferent to the need to train for unlikely happenings." *Id.* Moreover, the lack of any

such evidence forecloses the possibility of a finding of deliberate indifference on the

basis of "evidence showing that the municipality possessed actual knowledge indicating a

deficiency with the existing policy or training (or lack thereof), such as where there have

been recurring constitutional violations." *Heyerman*, 680 F.3d at 648 (citation omitted).

Although the School District freely admits that no First Amendment training was

provided to teachers prior to the October 20, 2010 incident, the School District did have a

Religious Expression Policy in place and reasonably expected teachers to review and

understand those policies.[16] (Wilson Dep., Pls.' Mot. Summ. J., Ex. 9, at 23:1-19, 24:4-6,

59:10-12); *Beard*, 244 F. App'x at 611 (explaining that risk of unconstitutional search of

students was not foreseeable in part because the school district "provided teachers with

the relevant policies and guidelines and could reasonably expect them to review the

policies"). In declining to impose liability under § 1983, the *Beard* panel indicated that

"a school district is not liable if its employees 'simply choose to disregard [its] handbook

and all common sense.'" *Id.*, 244 F. App'x at 611 (citation omitted). As in *Beard*,

"while the need to have some policy" to prevent unconstitutional suppressions of speech

"might be obvious, the need to have a training program above and beyond the policy"

was not obvious here. *Id.* The Court is cognizant that the risk that unconstitutional

---

[16] Plaintiffs' own experts testified that it is a teacher's responsibility to become familiar with and apply policies pertinent to classroom management. (Jeynes Dep., Sch. Dist.'s Mot. Summ. J. Ex. 1, at 100:22-25; Guensey Dep., Sch. Dist.'s Mot. Summ. J. Ex. 2, at 51:14-17.)

suppression of speech might occur "is distinct from the risk that unconstitutional [actions] might occur despite the existence of the District's policy limiting such [acts]." *Id.*

The Court does not agree with Plaintiffs that the School District's decision to provide First Amendment training after October 20, 2010 serves as evidence that the School District should be held to account for McDowell's actions. Superintendent Wilson testified that First Amendment training was offered after October 20, 2010 because "it seemed somewhat self-evident that we needed to go ahead and review this with our staff and make sure that we set some clear guidelines to ensure that we don't have a repeat." (Wilson Dep., Pls.' Mot. Summ. J., Ex. 9, at 59:13-21.) This statement, however, is consistent with the notion that the need to provide such training was not obvious prior to the events giving rise to this action. *See Beard*, 244 F. App'x at 612. Further bolstering this conclusion is the fact that Plaintiffs have not presented evidence that teachers routinely encountered situations where there was a high risk speech would be suppressed absent training. (Wilson Aff., Sch. Dist.'s Mot. Summ. J. Ex. 11, at ¶ 5.)

Plaintiffs' argument is further eroded by the cautionary reminder expressed in *Beard*, wherein the court stated, "it is important not to conflate [the] *ex post* view of the District's policy from the District's *ex ante* decision not to engage in additional training." *Beard*, 244 F. App'x at 612. Viewed *ex post*, the School District's decision to engage in anti-bullying training without addressing First Amendment free speech rights might have been a poor one in light of what occurred. However, the Court's analysis must be *ex ante*. *Id.* As in *Beard*, the School District has "numerous policies and guidelines and it would be impossible to provide sufficient training to cover every possible contingency; a

38

decision to have training on one issue might inevitably lead to insufficient training on another."  *Id.*  In *Harris*, the Supreme Court "only required districts to focus on 'obvious' risks; it did not require them to account for every possible risk."  *Id.*

In light of the discussion above, the Court does not believe that the circumstances as they existed prior to October 20, 2010 presented a "plainly obvious" need for action to the School District's policymakers or where what happened was a "highly predictable consequence" of the School District's policy or the failure to train teachers on the handling of student speech.

c.      ***Summary of First Amendment Claims against Defendant School District***

After a careful and searching review of the various First Amendment claims asserted against the School District as well as the Plaintiffs' various theories for holding the School District liable, the Court concludes that the School District is entitled to judgment as a matter of law with respect to both Daniel's and D.C.G.'s First Amendment claims.  The School District's policies comport with the school speech standard set forth in *Tinker* and are therefore constitutional.  At most, the School District negligently adopted a policy that posed a risk to the First Amendment rights of its students and negligently failed to provide training on the intersection of anti-bullying policies and the First Amendment.  It cannot be said that the School District acted with "deliberate indifference" to the constitutional rights of its students in adopting the rule or neglecting to provide First Amendment training.  Plaintiffs generalized assertions amount to nothing more than an attempt to hold the School District liable under *respondeat superior*, a move unsupported by clearly-established Supreme Court precedent.  Accordingly, the

Court grants summary judgment in favor of the School District on Plaintiffs' First Amendment claims and dismisses these claims with prejudice.

## B.  EQUAL PROTECTION CLAIMS

The Court now turns to Plaintiffs' Fourteenth Amendment claim, which asserts that Defendants violated Plaintiffs' right to equal protection.  The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  "'The Equal Protection Clause prohibits discrimination by government which [] burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.'"  *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 986 (6th Cir. Ohio 2012) (quoting *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005) (citation omitted)). "The latter is known as the 'class of one' theory."  *Id.* (citing *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009) (citation omitted)).  Importantly, "[t]he threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection claim analysis to be applied is determined by the classification used by the government decision-makers."  *Satawa v. Macomb Cnty. Road Comm'n*, 689 F.3d 506, 528 (6th Cir. 2012) (internal quotation marks omitted).

The parties dispute the level of scrutiny this Court should apply in analyzing the equal protection claim: Plaintiffs argue for strict scrutiny because Defendants burdened a fundamental right while Defendants argue that because this is a class of one claim, the

proper standard is rational basis review.  (*See, e.g.*, Pls.' Resp. to Sch. Dist.'s Mot.
Summ. J. 15; Sch. Dist.'s Br. in Supp. Sch. Dist.'s Mot. Summ. J. 8 (citing *Scarbrough v.
Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006)).)  The Court, however,
finds that it need not address this argument because Plaintiffs have failed to show
disparate treatment.

Plaintiffs contend that the School District's "Free Speech Restriction" violated the
Equal Protection Clause and that summary judgment in their favor is appropriate as a
matter of law.  (Pls.' Br. in Supp. of Pls.' Mot. Summ. J. 16.)  To describe Plaintiffs'
argument as perfunctory is an understatement.  Plaintiffs argue that "'[u]nder the Equal
Protection Clause, not to mention the First Amendment itself, government may not grant
the use of a forum to people whose views it finds acceptable, but deny use to those
wishing to express less favored or more controversial views.'"  (*Id.* (quoting *Police Dep't
of the City of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S. Ct. 2286, 2290 (1972).)
Plaintiffs then indicate that when "disparate treatment invades a 'fundamental right' such
as free speech or religious freedom, the 'strict scrutiny' standard governs[.]"  (*Id.* at 17
(citations omitted).)  Plaintiffs' Brief merely parrots the equal protection standard most
favorable to them without any factual support or legal analysis.  As explained elsewhere
in this Opinion and Order, the School District's Anti-Bullying Policy prohibits all
bullying by all students, regardless of motivation or subject matter, and is therefore not
discriminatory on the basis of viewpoints.  (Anti-Bullying Policy, Sch. Dist.'s Resp. to
Pls.' Mot. Summ. J. Ex. 2, at 1.)  Moreover, given that public schools may regulate
speech as long as the regulations comply with *Tinker*, the School District's policies

41

cannot be said to impermissibly burden speech.  Accordingly, the School District did not violate Daniel's equal protection rights and summary judgment in favor of the School District is therefore proper.

With respect to McDowell, Plaintiffs argue that McDowell permitted speech that supported the homosexual lifestyle but prohibited speech voicing opposition to homosexuality on religious grounds.  At the motion hearing, Plaintiffs' counsel attempted to bolster the disparate treatment showing by explaining that Daniel was treated differently than those students who sat silently in class or those students whose religion does not condemn homosexuality.  This argument misses the mark.  Because public schools may prohibit bullying under *Tinker*, it is not enough to say that permitting speech voicing support of a particular group is the same as restricting speech indicating an opposition to the homosexual lifestyle.  Furthermore, and to the extent Plaintiffs argue that McDowell selectively enforced school policies against Daniel, (Compl. ¶ 80), Plaintiffs allege no facts that would permit a reasonable inference that the policies were not enforced against other persons or groups in similar situations.[17]

The Court concludes that without having identified a similarly-situated comparator or having shown disparate treatment, Plaintiffs' equal protection claims against both Defendants fail as a matter of law.

---

[17] The Court also notes that the School District did not apply or enforce its policies against Daniel.  In fact, the School District took no action against Daniel but did take disciplinary action against McDowell by issuing him a reprimand.

## IV.   CONCLUSION AND ORDER

For all of the reasons stated above in this Opinion and Order, the Court finds that Defendant McDowell's actions with respect to Plaintiff Daniel Glowacki on October 20, 2010 violated Daniel's First Amendment right to freedom of speech but did not violate Daniel's Fourteenth Amendment right to equal protection. The Court further finds that Defendant School District did not violate Daniel's constitutional rights under either the First or Fourteenth Amendment. Lastly, the Court finds that Plaintiff D.C.G. has not demonstrated an injury-in-fact and that as a result, D.C.G. lacks standing with respect to his First Amendment "chill" claim.

In light of the Court's findings above, the Court is granting declaratory relief in favor of and awarding nominal damages in the amount of one dollar ($1.00) to Plaintiff Daniel Glowacki to be paid by Defendant McDowell. To the extent Daniel seeks fees and costs, Daniel should file with the Court and serve upon Defendants a verified statement of any fees and/or costs sought pursuant to 42 U.S.C. § 1988 and in accordance with Federal Rule of Civil Procedure 54(d)(2). Defendants shall have the right to object to any such fees and costs as provided in the applicable statutes and court rules.

Accordingly,

**IT IS ORDERED** that Plaintiff Daniel Glowacki in his own capacity is substituted in to replace his mother Plaintiff Sandra Glowacki as the representative of Daniel Glowacki. The Clerk of the Court is directed to amend the docket accordingly.[18]

---

[18] Plaintiff Sandra Glowacki should, however, remain in the action as the representative of Plaintiff D.C.G.

43

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment, (ECF No. 24), is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiffs' Motion is **GRANTED** with respect to Daniel's free speech claim against Defendant McDowell but **DENIED** as to all other claims.

**IT IS FURTHER ORDERED** that Defendant McDowell's Motion for Summary Judgment, (ECF No. 21), is **GRANTED IN PART** and **DENIED IN PART**. McDowell's Motion is **DENIED** only as to Daniel's free speech claim against him but is **GRANTED** as to all other claims.

**IT IS FURTHER ORDERED** that Defendant School District's Motion for Summary Judgment, (ECF No. 23), is **GRANTED**.

Dated: June 19, 2013

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:

**Erin E. Mersino, Esq.**
**Richard Thompson, Esq.**
**Roy H. Henley, Esq.**
**Suzanne P. Bartos, Esq.**
**Michael J. Steinberg, Esq.**